

FILED

12/15/2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 13 CR 312-11 |
| v. | |
| JAGDISH SHAH | Judge Matthew F. Kennelly |

## PLEA AGREEMENT

1.    This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant JAGDISH SHAH, and his attorney, LEIGH D. ROADMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.    The superseding indictment in this case charges defendant with two counts of soliciting and receiving remuneration in return for the referral of patients for the furnishing of services for which payment may be made by Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) (Counts Fifty-Five and Fifty-Seven).

3.    Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

**Charge to Which Defendant Is Pleading Guilty**

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count Fifty-Five of the superseding indictment, which charges defendant with knowingly and willfully soliciting and receiving remuneration from Sacred Heart Hospital in return for the referral of patients to Sacred Heart for the furnishing and arranging for the furnishing of services for which payment made be made in whole under Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A). In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

**Factual Basis**

6.    Defendant will plead guilty because he is in fact guilty of the charge contained in Count Fifty-Five of the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

On or about July 21, 2010, at Chicago, defendant JAGDISH SHAH knowingly and willfully solicited and received remuneration in the amount of $2,000 from Sacred Heart in the form of a Sacred Heart operating account check, bearing check number 12914, dated July 21, 2010, made payable to SHAH, in return for SHAH referring patients to Sacred Heart for the furnishing and arranging to furnish

2

services for which payment was to be made in whole or in part by Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

Specifically, SHAH was a doctor licensed to practice medicine in Illinois. Beginning no later than in or about 2000, SHAH obtained privileges to treat patients at Sacred Heart Hospital. As a physician with admitting privileges, SHAH referred certain patients to Sacred Heart for treatment and care. From in or about 2000 through 2009, Sacred Heart provided SHAH with clinic space located within the hospital in which SHAH could evaluate and treat patients. Sacred Heart also provided the services of a nurse to assist SHAH in treating patients during the period that SHAH worked in the clinic. SHAH did not pay Sacred Heart for the use of its clinic space or the staff that the hospital assigned to work for him. SHAH offered to pay for these services but was told by Edward Novak, the owner and chief executive officer of Sacred Heart, that: "we don't charge the doctors." For the services that SHAH provided to patients at the Sacred Heart clinic, he billed patients and/or their insurers for those services.

During the same period, SHAH also treated patients at other clinics and hospitals. In particular, SHAH had a contract pursuant to which he treated patients at an outpatient clinic affiliated with Hospital A. SHAH shared Hospital A's clinic space with his colleague, Physician G. In or about 2009, Hospital A, with which SHAH was then also associated, decided to close this outpatient clinic. SHAH needed to find another location at which to treat the patients he had treated at that clinic.

3

SHAH approached Novak about transferring his outside clinic patients to Sacred Heart. In or about the summer of 2009, SHAH approached Novak about these patients, the need for space to see them and the need to transport these patients to a new clinic. SHAH told Novak that these patients were insured by Medicare, Medicaid, and private insurance. SHAH asked whether, if he brought these patients to Sacred Heart, Sacred Heart would provide him with additional time on the schedule to treat patients within the hospital's clinic space, transportation services for these patients, and additional nurse services to assist him in treating the patients. Novak told SHAH to contact Sacred Heart's chief operating officer, Clarence Nagelvoort, concerning his request. SHAH further told Novak that SHAH's colleague, Physician G, had additional patients who would also need to be treated at a new facility. Novak further instructed SHAH to have Physician G call Novak to schedule a meeting.

Shortly thereafter, SHAH met with Nagelvoort at Sacred Heart. During their meeting, SHAH reiterated his request for additional clinic time, transportation, and nursing assistance. SHAH further told Nagelvoort that he had been associated with Sacred Heart for many years and wanted to know how the hospital could show its appreciation for that relationship. Specifically, SHAH asked Nagelvoort what was "in it" for him if he were to bring additional patients to Sacred Heart. Nagelvoort asked SHAH how many patients he had, how those patients were insured, and what the types of medical conditions they exhibited. SHAH had oncology patients who, he told Nagelvoort, could have their testing done at Sacred Heart and be admitted to

4

the hospital for care. Nagelvoort told SHAH that he would talk to Novak and then get back to SHAH.

Approximately two weeks after the meeting, Nagelvoort called SHAH and told SHAH that a contract had been drafted, which SHAH should pick it up from the executive assistant assigned to Nagelvoort and Novak. As instructed, SHAH went to see that executive assistant and obtained the proposed contract. Under the terms of the proposed contract, SHAH was obligated to spend approximately 20 hours a month assisting in the establishment and development of cancer screening and prevention programs at Sacred Heart in return for $2,000 a month. The contract stated that SHAH would be required to submit monthly timesheets describing the services he had performed. The contract further obligated SHAH to produce quarterly reports describing the progress made in establishing the programs.

SHAH met with Nagelvoort approximately two days later and told Nagelvoort that he did not have the time to put in 20 hours a month to do what the contract called for. Nagelvoort told SHAH to sign the contract. Based on their conversations, SHAH understood that the contract was designed to pay him for his promised patient referrals and that SHAH would not be required to perform 20 hours a month of the services called for by the contract for the payments he was to receive under the terms of the contract. SHAH signed the contract, which was countersigned by Nagelvoort. The contract purported to take effect on August 1, 2009.

5

After August 1, 2009, SHAH performed some minimal services to assist in the establishment and development of cancer screening and prevention programs at Sacred Heart, but never performed 20 hours of those services in any month as called for by the contract. Nor did SHAH submit quarterly reports to Sacred Heart describing the progress made.

For each month from August 1, 2009, through March 2012, based on SHAH's conversations with Nagelvoort and with Nagelvoort's and Novak's assistant, SHAH understood that what SHAH needed to do to receive the $2,000 a month payment referenced in the contract was to provide Sacred Heart with monthly timesheets reflecting 20 hours of services. The timesheets SHAH drafted and provided to Sacred Heart often described services not related to the contract and that SHAH had already been performing at Sacred Heart before entering into the contract. No one at Sacred Heart ever asked SHAH to explain or clarify his timesheet entries. Similarly, no one at Sacred Heart ever asked SHAH for the quarterly reports that SHAH was purportedly required to provide under the terms of the contract.

SHAH did not perform 20 hours of services purportedly required by the contract because as SHAH understood, he was not actually required to perform those services. Rather, SHAH received the payments under the contract in return for his on-going referral of patients to Sacred Heart. SHAH continued to receive approximately $2,000 a month in concealed kickbacks from Sacred Heart from in or about August 2009 through March 2012, all of which was purportedly paid under the terms of the contract. SHAH continued to refer patients to Sacred Heart for care

during this period. In total, Sacred Heart paid SHAH $56,000 in exchange for the referral of patients, including patients for which Sacred Heart billed services to Medicare. Among those payments was check number 12914, dated July 21, 2010 for $2,000.

SHAH acknowledges that between August 2009 and March 2012, Sacred Heart received at least approximately $473,304 in reimbursement from Medicare for Part A hospital services provided to patients SHAH referred to Sacred Heart. SHAH also acknowledged that Sacred Heart realized a net profit from those services of at least $59,944. SHAH also acknowledges that between August 2009 and March 2012, Sacred Heart received at least approximately $213,666 in reimbursements from Medicaid for Part A hospital services provided to patients SHAH referred to Sacred Heart. SHAH also acknowledges that Sacred Heart realized a net profit from those services of at least approximately $23,701.

7.     The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

7

a.      A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

### Sentencing Guidelines Calculations

9.      Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2014 Guidelines Manual.

b.      **Offense Level Calculations**.

i.      The base offense level is 8, pursuant to Guideline § 2B4.1(a).

8

ii.    The offense level is increased by 8 levels pursuant to Guideline § 2B4.1(b)(1)(B) and Guideline § 2B1.1(b)(1)(E) because the value of the improper benefit was more than $70,000, but not more than $120,000.

iii.    The offense level is increased by 2 levels pursuant to Guideline § 3B1.3 because defendant abused a position of public trust in a manner that significantly facilitated the commission and concealment of the offense.

iv.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

v.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d. **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 15, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 18 to 24 months' imprisonment, in addition to any supervised release and fine the Court may impose.

e. Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

11.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Cooperation

12.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

13.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to

11

Guideline § 5Kl.l, to depart downward from the low end of the applicable guideline range. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court. The government will make no recommendation regarding the sentence to be imposed.

14. If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

15. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

16. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.     Defendant agrees that the United States may enforce collection of any fine imposed in this case pursuant to Title 18, United States Code, Sections 3572 and 3613, notwithstanding any payment schedule set by the Court.

18.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining count of the superseding indictment as to defendant.

<strong>Forfeiture</strong>

19.     The superseding indictment charges that defendant is liable to the United States for any and all right, title, and interest he may have in any money or property involved in the charged offense, and any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(7). Defendant acknowledges that he has subjected $56,000 to forfeiture. The funds are subject to forfeiture because, defendant acknowledges, the funds were involved in the defendant's violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A). By entry of a guilty plea to Count Fifty-Five of the superseding indictment, defendant acknowledges that the property identified above is subject to forfeiture.

20.     Defendant agrees to the entry of a forfeiture judgment in the amount of $56,000, in that these funds are subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds so that these funds may be disposed of according to law.

13

21.     Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

22.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 13 CR 312-11.

23.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

24.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

14

i.  The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.  If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.

15

Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

        viii.    With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

        b.    **Waiver of appellate rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in

which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of forfeiture, in exchange for the concessions made by the United States in this Agreement. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

25.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

26.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

27.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to

and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

28.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

29.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing

financial statements and supporting records as requested by the United States Attorney's Office.

30.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

31.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

32.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph,

notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

33.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

34.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 12 / 15 / 2014

ZACHARY T. FARDON
United States Attorney

JAGDISH SHAH
Defendant

JOEL M. HAMMERMAN
RYAN S. HEDGES
DIANE MACARTHUR
KELLY M. GREENING
Assistant U.S. Attorneys

LEIGH D. ROADMAN
Attorney for Defendant

20