UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

DEC 2 3 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 13 CR 312-8 |
| ANTHONY J. PUORRO | Judge Matthew F. Kennelly |

## PLEA AGREEMENT

1.      This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant ANTHONY J. PUORRO, and his attorney, SUSAN SHATZ, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

## Charge in This Case

2.      The superseding indictment in this case charges defendant with conspiracy to commit an offense against the United States, namely, conspiracy to solicit and receive and to offer and pay kickbacks, in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A), all in violation of Title 18, United States Code, Section 371 (Count One).

3.      Defendant has read the charge against him contained in the superseding indictment, and that charge has been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crime with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the superseding indictment, which charges defendant with conspiring to solicit and receive and to offer and pay remuneration in return for the referral of patients for the furnishing of services for which payment may be made by Medicare or Medicaid, in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A), all in violation of Title 18, United States Code, Section 371.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3:

### Background

West Side Community Hospital, Inc., doing business as Sacred Heart Hospital, was a licensed acute-care hospital located at 3240 West Franklin Boulevard, Chicago, Illinois. A significant percentage of Sacred Heart's patients were elderly and drawn from nursing homes. Sacred Heart permitted non-employee

physicians and podiatrists to apply for and receive privileges to treat patients at Sacred Heart.

Defendant ANTHONY J. PUORRO was chief operating officer at Sacred Heart for a period of time. PUORRO's employment at Sacred Heart officially began on or about May 30, 2011. As Chief Operating Officer, PUORRO's responsibilities included, among other things, overseeing the hospital's general operations, and recruiting physicians.

PUORRO worked at Sacred Heart until April 2013. In January 2013, PUORRO agreed to cooperate with the government in an investigation of Sacred Heart. PUORRO continued to work as Sacred Heart's Chief Operating Officer between January 2013 and April 2013 while cooperating in the investigation.

Defendant Edward J. Novak was Sacred Heart's owner and Chief Executive Officer. Novak hired PUORRO. Defendant Clarence Nagelvoort was the Chief Operating Officer at Sacred Heart before PUORRO. When PUORRO began at Sacred Heart on or about May 30, 2011, defendant Roy M. Payawal was Sacred Heart's Chief Financial Officer. Defendant Noemi Velgara was Sacred Heart's Vice President of Geriatric Services. Defendants Venkateswara R. Kuchipudi, Percy Conrad May, Subir Maitra, Rajiv Kandala, and Jagdish Shah were medical doctors who had privileges to treat patients at Sacred Heart. Defendant Shanin Moshiri was a podiatrist who had privileges to treat patients at Sacred Heart. Administrator A was a respiratory care practitioner whose employer had a contract

3

with Sacred Heart for Administrator A to provide services at Sacred Heart.
Administrator B was Sacred Heart's Director of Nursing.

### Kickbacks for Patient Referrals

PUORRO became aware after he began to work at Sacred Heart, but before
his cooperation in the investigation, that Sacred Heart had certain purported
contractual agreements in place with Maitra, Moshiri, Shah, May, and Kuchipudi.
These purported contractual agreements are described as follows:

**Subir Maitra.** Maitra's contract purported to require that Maitra serve as a
member of the teaching and consulting faculty of Sacred Heart's Medical Student
Program and for Maitra to permit students to observe his medical practice and
surgical procedures. Maitra received $2,000 per month from Sacred Heart
purportedly as payments under the contract.

**Shanin Moshiri.** Moshiri's contract purported to require that Moshiri serve
as a part-time faculty member in Sacred Heart's podiatric surgery residency
program teaching medical residents, with the title "Director of External Podiatric
Office Rotations." Moshiri received $2,000 per month from Sacred Heart
purportedly as payments under the contract.

**Jagdish Shah.** Shah's contract purported to require that Shah establish and
develop cancer screening and prevention programs at Sacred Heart. Shah received
$2,000 per month from Sacred Heart purportedly as payments under the contract.

**Percy Conrad May, Jr.** Sacred Heart entered into a purported lease
agreement with the May Medical Center, a clinic owned and operated by May, and
Sacred Heart then paid May Medical Center $2,000 per month purportedly under
the lease.

**Venkateswara R. Kuchipudi.** Sacred Heart's Employee A, a physician
assistant, provided services to Kuchipudi's patients both inside and outside Sacred
Heart, including at nursing homes where the patients resided and at Kuchipudi's
clinic, the Brookpark Medical Center. Sacred Heart had earlier assigned Employees
B and C, nurse practitioners, to provide services to Kuchipudi's patients at Sacred
Heart. Sacred Heart paid Employees A, B, and C for the services they provided to

4

Kuchipudi, while Kuchipudi billed for their services. Sacred Heart also paid Physician C to treat Kuchipudi's patients at night and on weekends.

In October 2011, after PUORRO had worked as Sacred Heart's Chief Operating Officer for approximately six months, Sacred Heart and Physician H entered into an alleged contract described as follows:

**Physician H.** Physician H's contract purported to require that Physician H provide teaching or education to Sacred Heart patients and staff on orthopedic issues. Physician H received $175 per hour up to 22 hours per month (or up to $3,850 total per month) from Sacred Heart purportedly as payments under the contract.

In April 2012, after PUORRO had worked as Sacred Heart's Chief Operating Officer for approximately one year, Sacred Heart and Kandala entered into an alleged contract described as follows:

**Rajiv Kandala.** Kandala's contract purported to require that Kandala provide education to Sacred Heart patients and staff on issues concerning palliative care and the treatment of terminally ill patients. Kandala received $175 per hour up to 23 hours per month (or up to $4,025 total per month) from Sacred Heart purportedly as payments under the contract.

PUORRO learned while working at Sacred Heart, and before his cooperation in the investigation, that the payments made to Maitra, Moshiri, Shah, May, Kandala, and Physician H, and the services provided to Kuchipudi, were bribes and kickbacks to these doctors under the guise of contracts, lease agreements, and employee services, in exchange for the referral of patients by these doctors to Sacred Heart. PUORRO gained knowledge about the bribe and kickback nature of the payments and services over time but prior to his cooperation in the investigation.

5

Throughout his employment at Sacred Heart, PUORRO tracked patient referrals with information provided by Payawal. PUORRO created a report identifying the number of patients each doctor referred to Sacred Heart and gave the report to Novak. PUORRO discussed the number of patient referrals with Novak. PUORRO understood these actions were taken to ensure that Sacred Heart received patients from the doctors to whom it paid kickbacks.

PUORRO, while working as Chief Operating Officer and at Novak's direction, tried to increase the Sacred Heart patient census and the Medicare and Medicaid billings that flowed therefrom by recruiting doctors willing to refer their patients to Sacred Heart. PUORRO knew that it was illegal to pay a doctor for the referral of patients but, even after PUORRO realized the bribe and kickback nature of the payments and services, PUORRO nevertheless offered financial benefits to doctors whom he tried to recruit as incentives for those doctors to refer patients to Sacred Heart. The type of financial incentives PUORRO offered in recruiting presentations included: (1) the payment of alleged rent by Sacred Heart to the doctor; (2) providing the doctor rent-free space in which to treat patients; (3) providing labor of medical professionals, such as physician assistants, to work for the doctor by providing care to the doctor's patients; (4) providing the doctor compensation for services allegedly provided to Sacred Heart, like serving as a director or on Sacred Heart committees; (5) paying the doctor allegedly to provide educational or training services; and (6) paying the doctor's malpractice insurance. For example on or about

January 5, 2012, PUORRO, along with Velgara, told Physician B that if Physician B referred patients to Sacred Heart, Novak, Velgara and PUORRO would cause Sacred Heart to pay money to Physician B disguised as employment compensation.

Throughout PUORRO's employment at Sacred Heart, Novak required PUORRO to advise him (Novak) of Sacred Heart's daily patient census. Novak instructed PUORRO to take action to increase the patient census. Novak also monitored and discussed with PUORRO expenses incurred by Sacred Heart employees for which the employees sought reimbursement. Novak monitored the number of patients particular doctors referred to Sacred Heart, including May, Moshiri, and Maitra, and instructed PUORRO to advise those doctors if, in Novak's view, the number of patient referrals was too low.

PUORRO, at Novak's direction, monitored whether Maitra, Shah, Kandala, and Physician H presented time sheets and/or other records to reflect the services they allegedly provided under their purported contracts. PUORRO understood that, to the extent that these doctors submitted such records, the records were not accurate and at times contained wholly fictionalized accounts of services the doctors claimed to have performed. PUORRO understood that, under the bribe and kickback arrangement, Maitra, Moshiri, Shah, Kandala, and Physician H did not perform services as required pursuant to their contracts, and that Sacred Heart did not utilize May's clinic, to an extent that justified the amount Sacred Heart paid them.

7

PUORRO informed Novak that the doctors were not performing the work set forth in the contracts and that their files lacked time sheets and records purporting to reflect services provided. Novak directed that PUORRO cause Maitra, May, and Moshiri to come to Sacred Heart to pick up their checks from PUORRO himself, including at least once in 2012 and again in February 2013. Novak told PUORRO that these face-to-face meetings would cultivate loyalty with the doctors. Payawal opined to PUORRO, during a conversation held on February 22, 2013, that the reason for requiring doctors to pick up checks in person was to allow PUORRO to ask them about the number of their patient referrals.

PUORRO agreed with Novak, Payawal and Velgara to increase patient referrals to Sacred Heart by offering doctors and prospective patients the following additional services in return for patient referrals by the doctors: (1) having Sacred Heart pay for the transportation of patients to the physicians and podiatrists who treated them; and (2) providing free clinic space to doctors. PUORRO agreed with Novak, Payawal, and Velgara to increase patient referrals to Sacred Heart by paying a marketing staff to recruit patients to Sacred Heart and its clinics and arranging for that marketing staff to provide benefits to others, including directors of senior centers and nursing homes to gain access to residents as prospective patients.

PUORRO knew that, as part of the bribe and kickback arrangement, Sacred Heart made arrangements with physicians and ambulance companies to ensure

that Sacred Heart, and no other medical facility, would receive these patient referrals. Under this arrangement, referring doctors instructed the ambulance transport companies, using coded language, that the patient was a "direct admit" to "Room 200A" to make it appear as if arrangements for the patients' transportation had been made in advance for the patient to be admitted to Sacred Heart and not another hospital. The use of this coded designation authorized ambulance drivers to pass closer and/or possibly more suitable medical facilities in order to get the patients to Sacred Heart. The patients transported to Sacred Heart through the use of this coded designation thus endured longer transportation than necessary in order to receive care. PUORRO knew that patients were transported to Sacred Heart, often over distances of many miles, irrespective of any need for emergency medical treatment.

On or about October 29, 2012, Sacred Heart's Credentialing Committee granted temporary privileges to Dr. Kenneth Nave to treat patients at Sacred Heart for 120 days. The Committee later extended this period. As a result, as PUORRO knew, Nave was allowed to and did treat patients at Sacred Heart. Nave did not have a DEA license to allow him to prescribe controlled substances. Nave was supposed to have his controlled substance orders for patients signed by another physician. As PUORRO knew, and discussed with Novak, Nave wrote prescriptions for controlled substances at Sacred Heart by using the name of another physician who was appropriately licensed to issue such prescriptions.

At some point after the Credentialing Committee meeting, Novak told PUORRO to find office space for Nave. PUORRO understood that Novak wanted PUORRO to cut a deal with Nave because Nave would refer patients to Sacred Heart. PUORRO tried unsuccessfully to find office space for Nave.

### The Charged Conspiracy

While PUORRO worked at Sacred Heart, but before he began to cooperate with the government, PUORRO conspired with defendants Novak, Payawal, Velgara, and Kuchipudi, as well as Administrators A and B, to offer and to pay money from Sacred Heart to Kuchipudi, May, Maitra, Moshiri, Kandala, Shah and others to induce them to refer patients to Sacred Heart for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under Medicare and Medicaid.

PUORRO agreed with Novak, Payawal, Velgara, and Administrators A and B that Sacred Heart would offer to pay bribes and kickbacks to Kuchipudi, May, Maitra, Moshiri, Kandala, Shah and others in return for those medical professionals referring patients, including those insured by Medicare and Medicaid to Sacred Heart. PUORRO caused Sacred Heart to pay bribes and kickbacks to Kuchipudi, May, Maitra, Moshiri, Kandala, Shah, and others to induce their patient referrals to Sacred Heart. PUORRO agreed with Novak, Payawal, Velgara, and Administrators A and B to conceal the bribes and kickbacks paid to these medical professionals by making them appear to be legitimate payments for (a) employee and personal

services compensation; (b) rent payments; (c) teaching stipends; and (d) consulting payments.

### Specific Bribe and Kickback Payments

*Venkateswara R. Kuchipudi (Bribes and Kickbacks Disguised as Employee Compensation)*

PUORRO, along with Novak and Payawal and Administrators A and B, caused Sacred Heart to make bribe and kickback payments to Kuchipudi that were disguised as employee compensation in return for the referral of patients by Kuchipudi to Sacred Heart.

*Employees A, B and C*

PUORRO learned after he began to work at Sacred Heart, and before he began to cooperate in the investigation, that Employee A reported to Kuchipudi and performed services for Kuchipudi at various locations, including nursing homes, the Brookpark Medical Center, and Sacred Heart. PUORRO, once he learned of this arrangement, along with Novak and Payawal and Administrators A and B, caused Employee A to continue to perform services for Kuchipudi in this manner. PUORRO knew that Sacred Heart paid the majority of Employee A's compensation for Employee A's work treating Kuchipudi's patients and that Kuchipudi, not Sacred Heart, billed insurers for Employee A's services.

PUORRO, along with Novak and Payawal and Administrators A and B, caused Sacred Heart to reimburse Employee A for travel expenses that Employee A incurred when traveling to treat Kuchipudi's patients in nursing homes and at the

Brookpark Medical Center. PUORRO knew that Employee A had received these reimbursements for travel expenses before PUORRO began at Sacred Heart. PUORRO knew that Sacred Heart's reimbursement of Employee A's travel expenses was a benefit to Kuchipudi because Employee A incurred the expenses while performing work for Kuchipudi outside of Sacred Heart, which expenses Kuchipudi thereby did not have to pay himself. PUORRO acknowledges that, between June 2011 and March 2013, Sacred Heart, through himself, Novak or Payawal, paid Employee A a net total of at least approximately $131,000 for work Employee A performed for Kuchipudi and for travel to see his patients. This $131,000 figure is comprised of approximately $10,000 in reimbursed travel expenses and approximately $121,000 in Sacred Heart payroll. This $131,000 figure includes the following specific payments from Sacred Heart: (a) $1,966.88 on February 17, 2012 for wages; (b) $1,955.47 on February 1, 2013 for wages; (c) $192.78 on June 2, 2011 for mileage; and (d) $184.32 on March 13, 2013 for mileage.

PUORRO learned while working at Sacred Heart, and before he began to cooperate in the investigation, that Employee B had a similar arrangement concerning Kuchipudi. PUORRO, along with Novak, Payawal and Administrator B, caused Employee B to report to Kuchipudi and to perform services for Kuchipudi at Sacred Heart, despite the fact that, as PUORRO knew, Sacred Heart paid Employee B's salary and benefits. PUORRO, along with Novak and Payawal, caused Sacred Heart to pay Employee B for these services to Kuchipudi a net total of at least

12

approximately $72,000, which includes the following specific payments from Sacred Heart: (a) $1,552.01 on August 17, 2012 for wages; and (b) $1,513.53 on January 18, 2013 for wages.

PUORRO learned while working at Sacred Heart, and before his cooperation in the investigation, that, during an earlier period of time that began before PUORRO worked at Sacred Heart and continuing until approximately June 2011, Novak and Payawal and Administrators A and B directed Employee C to report to Kuchipudi and perform services for him at various locations, including nursing homes, despite the fact that Sacred Heart paid Employee C's salary.

PUORRO understood that the arrangements with Employees A, B, and C were a benefit to Kuchipudi because Sacred Heart paid for the majority of the work Employees A, B and C performed for Kuchipudi, and Kuchipudi himself billed Medicare and other insurers for the services they provided. PUORRO acknowledges that he, along with Novak and Payawal, caused Employees A and B to receive from Sacred Heart the following approximate gross annualized salaries, pro-rated over bi-weekly pay periods, for the work they performed for Kuchipudi: (a) Employee A $75,000; and (b) Employee B $53,500. PUORRO understood that Sacred Heart made these payments to Employees A and B in exchange for Kuchipudi's past and future referrals of patients to Sacred Heart.

*Physician C*

PUORRO, along with Novak, Payawal and Administrator B, agreed to cause Sacred Heart to pay Physician C to treat Kuchipudi's patients on weekends and other occasions when Kuchipudi could not or would not come to Sacred Heart to treat the patients. PUORRO understood that Sacred Heart's payments to Physician C were a benefit to Kuchipudi because Sacred Heart paid for the work that Physician C performed and because Kuchipudi himself billed Medicare and other insurers for the services Physician C provided. PUORRO, along with Novak and Payawal, caused Sacred Heart to pay Physician C a total of approximately $18,466 for these services. Novak caused Sacred Heart to enter into a physician independent contractor agreement with Physician C as a justification to pay Physician C for the work he had already done and would do for Kuchipudi. The amounts of payments PUORRO, along with Novak, Payawal, and Administrator B, caused Physician C to receive from Sacred Heart for work Physician C performed for Kuchipudi during the period of time PUORRO worked at Sacred Heart are as follows: (a) $1,686 on November 5, 2012; and (b) $16,730 on April 15, 2013.

### *Patient Admissions Through and Observation in Sacred Heart's Emergency Room*

PUORRO, along with Novak, Payawal, and Kuchipudi, implemented procedures designed to ensure that Kuchipudi's patients were transported from nursing homes and facilities directly to Sacred Heart, irrespective of the patients' proximity to Sacred Heart and medical necessity, in order to increase patient

referrals to and the Medicare/Medicaid billings by Sacred Heart. Kuchipudi sent patients by ambulance from nursing homes directly to Sacred Heart's ER. Sacred Heart's ER was not equipped or staffed to handle some of the purportedly life-threatening medical conditions used to justify the patients' transportation.

In February 2012, for example, PUORRO participated in a meeting at Sacred Heart with Kuchipudi, Administrator B, and Physician D to discuss the admission of Kuchipudi's patients through the ER. PUORRO and Kuchipudi directed Physician D to direct Sacred Heart ER Physician F to accept patients sent by Kuchipudi to the ER for admission regardless of the medical need for an admission or, at a minimum, to place the patient under "23 hour observation" until Kuchipudi could see the patient the next morning. PUORRO knew that both Sacred Heart and Kuchipudi wanted Kuchipudi's patients treated in this way to ensure that both Sacred Heart and Kuchipudi could bill Medicare for the patient's admission and treatment.

### Percy Conrad May, Jr. (Bribes and Kickbacks Disguised as Rent Payments)

PUORRO, along with Novak and Payawal, caused Sacred Heart to pay bribes and kickbacks to May that were disguised as "rent" payments to May and the May Medical Center in return for May's referral of patients to Sacred Heart. PUORRO learned after he began to work at Sacred Heart, and before he began to cooperate in the investigation, that Novak created the arrangement and signed the lease to have Sacred Heart lease space at May Medical Center. The lease caused Sacred Heart to

15

make regular payments of $5,000 per month to the May Medical Center for Sacred Heart's purported use of the May Medical Center space. PUORRO also learned that, later, Nagelvoort, his predecessor as Sacred Heart's Chief Operating Officer, reduced Sacred Heart's rent payment to $2,000 per month. PUORRO became aware while working at Sacred Heart, and before he began to cooperate in the investigation, that these payments were not legitimate business expenses of Sacred Heart and were instead disguised bribes and kickbacks to May for May's referral of patients to Sacred Heart. PUORRO acknowledges that, during the lifetime of the agreement, between in or about March 2004 and in or about April 2013, he and others, including Novak, Nagelvoort and Payawal, caused Sacred Heart to pay May approximately $197,000 in bribes and kickbacks disguised as rent payments. At least one of Sacred Heart's payments occurred during the period when PUORRO was cooperating in the investigation.

### Shanin Moshiri and Subir Maitra (Bribes and Kickbacks Designed as Teaching Stipends)

#### Shanin Moshiri

PUORRO learned while working at Sacred Heart, and before he began to cooperate in the investigation, that, on or about November 1, 2006, Novak signed on behalf of Sacred Heart an alleged physician independent contractor agreement with Moshiri, and that, on or about September 1, 2008, Nagelvoort signed on behalf of Sacred Heart a physician independent contractor agreement with Moshiri. PUORRO became aware after he began to work at Sacred Heart, and before he

began to cooperate in the investigation, that the regular payments Moshiri received from Sacred Heart constituted disguised bribes and kickbacks for Moshiri's past and future referral of patients. PUORRO acknowledges that, between November 2006 and April 2013, Sacred Heart paid Moshiri more than $150,000 containing bribes and kickbacks disguised as payments for Moshiri's service as an administrator and instructor for the podiatric residency program. Some of Sacred Heart's payments, that is, those made between January 2013 and April 2013, occurred during the period when PUORRO was cooperating in the investigation.

*Subir Maitra*

PUORRO learned that, in or about May 2010, Novak and Nagelvoort had negotiated an agreement with Maitra and that, on or about June 1, 2010, Novak signed on behalf of Sacred Heart an alleged teaching agreement with Maitra. Sacred Heart paid Maitra $2,000 per month purportedly to teach medical students at Sacred Heart while PUORRO worked at Sacred Heart. But, as PUORRO learned after he began to work at Sacred Heart, and before he began to cooperate in the investigation, Maitra was not a formal participant in the medical student programs operated by organizations at Sacred Heart. PUORRO acknowledges that, between in or about May 2010 and April 2013, Sacred Heart paid Maitra at least $68,000 under the contract. PUORRO knew that the payments to Maitra contained bribes and kickbacks disguised as payments for Maitra's teaching services. PUORRO acknowledges that, during the period between June 2010 and March 2013, Maitra

17

received approximately 34 checks from Sacred Heart, each in the amount of $2,000, totaling approximately $68,000. Some of Sacred Heart's payments, that is, those made between January 2013 and April 2013, occurred during the period when PUORRO was cooperating in the investigation.

### Jagdish Shah, Rajiv Kandala and Physician H (Bribes and Kickbacks Disguised as Consulting Payments)

#### Jagdish Shah

PUORRO learned that, on or about August 1, 2009, Nagelvoort had signed on behalf of Sacred Heart an independent contractor agreement with Shah and that Sacred Heart thereafter paid Shah $2,000 per month purportedly to establish and develop a cancer screening and prevention program at Sacred Heart. PUORRO learned after he began to work at Sacred Heart, and before he began to cooperate in the investigation, that the payments to Shah contained what were in fact disguised bribes and kickbacks to Shah in return for Shah's referral of patients to Sacred Heart. PUORRO knew that Shah presented false time sheets to Sacred Heart but that Shah nonetheless continued to receive payments from Sacred Heart. PUORRO acknowledges that, during the period between January 2010 and March 2012, Shah received checks from Sacred Heart, each in the amount of $2,000, totaling approximately $56,000.

#### Rajiv Kandala

In approximately April 2012, during a dinner meeting, Novak told Kandala that he wanted Kandala to come to Sacred Heart because Kandala could refer a lot

of patients to the hospital. Later, during a meeting with Novak, PUORRO told Novak that Kandala wanted to come to Sacred Heart and was looking for a way to be compensated for his patient referrals. Novak told PUORRO that Sacred Heart should enter into a contractual agreement with Kandala that would justify payments provided to Kandala for his patient referrals. PUORRO, at Novak's direction, arranged for Sacred Heart to enter into an alleged contractual agreement pursuant to which Kandala would establish an educational program for palliative hospice at Sacred Heart that Kandala would allegedly oversee.

In particular, in approximately April 2012, PUORRO and Novak caused Sacred Heart to enter into an agreement with Kandala whereby Sacred Heart, through Payawal, paid Kandala $175 per hour, up to 23 hours per month, purportedly to educate Sacred Heart patients and staff in the area of palliative care and treatment of the elderly, frail elderly, disabled, and other patients, and case management of patients at Sacred Heart. PUORRO signed Kandala's physician services agreement on behalf of Sacred Heart on or about April 1, 2012. Kandala presented fraudulent time sheets to Sacred Heart that falsely represented that Kandala was performing services under the contract with Sacred Heart, but PUORRO nonetheless continued to authorize payments to Kandala from Sacred Heart. PUORRO acknowledges that, from in or about April 2012 through February 2013, Sacred Heart paid Kandala at least approximately $40,000 under the contract. PUORRO knew that the payments to Kandala contained bribes and

19

kickbacks disguised as payments for Kandala's teaching services. One of Sacred Heart's payments made between January 2013 and April 2013 occurred during the period when PUORRO was cooperating in the investigation.

In addition to these kickback payments to Kandala, PUORRO and Novak caused Sacred Heart to provide the services of a physician "hospitalist" to treat Kandala's patients at Sacred Heart. The "hospitalist" was Physician F, an emergency room physician employed by Sacred Heart who treated the patients that Kandala referred to Sacred Heart. PUORRO knew and discussed with Novak that Kandala billed Medicare and Medicaid for the services that Physician F provided for Kandala's patients at Sacred Heart. PUORRO and Physician F discussed and agreed that Sacred Heart would pay Physician F some or all of the fair market value for Physician F's services treating Kandala's patients. However, neither Kandala nor Sacred Heart made any such payment to Physician F before April 2013. Physician F stopped treating Kandala's patients at Sacred Heart in or about January 2013. PUORRO acknowledges that Kandala received reimbursements of approximately $37,730 from Medicare and approximately $4,394 from Medicaid for services that Physician F performed for Kandala's patients at Sacred Heart.

*Physician H*

PUORRO agreed with Novak to cause Sacred Heart to pay Physician H purportedly for alleged orthopedic teaching or education services, even though, as PUORRO knew, Physician H did not perform services for Sacred Heart that

justified these payments. The payments to Physician H were in fact disguised bribes and kickbacks paid to Physician H in return for Physician H's referral of patients to Sacred Heart. PUORRO knew about but did not disclose this kickback arrangement with Physician H when he began to cooperate in the government's investigation. PUORRO did not disclose the kickback arrangement until he was confronted by the government about it.

Physician H and PUORRO, on behalf of Sacred Heart, signed a purported contract in or about September 2011 which required Physician H to develop and to provide an alleged Orthopedic Teaching Program at Sacred Heart. PUORRO thereafter authorized purported payments to Physician H under the purported contract prior to PUORRO's cooperation in the investigation, even though, as PUORRO knew, Physician H had not performed services under the purported contract justifying these payments. Physician H received from Sacred Heart a total of approximately $57,400 under the purported contract. PUORRO knew that the payments were bribes and kickbacks disguised as payments for Physician H's referral of patients to Sacred Heart.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

8. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

9. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

22

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2014 Guidelines Manual.

b.    **Offense Level Calculations.**

i. The base offense level is 8, pursuant to Guideline §§ 2X1.1(a) and 2B4.1(a).

ii. The offense level is increased by 14 levels pursuant to Guideline §§ 2B1.4(b)(1)(B) and 2B1.1(b)(1)(H) because the value of the improper benefit from the offense of conviction and relevant conduct was more than $400,000 but not more than $1,000,000.

iii. The base offense level is increased an additional four levels pursuant to Guideline §§ 3A1.1(b)(1) and 3A1.1(b)(2) because the defendant knew or should have known victims of the offense were vulnerable victims and because the offense involved a large number of vulnerable victims.

iv. The base offense level is increased an additional three levels pursuant to Guideline § 3B1.1(b) because the defendant was a manager or supervisor and the criminal activity involved five or more participants and was otherwise extensive.

v. The base offense level is increased an additional two levels pursuant to Guideline § 3B1.3 because defendant abused a position of trust in a manner that significantly facilitated the commission and concealment of the offense.

vi. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vii. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts

now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I. In or about June 2003, defendant pled no contest to a disorderly conduct minor misdemeanor charge in Ohio and received a $50 fine. Defendant receives no criminal history points for this conviction pursuant to Guideline §§ 4A1.2(c)(1) and 4A1.2(e).

      d.    **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 28, which, when combined with the anticipated criminal history category of I, and pursuant to Guideline § 5G1.1(a), results in an anticipated advisory Guidelines sentence of 60 months' imprisonment, in addition to any supervised release and fine the Court may impose.

      e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and

defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.       Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections

### Cooperation

11.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and shall recommend a sentence of 60 months' imprisonment in the custody of the Bureau of Prisons. Defendant shall be free to recommend any sentence.

13.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

14.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

15.    Defendant agrees that the United States may enforce collection of any fine imposed in this case pursuant to Title 18, United States Code, Sections 3572 and 3613, notwithstanding any payment schedule set by the Court.

16.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the original indictment as to defendant.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

17.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 13 CR 312-8.

18.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

19.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge

28

sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.     **Waiver of appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, and based on the concessions made by the government, including charging defendant in a single count with a statutory maximum sentence of five years and agreeing not to pursue the filing of additional charges should defendant continue to provide full and truthful cooperation, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Agreement. The waiver in this paragraph does not apply to a

claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

20.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

21.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

22.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands

that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

23. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

24. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

25. Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

26. If defendant continues to fully and truthfully cooperate with the government, the United States agrees not to seek additional criminal charges in the Northern District of Illinois against defendant for the events between May 2011 and April 2013 which occurred in the Northern District of Illinois and which: (a) occurred while defendant's was part of the charged conspiracy; and (b) defendant described in his proffer statements provided to the United States. However, nothing in this Agreement limits the United States in prosecution of defendant in other districts or for crimes not disclosed in his proffer statements, except as expressly set forth in this Agreement.

### Conclusion

27. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

28. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this

33

Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29.   Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

30.   Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

34

31.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _December 23, 2014_

_Zachary T. Fardon by DBP_
ZACHARY T. FARDON
United States Attorney

_Diane MacArthur_
JOEL M. HAMMERMAN
RYAN S. HEDGES
KELLY GREENING
DIANE MacARTHUR
Assistant United States Attorneys

_Anthony Puorro_
ANTHONY J. PUORRO
Defendant

_Susan Shatz_
SUSAN SHATZ
Attorney for Defendant

35