

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

DEC 2 3 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 13 CR 312-9 |
| v. | |
| NOEMI VELGARA | Judge Matthew F. Kennelly |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant NOEMI VELGARA, and her attorneys, EDWARD M. GENSON and VADIM A. GLOZMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charge in This Case

2.     The superseding indictment in this case charges defendant with conspiracy to commit an offense against the United States, namely, conspiracy to solicit and receive and to offer and pay kickbacks in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A), all in violation of Title 18, United States Code, Section 371 (Count One).

3.     Defendant has read the charge against her contained in the superseding indictment, and that charge has been fully explained to her by her attorneys.

4.      Defendant fully understands the nature and elements of the crime with which she has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.      By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the superseding indictment, which charges defendant with conspiring to solicit and receive remuneration, and to offer and pay remuneration, in return for the referral of patients for the furnishing of services for which payment may be made by Medicare or Medicaid, in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A), all in violation of Title 18, United States Code, Section 371.

## Factual Basis

6.      Defendant will plead guilty because she is in fact guilty of the charge contained in the indictment. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt:

## Background

West Side Community Hospital, Inc., doing business as Sacred Heart Hospital, was a licensed acute-care hospital located at 3240 West Franklin Boulevard, Chicago, Illinois. A significant percentage of Sacred Heart's patients were elderly and drawn from nursing homes. Sacred Heart permitted non-employee physicians and podiatrists to apply for and receive privileges to treat patients at Sacred Heart. Sacred Heart operated four clinics in the Chicago area known as

2

"Chicago Golden L.I.G.H.T. Medical Clinics." The designation "L.I.G.H.T." was formed using the first letter in each word of the phrase "Living In Good Health Today."

VELGARA worked at Sacred Heart at two different periods of time. VELGARA first worked for Sacred Heart as a marketer, that is, a recruiter of patients. VELGARA left Sacred Heart for approximately one year and then was rehired as Sacred Heart's Director of Marketing. In approximately 2006, VELGARA received the title of Vice President of Geriatrics. VELGARA held the position of Vice President of Geriatrics until April 2013. VELGARA's responsibilities as Vice President of Geriatrics included, among other things, overseeing the Golden L.I.G.H.T medical clinics, managing Sacred Heart's marketing and transportation services staff, and overseeing employees responsible for patient recruitment at Sacred Heart and the Golden L.I.G.H.T. clinics. In February 2012, VELGARA agreed to cooperate with the government in an investigation of Sacred Heart. VELGARA continued to work at Sacred Heart between February 2012 and April 2013 while cooperating in the investigation.

Defendant Edward J. Novak was Sacred Heart's owner and Chief Executive Officer. Defendant Anthony J. Puorro was Sacred Heart's Chief Operating Officer. Defendant Clarence Nagelvoort was Chief Operating Officer before Puorro. Defendant Roy M. Payawal was Sacred Heart's Executive Vice President of Finance and Chief Financial Officer. Defendants Venkateswara R. Kuchipudi, Percy Conrad

3

May, Subir Maitra, Rajiv Kandala, and Jagdish Shah were medical doctors who had privileges to treat patients at Sacred Heart. Defendant Shanin Moshiri was a podiatrist who had privileges to treat patients at Sacred Heart. Administrator A was a respiratory care practitioner whose employer had a contract with Sacred Heart for Administrator A to provide services at Sacred Heart. Administrator B was Sacred Heart's Director of Nursing.

Novak and Puorro set patient recruitment quotas for VELGARA and the individuals who worked for her. VELGARA reviewed patient census spreadsheets every day. At one point, Novak asked VELGARA to ensure that Sacred Heart had ten patient admissions a day and that the clinics had ten patients a day. In order to fill these or other imposed quotas, VELGARA, among other methods, called former Sacred Heart or clinic patients to ask if they were sick. If the patient said they were sick, VELGARA sent a van to pick them up to transport them either to Sacred Heart or to one of the clinics. VELGARA and the individuals who worked under her supervision collaborated with nursing home and senior housing administrators to arrange transportation of prospective patients to Sacred Heart and its clinics by use of Sacred Heart's vans.

One of VELGARA's responsibilities was to supervise the individuals Sacred Heart employed as purported marketers. These individuals worked as patient recruiters, and had monthly patient recruitment quotas. Novak routinely asked VELGARA if the marketers were meeting their quotas and he routinely asked

VELGARA for copies of the marketers' schedules and reports. Novak instructed VELGARA to fire marketers who did not meet their quotas.

The marketers who worked for VELGARA located potential patients for Sacred Heart and the Golden L.I.G.H.T. clinics by, among other things, conducting activities and programs in nursing homes and public housing facilities for senior citizens, which they coupled with purported health screenings. The marketers provided gifts and benefits to nursing home and senior residence administrators, including lunches and gift cards, to secure access to their facilities. VELGARA approved expense reports seeking reimbursement for the benefits provided to these administrators. The expense reports were then provided to Nagelvoort or Puorro for final approval. Sacred Heart issued reimbursement checks for these expenses, signed or auto-signed by Novak.

VELGARA organized health fairs at Sacred Heart as a means of attracting patients to Sacred Heart or its clinics. VELGARA arranged for Sacred Heart to transport senior citizens to the health fairs from nursing homes and public housing facilities in Sacred Heart vans.

VELGARA arranged for Sacred Heart to pay the drivers of Sacred Heart's vans for referring patients to Sacred Heart or its clinics. VELGARA submitted requests to Sacred Heart for the issuance of checks to the drivers for these referrals. On one occasion, for example, VELGARA submitted a request to Sacred Heart for a

check in the amount of $200 for a driver who had referred patients to Sacred Heart. Sacred Heart issued a check to the driver in this amount.

VELGARA knew that Sacred Heart had arrangements with one or more ambulance companies to ensure that patients referred to Sacred Heart by doctors were transported to Sacred Heart and not to other medical facilities. Sacred Heart and the ambulance companies agreed that, in exchange for Sacred Heart using the particular ambulance company to transport a patient to Sacred Heart, the ambulance company would not divert the patient to a hospital closer to the patient's location for care. The ambulance company instead transported the patient directly to Sacred Heart even though Sacred Heart was located further away.

VELGARA monitored the number of patient referrals made by specific physicians to Sacred Heart and its clinics. VELGARA or one of her assistants each day determined the number of patient referrals from these physicians, and one of VELGARA's assistants entered the information on a spreadsheet. VELGARA's assistant routinely emailed the spreadsheet to Puorro. VELGARA also communicated with Novak about the number of patient referrals obtained by the marketers who reported to her or by the physicians who worked in the Golden L.I.G.H.T. clinics. VELGARA knew it was illegal to pay anyone, including a physician, for patient referrals.

6

**The Charged Conspiracy**

From no later than 2006, when VELGARA began as Sacred Heart's Vice President of Geriatrics, through in or about February 9, 2012, when VELGARA began to cooperate with the government, VELGARA conspired with Novak, Nagelvoort, Puorro, Payawal, and Kuchipudi, as well as Administrators A and B, to offer and to pay money from Sacred Heart to Kuchipudi, May, Maitra, Moshiri, Kandala, Shah, and others, to induce them to refer patients to Sacred Heart for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under Medicare and Medicaid.

VELGARA agreed with Novak, Nagelvoort, Puorro, Payawal, and Administrators A and B that Sacred Heart would offer to pay bribes and kickbacks to Kuchipudi, May, Maitra, Moshiri, Kandala, Shah and others, in return for their referral of patients, including those insured by Medicare and Medicaid, to Sacred Heart. VELGARA caused Sacred Heart to pay bribes and kickbacks for patient referrals to increase the patient census at Sacred Heart and to, in turn, increase hospital revenue. VELGARA agreed with Novak, Nagelvoort, Puorro, Payawal, and Administrators A and B, to conceal bribes and kickbacks by making them appear to be legitimate payments in ways that included (a) employee and personal services compensation; (b) rent payments; (c) teaching stipends; and (d) consulting payments.

### Specific Bribe and Kickback Arrangements

*Physician A*

On or about May 5, 2009, VELGARA proposed an arrangement to Physician A by which Sacred Heart would pay Physician A for referring Medicare-insured patients to Sacred Heart. VELGARA proposed to Physician A that, in order to conceal the payments, Sacred Heart would pay a "marketing girl" purportedly associated with Physician A a salary of $65,000 per year which, as VELGARA knew, was to be redirected to Physician A for his patient referrals. VELGARA told Physician A that if the "marketing girl," meaning Physician A, exceeded a monthly quota of patient referrals, Sacred Heart would pay the "marketing girl" a bonus. VELGARA told Physician A that the "marketing girl" arrangement was subject to a 90 day probationary period during which, if there were no patient referrals or an insufficient number of patient referrals, the "marketing girl" would be let go, that is, Physician A would not receive any further compensation.

*Physician B*

On or about January 5, 2012, VELGARA and Puorro discussed with Physician B compensation for patient referrals by Physician B to Sacred Heart. Physician B told VELGARA that Physician B had a base of approximately 500 patients who were insured by Medicare.

Days later, VELGARA and Physician B again discussed Sacred Heart's payment for patient referrals. VELGARA told Physician B that, while Sacred Heart

paid for patient referrals, Physician B would first have to "show the money" through a trial period and, in the event Physician B referred to Sacred Heart a sufficient number of patients during that period, she would discuss with Novak paying Physician B for those referrals on a going forward basis. Physician B was told that, under those circumstances, Novak and Puorro could offer Physician B a contract for a program or a hospital directorship that would be a front or a "show" to hide the fact that Physician B was paid for patient referrals. VELGARA understood that any program or directorship contract offered to Physician B was a way to disguise paying Physician B for sending patients to Sacred Heart and that there would be no real duties or work associated with having any such title or position.

### Summary of Bribes and Kickbacks

The chart set forth below shows for purposes of VELGARA's loss calculation under Guideline § 2B4.1(b) the greater of the following two values as to particular doctors: (1) the payments by Sacred Heart as kickbacks in the form of checks or rent payments between January 2008 and January 2012; and (2) the approximate value of the benefit Sacred Heart received through Medicare/Medicaid reimbursements from patient referrals between January 2008 and January 2012.

| Doctor | Kickback Payments Jan. 2008 – Jan. 2012 | Value to Sacred Heart of Improper Benefit from Medicare/Medicaid Billings |
|---|---|---|
| Maitra | | Approximately $52,624 July 2011 – Jan. 2012 |
| Moshiri | Approximately $142,000 | |
| Shah | | Approximately $78,536 July 2010 – Jan. 2012 |
| May | Approximately $169,000 | |
| Kuchipudi | | Approximately $510,041 May 1010 – Jan. 2012 |
| Physician H | | Approximately $66,228 July 2011 – Jan. 2012 |

7.    Defendant, for purposes of computing her sentence under Guideline § 1B1.2, stipulates to having committed the following additional offenses:

VELGARA entered into an agreement with the owner of a durable medical equipment company (DME Individual 1). VELGARA met DME Individual 1 while VELGARA was employed by Chicago R.E.A.C.H. and while she was doing marketing for Sacred Heart. Chicago R.E.A.C.H. was a senior citizen services company affiliated with Sacred Heart. VELGARA directed orders for durable medical equipment for Sacred Heart, Golden L.I.G.H.T., and Chicago R.E.A.C.H. patients to DME Individual 1's company. VELGARA received cash from an employee of DME Individual 1's company for her DME referrals. VELGARA received payments from DME Individual 1's employee for VELGARA's DME referrals until approximately 2006.

DME Individual 1 lost his ability to bill Medicare and Medicaid and sold his business to DME Individual 2. DME Individual 1 subsequently opened a home

health company. VELGARA referred Sacred Heart patients to DME Individual 1's home health company and, in return, DME Individual 1 gave VELGARA cash kickbacks. DME Individual 1 also allowed VELGARA and a family member to use certain office space rent-free in a building for a homemaker and transportation business that VELGARA and her family member were starting.

VELGARA continued referring DME orders to the DME company after DME Individual 1 sold the company to DME Individual 2. In addition to referring patients to the DME company, VELGARA referred patients to a pharmacy owned by DME Individual 2 if the patient did not have an existing pharmacy of their own.

DME Individual 2 continued to pay VELGARA in cash and gave her other gifts, such as gift cards, for her referrals. DME Individual 2 once paid for a trip that VELGARA took to Las Vegas, Nevada. DME Individual 2 also provided VELGARA and certain of her family members with prescriptions at lower or no cost to the family members.

VELGARA's actions in soliciting and receiving remuneration, and in offering and paying remuneration, in return for the referral of patients for the furnishing of services for which payment may be made by Medicare or Medicaid, constitute violations of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A),

8.    The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are

not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

9.      Defendant understands that the charge to which she is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of 5 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which she has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

10.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following

12

statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2014 Guidelines Manual.

**b.** **Offense Level Calculations.** The parties agree that, pursuant to Guideline § 1B1.2(a), the stipulated offense is not a more serious offense than the offense of conviction.

c. **Grouping.** Defendant's offense of conviction and the stipulated offense are grouped pursuant to Guideline §§ 3D1.2(d) and 3D1.3.

d. **Offense Level Calculations.**

i. The base offense level for both the offense of conviction and the stipulated offense is eight, pursuant to Guideline §§ 2X1.1(a) and 2B4.1(a).

ii. The offense level is increased by 16 levels pursuant to Guideline §§ 2B1.4(b)(1)(B) and 2B1.1(b)(1)(I) because the aggregate value of the improper benefit from the offense of conviction and stipulated offense was more than $1,000,000 but not more than $2,500,000.

iii. The base offense level is increased an additional four levels pursuant to Guideline §§ 3A1.1(b)(1) and 3A1.1(b)(2) because the defendant knew or should have known victims of the offense of conviction and stipulated offense were vulnerable victims and because the offenses involved a large number of vulnerable victims.

13

iv. The base offense level is increased an additional three levels pursuant to Guideline § 3B1.1(b) because the defendant was a manager and supervisor in criminal activity and the criminal activity involved five or more participants and was otherwise extensive.

v. The base offense level is increased an additional two levels pursuant to Guideline § 3B1.3 because defendant abused a position of trust in a manner that significantly facilitated the commission and concealment of the offense.

vi. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for her actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to her ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vii. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant

is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 30, which, when combined with the anticipated criminal history category of I, and pursuant to Guideline § 5G1.1(a), results in an anticipated advisory Guidelines sentence of 60 months' imprisonment, in addition to any supervised release and fine the Court may impose.

      e.    Defendant and her attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the

probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw her plea on the basis of the Court's rejection of these calculations.

f.      Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw her plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Cooperation

12.     Defendant agrees she will fully and truthfully cooperate in any matter in which she is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of her sentencing until after the conclusion of her cooperation.

## Agreements Relating to Sentencing

13.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the applicable guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 40 percent of the applicable guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

14.     If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw her plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

15.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the

17

Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw her guilty plea.

16.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.     Defendant agrees that the United States may enforce collection of any fine imposed in this case pursuant to Title 18, United States Code, Sections 3572 and 3613, notwithstanding any payment schedule set by the Court.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

18.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 13 CR 312-9.

19.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

18

**Waiver of Rights**

20.     Defendant understands that by pleading guilty she surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charge against her, and if she does, she would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and her attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict her unless, after hearing all the evidence, it was persuaded of her guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

19

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify in her own behalf.

b.    **Waiver of appellate rights.** Defendant further understands she is waiving all appellate issues that might have been available if she had exercised her right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal her conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal her conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Agreement. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

21.    Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights.

**Presentence Investigation Report/Post-Sentence Supervision**

22. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charge against her, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

23. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of her financial circumstances, including her recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of her sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

24. For the purpose of monitoring defendant's compliance with her obligations to pay a fine during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to

the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

25.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

28.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

### Conclusion

29.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

30.     Defendant understands that her compliance with each part of this Agreement extends throughout the period of her sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further

understands that in the event she violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

31.    Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

32.    Defendant and her attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

33.     Defendant acknowledges that she has read this Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE:  _12-23-2014_

ZACHARY T. FARDON
United States Attorney

JOEL M. HAMMERMAN
RYAN S. HEDGES
KELLY GREENING
DIANE MacARTHUR
Assistant United States Attorneys

NOEMI VELGARA
Defendant

EDWARD M. GENSON
Attorney for Defendant

VADIM GLOZMAN
Attorney for the Defendant