UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>EDWARD NOVAK, *et al.* | Case No. 13 CR 312-3<br><br>The Honorable Matthew F. Kennelly |

## **GOVERNMENT'S CORRECTED MOTION TO ADMIT CERTAIN EVIDENCE**

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, moves this Court for a pretrial ruling authorizing the admission of certain evidence that is direct evidence of the charged kickback conspiracy, or, alternatively, pursuant to Federal Rule of Evidence 404(b).

### ***Federal Rule of Evidence 404(b)***

Direct evidence of defendants' charged criminal conduct is generally admissible, while evidence of other uncharged acts is subject to additional evidentiary scrutiny. Federal Rule of Evidence 404(b) prohibits the admission of other-act evidence for the purpose of proving a person's character or propensity to behave in a certain way. *See* Fed. R. Evid. 404(b). The Rule, however, allows the use of that evidence for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *Id.*

In *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (*en banc*), the Seventh Circuit directed that, in assessing the relevance of other-act evidence, trial courts should look to the "the non-propensity theory that makes the other-act

evidence relevant and specifically ask[] how the evidence tends to make a particular fact of consequence more or less probable." *Gomez*, 763 F.3d at 856. This other purpose "must be established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character." *Id.* at 860-61. Proposed other-act evidence must also clear the hurdle of Rule 403, *i.e.*, its probative value is weighed against its potentially prejudicial effect. *Id.* at 857; Fed. R. Evid. 403 ("[C]ourt may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."). This Rule 403 balancing should "take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue." *Gomez*, 763 F.3d at 860.

By this motion, the government seeks to introduce evidence that:

- Kuchipudi solicited bribes from a hospital other than Sacred Heart;

- Kuchipudi personally billed for the services rendered by other medical professionals;

- The defendants arranged for patients to be transported to Sacred Heart irrespective of the patients' geographic proximity to the hospital;

- Kuchipudi sent and kept patients at Sacred Heart;

- Kuchipudi sent patients to Sacred Heart despite his knowledge that the hospital's facilities and services were substandard;

- Novak sought to conceal evidence that Sacred Heart had extended privileges to a physician with a suspended DEA license; and

- Novak benefited from referrals of Sacred Heart patients to Novak's other businesses.

This other-act evidence is not offered in reliance on propensity-based arguments. Rather, as demonstrated below, it is admissible as direct evidence of the charged conspiracy or, alternatively, under Fed. R. Evid. 404(b) as evidence of the defendants' motive, knowledge, intent, and absence of mistake in violating the anti-kickback statute, as charged in the indictment.

## I. KUCHIPUDI'S SOLICITATION OF A SECOND HOSPITAL EVIDENCES THE NATURE OF HIS ARRANGEMENT WITH SACRED HEART, AS WELL AS HIS MOTIVE, KNOWLEDGE, INTENT, PLAN, AND ABSENCE OF MISTAKE.

The government proposes to introduce evidence demonstrating that while the charged conspiracy was in progress, Kuchipudi asked a hospital other than Sacred Heart to supply a mid-level practitioner to service his patients, with the understanding that Kuchipudi, rather than the hospital, would bill for the practitioner's services, and was told that the hospital had obtained a legal opinion that such an arrangement would violate the anti-kickback statute. Kuchipudi's request, and the information he received in response, constitutes both direct evidence of the charged offenses and evidence, admissible pursuant to Fed. R. Evid. 404(b), of Kuchipudi's motive, knowledge, intent, plan, and absence of mistake in committing the charged offenses.

In late 2009, Kuchipudi approached the CEO of another area hospital at which he had privileges (hereinafter, "Hospital A") and requested that the hospital hire a mid-level practitioner to treat his patients while allowing Kuchipudi to bill

3

for the practitioner's service.[1]  The government seeks to introduce the testimony of Hospital A's former CEO that Kuchipudi made this request, that the CEO investigated the proposal and was informed by counsel that it was unlawful, and that the CEO advised Kuchipudi that, based on his inquiries, he believed that Hospital A could not retain mid-level practitioners and allow Kuchipudi to bill for their services.

The government's evidence will show that Kuchipudi nevertheless continued to press Hospital A for the assistance of a non-physician practitioner.  After multiple, renewed requests, Hospital A's former CEO sought and obtained a formal legal opinion concerning the legality of the arrangement Kuchipudi had proposed from the hospital's outside counsel.  The legal opinion obtained by the CEO stated that the patients-for-practitioner services proposal Kuchipudi had requested would violate the Anti-Kickback Statute, the False Claims Act and the Stark Act.[2] Hospital A's former CEO told Kuchipudi that the hospital's lawyers had rejected the proposal and provided Kuchipudi with a copy of the legal memorandum.[3]

According to Hospital A's former CEO, Kuchipudi responded to the hospital's memorandum by stating that "other hospitals" had agreed to hire practitioners to work for him.  Even after receiving a copy of the legal memorandum, Kuchipudi

---

[1]  Hospital A is a larger acute care facility located in close geographic proximity to Sacred Heart, which offered a more extensive range of services than Sacred Heart. Hospital A did not, however, employ physician assistants or advanced nurse practitioners to assist its medical staff.

[2]  A redacted copy of the legal memorandum is attached hereto as Exhibit A.

[3]  According to Hospital A's CEO, at the time he provided Kuchipudi the memo, he stated that he [the CEO] "did not look good in orange, and neither would you [Kuchipudi]."

continued to push Hospital A's former CEO to hire a physician assistant or advanced practice nurse for his use and told the CEO that the hospital was losing money because of "this issue." As Hospital A's former CEO will explain, corroborated by hospital admission records, Kuchipudi's rate of admissions to Hospital A began to decline noticeably after the hospital rejected Kuchipudi's proposal.[4]

Hospital A's former CEO will testify that after he initially rejected Kuchipudi's proposal, he was approached by other hospital physicians on Kuchipudi's behalf, including a cardiologist who served on Hospital A's Medical Executive Committee, referred to herein as Physician U, who requested that Hospital A provide Kuchipudi the mid-level practitioner staff he was requesting. Accordingly, Hospital A's CEO disseminated the legal memorandum at the next meeting of Hospital A's Medical Executive Committee, of which Kuchipudi was a member.

The government also intends to present the testimony of Physician U regarding Kuchipudi's statements to him concerning Kuchipudi's request that Hospital A hire mid-level practitioners to work on his behalf, and his request that Physician U lobby Hospital A's executives to comply with Kuchipudi's request. Physician U will testify that he twice approached Hospital A's former CEO on Kuchipudi's behalf, and that Hospital A's CEO rejected the proposal, stating that he

---

[4] The government will also present Kuchipudi's insurance billing records that show how, following Hospital A's rejection of his proposal, Kuchipudi began referring patients to Sacred Heart.

believed it would be illegal, and provided Physician U with a copy of the legal memorandum he previously provided to Kuchipudi (and also disseminated the memorandum at the hospital's next Medical Executive Committee meeting). According to Physician U, Hospital A's CEO explained that the hospital could not pay for mid-level practitioners to work for staff physicians and that, if it did, the doctors could not bill for the practitioners' services.[5]

To prove a violation of the anti-kickback statute, the government must show that the defendant knowingly and willfully violated the statute's prohibitions. *See* 42 U.S.C. § 1320a-7b(b). Moreover, Kuchipudi has, in pretrial filings, argued that he believed at the time that his practitioners-for-patients arrangement with Sacred Heart was lawful. *See* R. 268 at 1-2 (arguing that Kuchipudi was "rightfully confused" by the government's charges); *id.* at 24 (arguing the statute was unconstitutionally vague as applied, exposing him to liability without "fair warning."). Evidence that Kuchipudi was specifically advised of a legal opinion that a patients-for-staffing arrangement he solicited and obtained from Sacred Heart violated the anti-kickback statute is highly probative of Kuchipudi's knowledge and intent, as well as absence of mistake. *See United States v. Yielding*, 657 F.3d 688, 701 (8th Cir. 2011) (evidence of defendant's prior theft in the healthcare industry

---

[5] Finally, Physician U will testify that he had conversations with both Kuchipudi and Novak about the Kuchipudi's arrangement at Sacred Heart. When he questioned Kuchipudi concerning how Sacred Heart could pay mid-level practitioners to work exclusively for him, Kuchipudi stated he was "paying his part" and walked away. When Physician U told Novak that he thought it was illegal for the hospital to provide a physician assistant or advanced practice nurse to aide a doctor, Novak responded that "it could be," and similarly walked away.

admissible to establish knowledge and intent where defendant had put his state of mind at issue).

The anti-kickback statute requires the government to show the benefit provided to a physician was *in return* for the physician's patient referrals and, in pretrial proceedings, Kuchipudi also has questioned whether the government can show a connection between the benefits he received from the mid-level practitioner's services provided to him by Sacred Heart and his decision to refer his patients to the hospital. *See* R. 268 at 23. Kuchipudi's explicit solicitation of mid-level practitioner services from Hospital A in return for patient referrals, together with claims that other hospitals had agreed to the same arrangement, is direct evidence of the nature of the arrangement between Kuchipudi and Sacred Heart, that is, that the mid-level practitioner services provided to him by Sacred Heart were provided in return for patient referrals. Thus, the evidence is admissible as direct evidence. *See Gomez*, 763 F.3d at 863 (direct evidence of charged criminal activity is not barred by 404(b)); *United States v. Phillips*, 745 F.3d 829, 833 (7th Cir. 2014) (same). Moreover, Kuchipudi's simultaneous solicitation of a comparable bribe from Hospital A is highly probative of Kuchipudi's state of mind at the time of the offense. The timing and manner in which the Sacred Heart-Kuchipudi kickback arrangement developed—namely, that Kuchipudi: (1) asked Hospital A to provide him free mid-level practitioner assistance at the same time that Sacred Heart offered him those same services; and (2) began re-directing a significant number of his patient referrals to Sacred Heart after Hospital A refused to provide him with

the medical staffing assistance he demanded—evidences the *quid pro quo* nature of the kickback arrangement with Sacred Heart, and Kuchipudi's intent to exchange referrals for practitioner services and billings. Utilizing the language of Rule 404(b), evidence concerning Kuchipudi's simultaneous solicitation of a comparable bribe from Hospital A evidences the defendants' intent, motive, plan, and absence of mistake.

Finally, the probative value of evidence concerning Kuchipudi's solicitation of services from Hospital A in exchange for referrals far exceeds any potential unfair prejudice to the defendants from its admission, and any potential prejudice may be eliminated with instructions limiting the use of the evidence to proper purposes.

## II. KUCHIPUDI'S MEDICARE BILLING IS ADMISSIBLE AS DIRECT EVIDENCE OF THE CONSPIRACY AS WELL AS UNDER RULE 404(b).

Sacred Heart compensated Kuchipudi for his patient referrals by paying the salaries of the medical professionals assigned to work for him. The hospital paid Employee A, a physician assistant, to treat his patients within the hospital, at Kuchipudi's clinic and at the nursing homes in which those patients resided. Sacred Heart similarly paid Employees B and C, advanced nurse practitioners, to treat Kuchipudi's patients within the hospital.[6] Finally, Sacred Heart paid Physician C to treat Kuchipudi's patients at Sacred Heart on weekends and holidays when Kuchipudi was absent from the hospital. These arrangements

---

[6] Employee C was also assigned to treat Kuchipudi's patients in the nursing homes for a period of time. Employee D, another physician assistant, was briefly assigned to treat Kuchipudi's patients.

benefited Kuchipudi, who billed insurers for the services these professionals provided.

Kuchipudi relied on the professional services provided by Sacred Heart. The non-physician practitioners assigned to Kuchipudi's patients would spend hours each day evaluating and treating those patients. Kuchipudi would then come to Sacred Heart, purportedly to review their work. At trial, the government will show that Kuchipudi did not perform much, if any, independent analysis of his patients. Instead, he relied on the assessments of the mid-level professionals who cared for his patients. Kuchipudi nevertheless submitted records to his billing company reflecting that he had performed the services the mid-level practitioners had performed.

Kuchipudi's billing is relevant and admissible as direct evidence and under Rule 404(b) to evidence the benefit Kuchipudi received from his Sacred Heart kickback arrangement. Kuchipudi submitted insurance claims seeking hundreds-of-thousands-of-dollars in reimbursement for services rendered by the practitioners Sacred Heart provided to him. That billing represents the benefit Kuchipudi received from his kickback arrangement and is appropriately admitted as evidence of motive.

Kuchipudi's billing also evidences his efforts to conceal his unlawful arrangement with Sacred Heart. Kuchipudi was unwilling to submit claims in the names of the medical professionals who provided his patients' care because he had not paid for the practitioners' labor. By claiming he had performed their services

himself, Kuchipudi sought to camouflage the benefits he obtained for his patient referrals. *United States v. Watts*, 535 F.3d 650, 659-60 (7th Cir. 2008) (rejecting argument that evidence demonstrating that defendant sought to conceal scheme proceeds was precluded by 404(b); evidence was relevant and admissible as direct evidence of the charged conspiracy). Kuchipudi's efforts to secret his unlawful arrangement with Sacred Heart demonstrate his consciousness of guilt. Kuchipudi knew his arrangement with Sacred Heart violated the anti-kickback statute; his violation was not the result of mistake, misunderstanding or accident. *See United States v. Ryan*, 213 F.3d 347, 350-51 (7th Cir. 2000 (defendant's efforts to conceal bank fraud proceeds was appropriate circumstantial evidence of intent); *see also United States v. Helton*, 2010 WL 345896, *4 (N.D. Ill. Jan. 21, 2010) (evidence that attorney who sought to conceal the extent of his client fees was relevant and admissible "as an additional means by which [the defendant] could gain funds from the fraudulent scheme and. . . . under Rule 404(b) to show [his] efforts to conceal evidence of the fraudulent scheme and to negate any conclusion that [his] failure to properly disclose fees was due to a misunderstanding or oversight.").

The government will present the testimony of the physician assistants (Employees A and D) and advanced nurse practitioners (Employees B and C) who treated Kuchipudi's patients. These witnesses will testify that they provided the care that was the basis for Kuchipudi's billing. They will explain how they spent hours evaluating, charting and treating Kuchipudi's patients. Kuchipudi would then perform only cursory evaluations of those same patients. The government will

corroborate this testimony by presenting the Sacred Heart physicians and nurses who observed this process. The government will also present Kuchipudi's billing submissions to show how Kuchipudi coded forms to reflect that he had provided the mid-level practitioners' service.[7]

The government will also present Rule 1001 summaries of Kuchipudi's billings. Those submissions—including a derivative date and time analysis—will show that Kuchipudi could not have performed all of the services for which he submitted claims. The government will show that Kuchipudi submitted claims for services rendered at Sacred Heart that far-exceeded the time he actually spent with patients. The time analysis will suggest that Kuchipudi was incapable of personally performing all of the services for which he submitted claims. The date and time analysis will show that Kuchipudi submitted claims for patient care on days when he was unquestionably unavailable, *e.g.*, when he was out-of-town or recovering from surgery.

In presenting this evidence, the government will not suggest that Kuchipudi billed for services not rendered. The government's evidence will suggest the contrary – that the care was rendered, but not by Kuchipudi. As set forth above, this evidence is appropriate and admissible under Rule 404(b) to show how Kuchipudi benefitted from the labor provided to him by Sacred Heart.[8]

---

[7] Kuchipudi similarly billed for the services provided by Physician C as if he had performed those services himself.

[8] In billing for the services of mid-level practitioners as his own, Kuchipudi systematically "up-coded" the claims for their service because physician assistants' and advance nurse practitioners' service is generally billed at eighty-five percent of a physician's rate for the same service. Thus, by billing the mid-level practitioners' service as

## III.  KUCHIPUDI SENT PATIENTS TO SACRED HEART REGARDLESS OF THEIR PROXIMITY TO THE HOSPITAL.

The government proposes to introduce evidence demonstrating that, as alleged in the indictment, Sacred Heart's administrators and Kuchipudi used the hospital's "direct admits" procedure to ensure the delivery of paid-for patients to the hospital. This evidence is admissible as direct evidence of the charged offenses. To the extent that use of the "direct admit" procedure can also be characterized as a separate bad act, it is admissible under Fed. R. Evid. 404(b) to show how the defendants executed, and obtained the benefits of, the kickback arrangement.[9]

As alleged in the indictment, "to maximize the benefits to Sacred Heart from bribe-and-kickback-induced referrals. . . , [the defendants] implemented procedures designed to ensure that patients were transported from nursing homes and facilities directly to Sacred Heart irrespective of the patients' proximity to Sacred Heart and medical necessity."   R. 231, ¶ 6.   As the government will demonstrate, the defendants arranged for patients to be shipped to Sacred Heart's emergency room from nursing homes located all over the Chicagoland area.   The length of the patients' travel was, at times, significant; on occasion, exceeding 25 miles.  Despite the fact that there were often multiple different hospitals at which these patients could have received emergency care if required, the defendants directed ambulances

---

his own, Kuchipudi fraudulently charged Medicare a fifteen percent premium.   The government will not argue to the jury that defendant Kuchipudi wrongfully "up-coded" his Medicare billing, thereby avoiding any unfair prejudice.

[9]  Sacred Heart's direct admit procedure also demonstrates the defendants' control over the patient-beneficiaries that were the object/subject of the conspiracy.  *See United States v. Rodriguez*, 427 Fed. Appx. 784, 790 (11th Cir. 2011) (unpublished) (admitting evidence under Rule 404(b) to show defendants' "degree of control over patient beneficiaries").

to take these patients to Sacred Heart. The ambulances carrying these patients bypassed multiple, closer facilities, including hospitals at which the referring physicians had privileges.[10]

To ensure that ambulance drivers did not re-direct patients to hospitals in geographic proximity to their residences, the defendants established a code designed to ensure the patients were delivered to Sacred Heart. Kuchipudi and the administrator-defendants directed nursing home operators to send patients to Sacred Heart with the instruction that they were to be "directly admitted" to "Room 200A." There was no patient Room 200A. The directive was just a code used to ensure the patients' delivery. By characterizing the patients as "direct admits" to a purported assigned Sacred Heart bed, ambulance drivers would not divert the subject patients to closer emergency care facilities.

Kuchipudi described the scheme in a consensually recorded February 28, 2010 meeting: "Yeah, if I say emergency room to Sacred Heart, they won't come here. Because they have to bypass so many hospitals, they're [not] gonna go to this one. . . . That's why we say direct admission." Novak similarly acknowledged the purpose of the "direct admit" scheme in a September 12, 2012 recorded meeting in which he was trying to recruit yet another physician to refer patients to Sacred

---

[10] For example, Kuchipudi directed patients from a nursing home in Indian Head Park, Illinois to Sacred Heart—a distance of nearly 21 miles. There were approximately 30 closer hospitals from which Kuchipudi could have chosen to send those patients, including multiple institutions at which he then had or once had privileges.

Heart: "You tell the ambulance it is direct admission Sacred Heart Hospital, Room 200A. That is the code word to come direct there."[11]

The transfer of patients to Sacred Heart as "direct admits" arguably constituted an independent fraudulent scheme. Ambulance companies billed Medicare for the transportation of patients to Sacred Heart. While the government intends to elicit evidence demonstrating how the defendants implemented the charged conspiracy through the use of the "direct admit" procedure, it does not intend to elicit testimony concerning any unnecessary costs associated with this component of the defendants' scheme, thereby avoiding any risk of unfair prejudice.

## IV. KUCHIPUDI REFERRED, AND SACRED HEART ACCEPTED, PATIENTS IRRESPECTIVE OF THEIR APPARENT MEDICAL NEEDS.

The government's evidence will show that, in executing the kickback conspiracy and obtaining its benefits, Sacred Heart administrators and Kuchipudi arranged for patients to be held for care despite, in some cases, vague and questionable diagnoses and assessments by hospital medical personnel at the time of arrival indicating that care was not necessary. This evidence is direct evidence of the charged offenses. To the extent that it can also be seen as evidencing separate bad acts, it is admissible under Fed. R. Evid. 404(b) to show the defendants' financial motives.

The government will present testimony from emergency room physicians who assessed Kuchipudi's referrals, the directors of nursing responsible for the hospital's

---

[11] *See* 1D110 (September 12, 2012).

medical staff, and the medical professionals assigned to treat Kuchipudi's patients, concerning Sacred Heart's informal policy of holding and/or admitting Kuchipudi's referrals regardless of the patients' apparent condition. In addition, the government will present the February 28, 2012 recording of a meeting between Kuchipudi, Puorro, Administrator B, and [Physician D], the hospital's then-emergency room director, in which the participants outlined and discussed the hospital's unwritten policy requiring all Kuchipudi referrals to be held and/or admitted. Sacred Heart benefited from this policy because patients in beds ("census") equated to Medicare billing. Kuchipudi benefited because Medicare reimbursement rates for physician services were greater for in-hospital treatment. In addition, hospitalization allowed Kuchipudi to bill for patient services on a daily basis, rather than the monthly basis that he and his medical staff were limited to billing for their nursing home care.

Kuchipudi obtained privileges at Sacred Heart in April 2010. He immediately began referring patients to the hospital, including on weekends, and at night. Although Kuchipudi did not work at night or on weekends, he did not want other doctors treating his patients. Accordingly, from the onset of his relationship with Sacred Heart, Kuchipudi directed that his patient referrals wait for his evaluation. These patients would therefore have to wait until the following day, or

for weekend admits, on Monday afternoon, to be evaluated by Kuchipudi.[12] Kuchipudi's initial willingness to delay his patients' care evidences the questionable need for those referrals.

The government will present the testimony of a number of emergency room physicians who were pressured to accept patients for subsequent evaluation by Kuchipudi although they often did not understand the reasons for Kuchipudi's referrals. Kuchipudi's patients were often sent to the hospital after-hours, some with poorly defined diagnoses, such as "altered mental status." An emergency room physician identified herein as "Physician F," who triaged Kuchipudi's referrals, will testify that a number of Kuchipudi's "altered mental status" patients appeared to suffer only from chronic cognitive impairment, like Alzheimer's or other forms of dementia. Another physician who worked in Sacred Heart's emergency room referred to herein as "Physician S" will testify that many of Kuchipudi's "altered mental status" patients appeared mentally ill. Yet another emergency room physician, referred to herein as "Physician I," will testify that he could not detect symptoms in close to half of patients referred by Kuchipudi for "altered mental status." These emergency room physicians will testify that they were pressured, if not required by the hospital to hold Kuchipudi's referrals for testing and observation, regardless of their own assessments.

---

[12] The lack of a prompt patient evaluation concerned certain hospital administrators, including an administrator referred to herein as "Administrator C," who implemented procedures to have Kuchipudi patients assessed by the hospital's emergency room staff. For patients admitted on weekends, Administrator C arranged for the hospital's physician assistants to see those patients. Eventually, the hospital arranged for Physician C to evaluate those referrals.

Physician F will testify that he had a number of run-ins with Kuchipudi concerning the apparent lack of necessity for his patient referrals. When Physician F could not find any justification to hold Kuchipudi's patients, he directed their return to their residences. Kuchipudi confronted Physician F concerning his "failure" to hold or admit these patients, demanding that Physician F hold the patients for further observation. When Physician F challenged Kuchipudi's justification for specific referrals, Kuchipudi stated that while he may not know the reasons for specific referrals, his patients' hospitalization was justified. Kuchipudi told Physician F that, at a minimum, he wanted his patients held for observation so that his staff of mid-level practitioners could assess the patients.

Kuchipudi's dispute with Physician F resulted in the February 28, 2012 consensually-recorded meeting during which Puorro and Kuchipudi told Physician D that Kuchipudi's patients needed to be treated as "direct admissions." "When we tell them to admit a patient . . ., they have to be seen for sure. Complete evaluation." As an additional justification, Kuchipudi reminded Physician D and Puorro that his patients "were bypassing so many hospitals" to come to Sacred Heart.

The staff assigned to treat Kuchipudi's patients—mid-level practitioners and nursing staff—will testify that when they advised Kuchipudi that they could not detect symptomology requiring a patient's admission, Kuchipudi would nevertheless

insist that the patients be admitted or remain in the hospital for a period of days.[13] These witnesses will testify that Kuchipudi's patients were almost always held for observation, if not admitted.[14]

The government will also present evidence that Kuchipudi kept his patients at Sacred Heart longer than necessary. Employee B, for example, will testify that she would ask Kuchipudi why patients who did not appear to require further hospitalization were still at Sacred Heart and that, in response to such an inquiry, Kuchipudi stated that once a patient was removed from the nursing home, the patient could not be returned for three days. The government anticipates Employee A will testify that while she never discussed this "policy" with Kuchipudi, she "figured out" Kuchipudi's three day rule over time.[15] Employee D will similarly testify that Kuchipudi would not respond to inquiries concerning the need to discharge patients. Finally, the government will call Sacred Heart's utilization review manager, referred to herein as "Employee M," who will explain that Kuchipudi's patients consistently remained at Sacred Heart for unnecessarily long periods of time.

---

[13] According to the Kuchipudi practitioners, certain patients would not know the reason for their own hospitalization. According to Employee B, Kuchipudi frequently did not know who his patients were or why he had admitted them to the hospital.

[14] For example, the government intends to present the testimony of a registered nurse who worked in Sacred Heart's emergency room, referred to herein as "Employee J," who will explain that the hospital had an unofficial policy to admit or hold for observation any Kuchipudi patient presented to the ER.

[15] The government anticipates that Employees A, B and D will further testify that Kuchipudi patients often spent days at the hospital awaiting tests, labs and/or specialty consults.

## V.     SACRED HEART'S SUBSTANDARD FACILITIES AND PATIENT SERVICES EVIDENCES THE DEFENDANTS' MOTIVES.

Sacred Heart had difficulty marketing its services to physicians and patients. The hospital offered limited services, had substandard facilities and had a small medical staff. The hospital therefore had a limited number of specialists, some of whose patient care was questioned by the hospital's administration and their physician-colleagues. Finally, the hospital was located in an economically disadvantaged and high-crime area of Chicago's west side. As a result, the hospital could not effectively sell itself to doctors or patients.

Evidence of Sacred Heart's limitations is relevant and admissible as direct evidence of the hospital's need to pay kickbacks and physicians' justification for choosing Sacred Heart. To the extent that it constitutes "other-act" evidence, it remains admissible pursuant to Rule 404(b) for the same reason: to show the defendants' motive to offer and pay and solicit and receive the charged kickbacks. *See United States v. Schmitt*, 770 F.3d 524, 533 (7th Cir. 2014) (*citing United States v. Harris*, 536 F.3d 798, 807 (7th Cir. 2008)) (Motive is "an express exception to the Rule 404(b) bar.").

The government will present evidence that Novak pressured his administrative staff to maintain the hospital's census.[16] Unable to sell the quality of its services, Sacred Heart was required to purchase patients, which, at the

---

[16]    The government will present a number of witnesses who will testify about Novak's focus on the hospital's census, including Noemi Velgara and the hospital's former directors of nursing. The government will also present email correspondence between Novak, Payawal and Puorro, tying the hospital's budget to its census projections, highlighting Novak's directive that the hospital needed to find more patient sources.

defendants' direction, it did. The hospital's substandard facilities and care also evidences why doctors like Kuchipudi sent their patients to Sacred Heart. Despite having privileges at other hospitals that offered patients more accessible and higher quality care, Kuchipudi directed his patients to Sacred Heart motivated by his own economic interest.[17]

Sacred Heart was not a full-service hospital. The hospital did not have a comprehensive emergency department. Rather, its emergency room functioned like an urgent care center. While the hospital did have a surgical suite and three, open general population intensive care rooms, the hospital maintained a skeletal night and weekend staff.[18] Because the hospital retained only a limited night and weekend staff, various patient services, like x-rays and labs, were either delayed or otherwise unavailable. Sacred Heart's ER was therefore incapable of treating potentially serious medical conditions.[19] The hospital also offered a limited range of

---

[17] Demonstrating Sacred Heart's substandard facilities is particularly relevant to establish the reasons Kuchipudi referred his patients to Sacred Heart. In pretrial communications with the government, Kuchipudi's counsel explained that Kuchipudi directed patients to Sacred Heart because he held the hospital's facility and staff in high regard. Kuchipudi's consistent complaints concerning Sacred Heart's substandard care contradict this argument.

[18] The limited nature of the hospital's overnight staff, which sometimes included only a single in-house doctor, is relevant because Kuchipudi referred significant numbers of patients to Sacred Heart at night.

[19] The government will show that Kuchipudi nevertheless justified the transfer of patients to Sacred Heart, citing potentially serious medical conditions.

medical services; in particular, Sacred Heart did not offer in-patient psychiatric services, only addressing mental illness needs by way of specialty consult.[20]

## A.   The Hospital's Limited Facilities and Substandard Care Evidence Kuchipudi's Motive.

The government will establish that Kuchipudi was aware of the hospital's limited facilities and was often advised of its poor quality and care, but continued to refer his patients there.   Administrators, doctors and mid-level clinicians (*i.e.*, the physician assistants and nurse practitioners assigned to work for him) will testify that they either advised Kuchipudi of patient care issues and/or Kuchipudi complained to them about the same.   The government will also present recordings in which he complained about Sacred Heart's medical care.   In their February 28, 2012 meeting, Kuchipudi complained that certain ER physicians were not properly assessing his patients when presented to the hospital.   However, later in that same recording, Kuchipudi complained that a different ER physician was ordering medically unnecessary specialty consults for his patients: "He does a lot of stuff. He'd . . ., he does too, he does too much sometimes.   But he does cardiac consultation, somebody has fracture, he does everything."   Adding the hospital's primary surgeon as part of the problem, Kuchipudi stated: "They do consultation

---

[20] The government will present testimony from a number of sources, including Sacred Heart's ER staff and the mid-level practitioners assigned to work for Kuchipudi, who will state that Kuchipudi would transfer patients to Sacred Heart based on an altered mental status diagnosis.   Because Sacred Heart did not have a psychiatric ward, certain patients would, at times, have to wait to be seen by a neurologist or a psychiatrist asked to consult on the patients' status.   Sacred Heart's medical professionals will explain that patients would, at times, wait days at Sacred Heart to be seen by such a specialist.   The government will show that Kuchipudi also had privileges at nearby Hospital A, which had a psychiatric department.

and there's no reason." "He [the ER physician] does a lot of consult; he does like six consultations sometimes." Kuchipudi further directed that "unless it's really important, an acute emergency," he did not want any consultations ordered for his patients. "That's why, that's why I told, I says cancel all the consults unless approved by me. They [*i.e.*, the ER physician and surgeon] can't follow these orders." The medical practitioners assigned to work for Kuchipudi will testify that Kuchipudi directed them to cancel all specialty consultation referrals until they were approved by him. Employee C will testify that Kuchipudi instructed her to protect his patients from the hospital's surgeon. On occasion, Employee C would contact Kuchipudi concerned that the surgeon was going to unilaterally schedule surgery for a patient, and that, in response, Kuchipudi would indicate that he would try to get the patient out of Sacred Heart.[21]

In a March 5, 2013 recorded conversation, Kuchipudi told Puorro that it was difficult to control the hospital's surgeon, who, he said, always wants to cut, "like a butcher."[22] In a March 15, 2013 recorded conversation, Kuchipudi told Puorro that the surgeon rushed operations, but that he [Kuchipudi] had to refer patients to the surgeon because the hospital had no other options.[23]

## B. Sacred Heart Could Not Legitimately Market Its Services.

The government will also present witnesses, recordings, and internal hospital records to illustrate the impact the hospital's limited facilities had on its patient

---

[21] Employee C will testify that she complained about the same surgeon to Nagelvoort, [Administrator A] and Novak.

[22] *See* 1D151 session 6 (March 5, 2013)

[23] *See* 1D153, session 23 (March 15, 2013).

marketing. The hospital's Director of Business Development hired by Novak to recruit physicians to Sacred Heart, referred to herein as "Employee E," will testify that she could not effectively sell Sacred Heart's services. According to Employee E, the only tool Sacred Heart had to recruit referring-physicians was its willingness to compensate doctors. The government will similarly present doctors and podiatrists, including a physician referred to herein as "Physician L," who ran Sacred Heart's podiatric residency program, and who will testify that, despite Novak and Nagelvoort's request, he did not refer patients to Sacred Heart because he feared those patients would refuse to receive treatment there.[24]

Other Sacred Heart administrators and doctors will similarly testify to the hospital's limited services and facilities and issues with quality care. These witnesses, including Sacred Heart administrators and medical professionals (*i.e.*, physicians, physician assistants, nurse practitioners and registered nurses) will testify that Sacred Heart was chronically understaffed, had high patient-to-nurse ratios, and had issues with the quality of its care.

By way of example, the government will seek to introduce memoranda sent by email to Nagelvoort in July and August of 2010 by the hospital's Human Resources and Payroll Manager, critiquing the poor performance of Administrator C, the hospital's director of nursing, that identified problems with the hospital's nursing staff. The memos indicate that the hospital had received many complaints

---

[24] A podiatrist who admits receiving a $2,000/month kickback from Sacred Heart from 2001 through 2008 (referred to herein as "Physician O"), will similarly testify that he had difficulty directing patients to the hospital because of its physical condition and neighborhood.

from patients and physicians regarding nurses quality of care, nursing deficiencies cited by state and federal regulators,[25] and the inability of the hospital to maintain a knowledgeable staff,[26] and the nursing staff's high turn-over rate. The first of the two memos concludes that [Administrator C] had "demonstrat[ed] an inability to provide a quality Nursing Team."

The government will also seek to present evidence reflecting the hospital's substandard facilities and maintenance. For example, in the fall of 2009 – shortly after Kuchipudi obtained privileges at Sacred Heart – the hospital suffered from a fly infestation. The government will present emails and witness testimony reflecting that the hospital's intensive care unit battled maggot infestations. To keep the flies at bay, nurses were instructed to spray ICU patients with "Off!" bug repellant.[27]

## VI. NOVAK'S ATTEMPT TO CONCEAL EVIDENCE FROM STATE AUDITORS EVIDENCES HIS ATTEMPT TO CONCEAL SACRED HEART'S KICKBACKS.

In early March 2013, investigators from the CMS and the State of Illinois initiated an audit of Sacred Heart's facilities. As the government will establish at

---

[25] The August 6, 2010 memorandum cites the auditors' critiques to include: infection control deficiencies, employees exposed to radiation, the failure to follow operating room safety policies, the lack of policies governing surgical care, the lack of patient confidentiality or privacy in the intensive care unit, poor nursing documentation, the failure of nurses to follow physician direction and orders, and nurses not administering medication as instructed by doctors.

[26] The July 12, 2010 memorandum indicates: "The Nursing Staff has continued to demonstrate poor skills in documentation, the inability to make good decisions and a lack of knowledge on Nursing and Hospital policy and procedure."

[27] In particular, the government would present both email correspondence and witness testimony establishing the ICU's maggot infestation and the hospital's "solution" to the problem.

trial, the auditors' presence within Sacred Heart heightened Novak's concern that Sacred Heart's kickback arrangements with physicians would be discovered. One such arrangement was the accommodation Sacred Heart had provided to Dr. Kenneth Nave.[28]

Sacred Heart recruited Dr. Nave—a home visiting physician with a significant patient base—in the fall of 2012. At the time Dr. Nave was given privileges, his DEA license was suspended. This limitation effectively precluded Nave from treating patients in a hospital setting. To accommodate Nave (and thereby obtain his patient admissions), Sacred Heart agreed to provide privileges to both Nave and another physician who would, in theory, write prescriptions for Nave's patients. In reality, this second physician infrequently came to Sacred Heart. Instead, Nave wrote prescriptions using the second physicians' name and DEA license number.[29]

At trial, the government will show that Novak became very concerned that the hospital's auditors would realize that Sacred Heart had provided Nave privileges and allowed him to write controlled substance orders for his patients. Novak consulted the hospital's outside counsel who advised him to self-report the

---

[28] Nave has been charged in another matter, *United States v. Kenneth Nave*, 13 CR 313 (Judge Coleman), with distributing controlled substances using the DEA registration number of another individual, in violation of Title 21, United States Code, Section 843(a)(2).

[29] As the government will further establish, in the fall of 2012, Sacred Heart's administrators sought to work out a payment-for-patients relationship with Nave. In particular, the administrators discussed an arrangement whereby Sacred Heart would rent a clinic at which Nave could treat his patients. In an October 2, 2012 meeting, Noemi Velgara (who was then cooperating with investigating agents) told Puorro and Payawal that Nave had requested that Sacred Heart pay his $1,500 monthly rent in exchange for future patient referrals. Roy Payawal stated that the $1,500 requested by Nave was reasonable. Anthony Puorro agreed to the proposed arrangement.

violation to the appropriate regulatory authorities, which would have likely required the hospital to disgorge the proceeds earned in treating Nave's patients. Novak balked. In a March 13, 2013 consensually-recorded meeting, Novak suggested another alternative, namely "get[ting] rid" of Nave's credentialing file and pretending that Nave never had privileges at Sacred Heart.

Novak:    [Outside counsel] wants us to turn ourselves in. That will never fucking happen, you know.

\* \* \* \*

Novak:    I'm telling you (unintelligible). Sit on it and think about it. We don't have to come up with anything right now, you know. I (unintelligible) don't know why we would want to start anything. Let a sleeping dog lie. I don't know, maybe it won't come back, I don't know.

Puorro:    Let a sleeping dog lie?

Novak:    What?

Puorro:    Let a sleeping dog lie?

Novak:    Sometimes, hopefully it won't, you know, we take a file and get rid of it or something, you know. I don't know. He's not on staff, you know?

Puorro:    Let me think about it.

Novak:    Yeah, think about it for a day or something. These people, you see, it would not have even come up if I didn't think about it, you know.

Novak immediately followed his suggestion that the hospital consider "get[ting] rid" of Dr. Nave's credentialing file by stating that the hospital needed to make sure its paperwork justifying payments to other physicians was in order and that Employee A was "seeing other patients, not just Kuchipudi's."

Novak:    But I think of every little thing. That is why I want you to get all these contracts together.

26

Puorro:     Right.

Novak:      Let's make sure they are kosher.  Maybe have what's her name review them.  We got to be adhering to them.  We got a contract with [defendant] Maitra.  He is supposed to be seeing students, what he has to be seeing students.

Puorro:     Um hmm.

Novak:      Very important.

Puorro:     Yea.

Novak:      Regarding that girl, [Employee A]; She's got to be seeing other patients, not just Kuchipudi's.

Puorro:     On the contracts, I spoke with [defendant] Roy [Payawal] and he told me that he had all the documentation in the file.  I asked him to have a copy made.

Novak:      What? (unintelligible).

Puorro:     Before he is cutting a check for [defendant] Maitra and [defendant] Moshiri and things like that.

Novak:      Well, yeah, but I want you to find them [the contracts], you know.

Puorro:     So, I asked him to give me a copy.

Novak:      Do not trust anybody; just get it yourself.  Make sure you say you know from February 1st.  We use to have,… I use to have them, ah, you go inside to sign them when I haven't seen him and would ask around, well, he hasn't come around.  Well fuck, you go get him; you don't give him; that's why I don't want you to give him.  Check to make sure that you don't have, check that everything is kosher.  Otherwise, you know?

Puorro:     I see.

Novak:      We don't need the problems, you know.  If you skip a month, okay, we fucked up one month, you know, but you better be dying on the floor; you know what I mean?

Puorro:     I see, yeah, yeah.

Novak:      Things happen, you know.

Puorro:   He gave me the file.  Let me go through the file, what he had, and I'm going through the file down here, and see what I have.  I have the contracts upstairs now.

Novak:   Yeah.  So, it would be [defendant] Moshiri.  I don't know.  Do we have somebody going to [defendant] May['s]?  Why do we have a contract with May for?

Puorro:   I have no idea.

Novak:   I don't know either.  Take a look at that.  I think we are supposed to have a podiatrist, you know.  Maybe a Podiatrist is going there or something.  If not, we have to correct it and make sure she is going there.  So, you know, it is stuff like that.  Just keep us kosher, you know, that's all just to cover our asses.

The government submits that evidence of Edward Novak's discussion regarding attempts to conceal Sacred Heart's unlawful arrangement with Dr. Nave is admissible (1) as direct evidence of Novak's state of mind with respect to the charged offenses; and (2) as other-act evidence admissible under Rule 404(b) to prove Novak's knowledge and intent.[30]  In particular, the above-referenced March 13, 2013 recording evidences Novak's view that the Nave arrangement was simply another relationship that had to be concealed.  By instructing Puorro to get all the hospital's contracts together to "make sure they are kosher;" to have "what's her name [i.e., the hospital's outside counsel] review them," and his warning that the

---

[30] As an initial matter, the government submits that evidence of Sacred Heart's relationship with Dr. Nave is admissible as yet another unlawful accommodation provided to a physician in return for his patient referrals.  In the case of Dr. Nave, the hospital provided him privileges and allowed him to treat (and thereby bill Medicare Part B) patients within the hospital despite the fact that he did not meet the hospital's basic credentialing requirements and could not provide them the totality of care they required.  Sacred Heart further aided Nave by simply looking away as he wrote fraudulent narcotics prescriptions for months.  Similarly, the hospital's efforts to find and rent new clinic space for Dr. Nave in return for his patient referrals constitutes yet another unlawful attempt by the Sacred Heart conspirators to pay for patient referrals as alleged in the indictment.  *See* R. 231, ¶ 2(b).

hospital needed to "be adhering to the[] [contracts]," in the context of the state auditor's examination and the suggestion that Puorro simply "get rid of" Nave's credentialing file, Novak revealed that his statements with respect to the physicians' contracts being "kosher" and "adhered to" had to do with concealment of illegality, rather than legality. As Novak succinctly states, all of the instructions were to insure that he and Sacred Heart's other co-conspirators remain "kosher," *i.e.*, "cover [their] asses."

By associating the schemes to conceal the hospital's payments to Kuchipudi, Maitra, May and Moshiri with his plan to destroy evidence of the hospital's improper association with Nave, Novak implicitly recognized his knowledge of the illegitimacy of Sacred Heart's purported contractual relationships with those physicians. As previously noted, at trial the government will be required to prove that Novak knowingly and willfully violated the anti-kickback statute's prohibitions. In his pre-trial filings – in particular, his motion for an evidentiary *Franks v. Delaware* hearing – Novak argued that Sacred Heart's contractual arrangements with the aforementioned physicians were legitimate and that the government's contrary assertions in its search affidavit concerning his *mens rea* were false. His suggestion that the Nave relationship be concealed proves differently.

## VII. REFERRAL OF SACRED HEART PATIENTS TO NOVAK'S OTHER BUSINESSES.

In addition to owning Sacred Heart, Edward Novak owned a number of other healthcare businesses, including Garfield Kidney dialysis center and Superior

Home Health, LLC, a home health care agency. At trial, the government plans to introduce evidence showing that Novak demanded that, when possible, employees arrange for patients treated at Sacred Heart be referred to his other healthcare businesses for treatment. This evidence is directly probative of the way in which the charged offenses were executed. To the extent that Novak's direction that Sacred Heart's patients be referred for treatment at other healthcare businesses owned by Novak constitutes other acts, the evidence of these inter-corporate referrals is admissible under Rule 404(b) to show Novak's motive.

At trial the government will present the testimony of various hospital employees who were responsible for recruiting and maintaining Sacred Heart patients. These employees, like defendant Noemi Velgara, will testify that Novak demanded that patients referred to the hospital receive follow-up services from his other businesses. The government will further admit recordings in which Novak demanded that Sacred Heart patients receive home health services from Superior. For example, in an April 12, 2012 recording,[31] Novak contacted Velgara about a physician, referred to herein as "Physician T," who had allowed a patient to be serviced by another home health company.

| NOVAK: | I understand [Physician T] let one of our patients, um, [patient name], go to another agency. |
| VELGARA: | Who's that? |
| NOVAK: | [Physician T]. We had a patient discharged from the hospital yesterday and she gave it to another agency. |

---

[31] *See* 1D134, session 2443 (April 12, 2012).

| | |
|---|---|
| VELGARA: | You know the name? |
| NOVAK: | [Patient name]. Ask Jessie. I want that f***ing patient back. |
| VELGARA: | Okay. Yeah, because she should (UI). |
| NOVAK: | This is bulls**t. |
| VELGARA: | Yeah okay. (UI) find out who... |
| NOVAK: | And you get ahold, well, get ahold of Jesse, right now, and you get that patient back and you tell [Physician T] if this happens again. I am pissed. |

Evidence that Novak sought to direct patients treated at Sacred Heart and its Golden L.I.G.H.T. clinics to Superior Home Health and/or the Garfield Kidney Center is relevant and admissible as evidence Novak's valuation of the Sacred Heart kickback arrangements he had structured. Novak arranged for his hospital to pay for patients. Once purchased, Novak expected that he would be able to maximize the value of his investment by controlling as much of the patients' care as possible. This evidence therefore reflects Novak's motive and intent and is therefore admissible under Rule 404(b).

## ***Conclusion***

For the foregoing reasons, the government respectfully submits that the Court should admit the evidence referenced herein.

<div style="margin-left:40%">

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

</div>

By:    s/ Joel M. Hammerman
        JOEL M. HAMMERMAN
        RYAN S. HEDGES
        DIANE MACARTHUR
        KELLY GREENING
        Assistant United States Attorneys
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 353-5300

Dated: December 24, 2014