**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 13 CR 312** |
| | ) | |
| **EDWARD NOVAK, et al.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Defendant Edward Novak and eleven others were indicted on fifty-seven counts involving their employment at Sacred Heart Hospital on the West Side of Chicago. The charges include allegations that the defendants participated in a scheme by which the hospital paid kickbacks to physicians in exchange for referrals of Medicare and Medicaid patients to the hospital, in violation of 42 U.S.C. § 1320a-7b(b).

Novak, joined by certain other defendants, moved to suppress evidence that the government seized by warrant from the premises of the hospital. In the motion, Novak argued that the government obtained the warrant by intentional misstatements and material omissions, and he sought an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The government opposed the motion, arguing that the movants lacked Fourth Amendment standing to challenge the search and that in any event no *Franks* hearing was warranted.

The Court, in an oral ruling, found that Novak had standing to challenge the seizure of materials from his office suite at the hospital but not elsewhere. The Court similarly found that the other defendants who joined the motion had standing to

challenge the seizure of materials from their own offices at the hospital. The government later advised that it intended to use material seized from Novak's office and that of defendant Roy Payawal but nothing from the offices of the other defendants who joined the motion, Shanin Moshiri and Ventakeswara Kuchipudi.

With regard to the substance of the motion to suppress, the Court found, in the same oral ruling, that Novak had made the showing necessary to get a hearing as to some, but not all, of the alleged misstatements and omissions in the affidavit offered to obtain the warrant. Specifically, the Court cited the disclosures regarding the credibility of Anthony Puorro, a defendant who served as a government informant during the investigation, and paragraphs 27, 32, 38-39, 43, 81, 84 n.18, 86, and 113 of the affidavit.

The Court held an evidentiary hearing over a three-day period in September-October 2014. Agent Cathy Barbour of the Federal Bureau of Investigation, the case agent for the investigation whose affidavit was offered to obtain the warrant, testified at the hearing, as did Agent Peter Theiler of the U.S. Department of Health and Human Services (HHS) Officer of Inspector General, who likewise had significant responsibilities in the investigation.

In this decision, the Court elaborates further on its conclusion regarding standing and also addresses the merits of the motion to suppress. For the reasons described below, the Court denies the motion to suppress.

**Facts**

In April 2013, the government filed a criminal complaint against Novak, Roy Payawal, Dr. Venkateswara Kuchipudi, Dr. Percy May, Dr. Subir Maitra, and Dr. Shanin

2

Moshiri.  The government also sought warrants based on an affidavit signed by agent

Cathy Barbour.  The ninety-page, 192-paragraph affidavit sought to establish probable

cause to support applications to obtain search warrants permitting the government to

search Sacred Heart and its outbuildings and seize certain bank accounts.  It contained

allegations of violation of the Medicare/Medicaid anti-kickback statute,

42 U.S.C.§ 1320a-7b, and 18 U.S.C. § 1347, which prohibits health care fraud.  The

affidavit was submitted to Magistrate Judge Daniel Martin, who approved the

government's warrant application, after which the search occurred.  A grand jury later

indicted these defendants and others.

## Discussion

### A.    Standing to challenge search

The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause, supported
> by Oath or affirmation, and particularly describing the place to be
> searched, and the persons or things to be seized.

The application of this right "depends on whether the person invoking its protection can

claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been

invaded by government action."  *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal

quotation marks omitted).  The Supreme Court has termed this "Fourth Amendment

standing."  *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1854 n.1 (2011).

To bring a Fourth Amendment challenge, a defendant "need only show that he

had a legitimate expectation of privacy in the area searched."  *Gardner v. United States*,

680 F.3d 1006, 1010 (7th Cir. 2012).  A court assesses a defendant's standing by

considering "(1) whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy; and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. Carlisle*, 614 F.3d 750, 756–57 (7th Cir. 2010).

The government has contested the standing of the defendants to challenge the search at issue. The Court will address the standing of each defendant in turn.

### 1. Novak

The government concedes that Novak may have had a reasonable expectation of privacy in the contents of his office at Sacred Heart, but it contends that he had no such reasonable expectation in the rest of the hospital campus or its bank accounts. The fact that Novak had "operational control" of Sacred Heart does not provide standing to challenge the search of the entire facility, the government argues, nor does his ownership of the hospital through a corporation. Gov't Resp. at 4–5. The reason, the government says, is that Novak cannot show "a personal connection to any of the locations searched and property seized." *Id.* at 6. Novak contends that his ownership of and authority at Sacred Heart, as well as the "private, secure and small nature of the hospital" provide the necessary connection and thus confer standing to challenge the search. Novak Reply at 7. He also cites the fact that he operated other businesses from the hospital facility, over which he had sole ownership or ownership through corporations.

Neither side presents controlling authority on this situation: the owner of corporate entities that own the business that was searched, when the owner also serves as the primary manager of the business and objects to a search of the entire business,

including the offices of others as well as storage rooms and outbuildings. Novak relies on *Mancusi v. DeForte*, 392 U.S. 364, 367–68 (1968), in which the Supreme Court reaffirmed that commercial premises were subject to Fourth Amendment protection and noted that "the Amendment does not shield only those who have title to the searched premises." The defendant in *Mancusi* worked in an office that was "one large room, which he shared with several other union officials." *Id.* at 368. State officials searched the office while the defendant was present; the defendant "had custody of the papers at the moment of their seizure," although the record did "not show from what part of the office the records were taken." *Id.* at 368–69. Under these circumstances, including the fact that the defendant "spent a considerable amount of time in the office," the Supreme Court held that he had standing to contest the admission of the seized materials at trial. *Id.* The defendant would have had an expectation of privacy if he had a private office, the Court reasoned, and "the situation was not fundamentally changed" because he shared an office. *Id.* at 369. He "still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups." *Id.*

Novak contends that he "had just this expectation with respect to the hospital in general." Novak Reply at 2. The situation in *Mancusi*, however, differed from Novak's. *Mancusi* concerned a one-room office shared by several people; in Novak's case, the searched area constituted an entire hospital building as well as two outbuildings. He is challenging a search that extended to a wide area beyond his own office or office suite. Furthermore, the defendant in *Mancusi* "had custody of the papers at the moment of their seizure." *Mancusi*, 392 U.S. at 369. The Supreme Court did not provide detail as

to what "custody of the papers" meant in this context. One way or another, however, Novak does not argue that he had custody of the materials seized when Sacred Heart was searched.

The Court in *Mancusi* also noted that the defendant "could reasonably have expected that . . . records would not be touched except with their permission or that of union higher-ups." *Id.* This passage, Novak argues, "confirms the notion that a person with authority over an office, like Defendant Novak, need not work there himself in order to expect that it be private." Novak Reply at 9. It is unclear, however, how this passage "confirms" the notion Novak describes. The Supreme Court's decision in *Mancusi* had nothing to do with the privacy expectations of the "union higher-ups" who apparently did not work in the defendant's office. But Novak is arguing that such a "higher-up" somehow has Fourth Amendment standing to challenge a search of subordinates' offices and workspaces because the higher-up has a say-so over whether the contents of those offices will be disturbed. *Mancusi* does not go this far.

*Mancusi* confirms that one has an expectation of privacy in the contents of her own office at a place of business. *See Mancusi*, 392 U.S. at 369 ("It has long been settled that one has standing to object to a search of his office, as well as of his home."). It does not, however, establish the standing of the owner of a business to challenge a search of the entire business premises.

Another factor Novak cites in favor of his Fourth Amendment standing is his ownership of Sacred Heart through corporations. His argument is that his expectation of privacy was "no less than" and "the same as" the corporations through which he owns the hospital's business and property. Novak Reply at 5. The government

contends that the corporations Novak owns may have standing to challenge the search of the hospital. But it argues that ownership of a business through a corporation is not sufficient to confer personal standing to assert an expectation of privacy in the business premises.

In this case, the owner of the hospital was West Side Community Hospital, Inc., and the owner of the buildings on the hospital grounds was West Side Building Limited Partnership. Neither is a defendant. It is undisputed that Novak was the sole owner of both of these entities, which Novak says "militates heavily in his favor." Novak Reply at 2. But he does not explain why, or provide any authority to confirm, that his Fourth Amendment standing and that of the corporations he owns are the same—in other words, that for Fourth Amendment purposes, he is the corporations, and they are him. As the Supreme Court recently reiterated, "Fourth Amendment rights are personal rights which may not be vicariously asserted." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (internal quotation marks and alterations omitted); *see also Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("[I]t is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.").

Novak has not persuasively responded to the government's contention that his argument of standing in this case amounts to a vicarious assertion of Fourth Amendment rights held by the corporations. His citation to *United States v. Brien*, 617 F.2d 299 (1st Cir. 1980), is not helpful in this regard. He contends that the court in *Brien* "noted the applicability of six factors" in determining an individual's standing to challenge the search of a business, among them "whether the defendant had 'any ownership interest.'" Novak Reply at 2 (quoting *Brien*, 617 F.2d at 306). To begin with,

the court in *Brien* did not endorse the list of factors or discuss it in any detail but instead simply noted briefly that the district court in applying it "properly adapted the *Rakas* guidelines to this case." *Brien*, 617 F.2d at 306. Second, though the court's discussion of the standing issue in *Brien* is sparse and largely confined to its conclusion that the district court had not erred, the court does not appear to have based standing on corporate ownership at all, for the three defendants who sought suppression in that case were not owners. *See id.* at 301. Rather, as best as one can make out from the decision, it appears to be premised largely on the fact that the defendants worked in the particular area that was searched. The Court also notes that because the court of appeals concluded that suppression of evidence was not warranted, its discussion of standing is *dictum*.

Novak also cites *United States v. Cortina*, 630 F.2d 1207 (7th Cir. 1980), to contend that "there is no practical reason to conclude" that his ownership of the hospital through corporations precludes his Fourth Amendment standing. Novak Reply at 4. The Seventh Circuit in *Cortina*, however, was concerned with an argument from the government "that only . . . corporations ha[ve] any privacy interest in their premises." *Id.* at 1215 n.5. Calling this argument "specious," the court noted that "[i]ndividuals may have a legitimate expectation of privacy in their offices as well as their homes," adding that "[t]he relevant issue is whether the defendant had a reasonable expectation of freedom from government intrusion in the area searched or the property seized." *Id.* The court did not go on to explore whether an individual may assume the Fourth Amendment standing of a corporation he owns. The court's statement that people "may" have a privacy expectation in their offices does not speak to whether a corporate

owner of a business can assert Fourth Amendment standing over the entire premises of the business. Further, the court in *Cortina* essentially set aside the standing question because it invoked its supervisory power to suppress the fruits of the search given the "completely illegal, sweeping search" that had been conducted. *Id.* Although the search in this case may have been "sweeping" in that it involved the entire hospital campus, the Court does not agree that it was "completely illegal," as explained below.

The government cites a number of cases from other circuits in which corporate officers or owners did not have Fourth Amendment standing with regard to the search of their businesses because of their lack of personal connection to the premises searched. The Court finds instructive the case of *United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009). There, the Ninth Circuit reversed and remanded a decision finding that two individuals who were controlling shareholders and corporate officers of a business had standing to challenge a search of the business. The court stated that "it does not suffice for Fourth Amendment standing merely to own a business, to work in a building, or to manage an office." *Id.* at 697. The court went on to state that "except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized." *Id.* at 698.

The court in *SDI Future Health* compared the case to *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1117 (9th Cir. 2005), in which the owners of "a small-family run business housing only 25 employees at its peak" had "managerial control over its day-to-day operations" and "full access to the building." Given these facts, the owners had a

reasonable expectation of privacy in the entire premises. *Id.* Unlike the defendants in *Gonzalez*, however, the defendants in *SDI Future Health* "at most . . . managed and worked in the office of a business of which they were, together, controlling shareholders," one that was "twice the size" of the office in *Gonzalez*. *SDI Future Health*, 568 F.3d at 697. Although they "owned and had authority to set policy" at the business, this rationale was "too broad and generalized" to support a finding of Fourth Amendment standing. *Id.* at 698. The Ninth Circuit remanded the case for further fact-finding after fashioning a test from a Tenth Circuit case for determining an expectation of privacy in a search of workplace areas beyond one's own office:

> (1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization.

*Id.* at 698 (citing *United States v. Anderson*, 154 F.3d 1225, 1230–32 (10th Cir. 1998)).

Novak argues that *SDI Future Health* is inapposite, but he does so by creating something of a straw man. He contends the government and *SDI Future Health* state "that one who owns premises through a corporation cannot, as distinct from the corporation itself, assert Fourth Amendment rights with respect to those premises." Novak Reply at 4. That is not what the government argues or what *SDI Future Health* holds. Rather, the case states that it is not sufficient for Fourth Amendment standing "merely to own a business, to work in a building, or to manage an office" and then goes on to establish the test outlined above. *SDI Future Health*, 568 F.3d at 697.

Novak further contends that Sacred Heart's size indicates he had an expectation of privacy in all of its contents under *SDI Future Health*. He says the hospital qualifies

as a small business, which means the holding of *SDI Future Health* finding a lack of standing does not apply to this case.  Novak is correct that *SDI Future Health* excludes from its holding "the case of a small business over which an individual exercises daily management and control," but the case does not define the term "small business."  *Id.* at 698.  Yet Novak does not persuasively argue that Sacred Heart is a small business as *SDI Future Health* appears to use that term.  He states that the hospital "was small when compared to other hospitals in Chicago and Cook County," considering that Sacred Heart had 119 beds and the average was 151.  Novak Reply at 8.  Taken at face value, however, this comparison is meaningless; Novak does not explain why a hospital with thirty-two fewer beds than the average hospital in the area makes that hospital small even by comparison, let alone a "small business."  He further contends Sacred Heart was a small business on the scale of the business discussed in *Gonzalez*, where the Ninth Circuit held the business owners possessed an expectation of privacy in the business premises.  This comparison does not withstand scrutiny.  The office searched in *Gonzalez* "was a small, family-run business housing only 25 employees at its peak."  *Gonzalez*, 412 F.3d at 1116.  Novak does not state how many employees Sacred Heart had; regardless, a functioning hospital with 119 beds cannot reasonably be considered a small business.  It is a complicated operation, with multiple layers of staff.  Further, unlike this case, the defendants in *Gonzalez* actually owned the building themselves, although they had leased it to their corporation.  *Id.* at 1109.  By contrast, as noted earlier, Novak owned a corporation that owned Sacred Heart's real property.

Considering the size of Sacred Heart, the hospital does not qualify as the sort of "small business" considered in *SDI Future Health*, nor does its size alone mean that

Novak had a reasonable expectation of privacy in the entirety of its contents. Under the circumstances, the Court considers *SDI Future Health* persuasive authority that an individual does not have Fourth Amendment standing to challenge a search of a business by virtue of corporate ownership of the business; he must show a more direct connection between himself or his work and the items seized.

The Court also finds parallels to Novak's case in *United States v. Chuang*, 897 F.2d 646 (2d Cir. 1990). There, the Second Circuit recognized that "a corporate officer or employee in certain circumstances may assert a reasonable expectation of privacy in his corporate office." *Id.* at 649. Beyond one's own office, however, the court adhered to the proposition that a defendant's expectation of privacy depends upon "a sufficient showing of a possessory or proprietary interest in the area searched" as well as "a sufficient nexus between the area searched and [his own] work space." *Id.* (internal quotation marks omitted). The defendant in *Chuang* was president, chairman, and CEO of a bank. In addition, "he or his family owned almost half of all outstanding bank stock at the time the bank was closed." *Id.* at 650. Further, the defendant "exercised significant operational control over the bank and all of its premises, and . . . the areas searched were non-public areas over which ultimate control rested in his hands." *Id.* The defendant was also present while the bank was searched. *Id.* The Second Circuit nonetheless found that he did not have standing to challenge the search. Many of the records uncovered—indeed, the "bulk"—were found in the office of another person on another floor of the bank, and none from the defendant's own office. *Id.* Regarding areas other than his office from which records were seized, the defendant "failed to demonstrate a sufficient nexus between" those offices and his own. *Id.*

12

Although the court went on to discuss privacy concerns specific to the banking industry, the facts regarding the search and the defendant's corporate ownership were similar to those of this case. The Court finds persuasive the Second Circuit's analysis of these issues.

Courts in addition to the Second and Ninth Circuits have reached similar conclusions—that individuals were not entitled to Fourth Amendment standing to contest searches of their businesses solely because of their status as corporate owners or shareholders; more was required. *See, e.g.*, *United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991) (defendant did not have standing to contest search of corporation he owned because items uncovered were "documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit"); *Williams v. Kunze*, 806 F.2d 594, 600–01 (5th Cir. 1986) (vice president and president / sole shareholder had no reasonable expectation of privacy in corporate records kept in "common file room").[1]

Considering these authorities, the Court is inclined to apply the factors outlined in *SDI Future Health* for assessing the personal connection between Novak and the items and places searched and seized. *See SDI Future Health*, 568 F.3d at 698. Thus the Court must ask if the items seized were Novak's personal property, or if he kept them private, away from other work material; if he had custody or immediate control of the

---

[1] Novak makes much of the government "exhum[ing]" a 1946 case in which the Second Circuit said that the sole shareholder of a corporation "may not vicariously take on the privilege of the corporation under the Fourth Amendment." *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946) (per curiam). The Court's discussion of more recent cases obviates the need to analyze *Lagow* in detail; as the Court has indicated, corporate ownership is neither necessary nor sufficient to establish an expectation of privacy in business premises.

items when seized; and if he "took precautions on his own behalf" to secure specific areas and items within the hospital "from any interference without his authorization." *Id.* Aside from his own office suite, Novak makes no assertions regarding whether any of the particular items seized were under his control or came from areas that he otherwise kept personally private, nor does he describe actions he personally took to keep any such items from others.

Novak's other arguments do not assist in filling in the gap. He contends that his position atop the hospital's leadership structure provides him with Fourth Amendment standing as to all of Sacred Heart. Novak was CEO of Sacred Heart; he contends that he had "full authority" over hospital operations and was "an active participant in the management of the hospital." Novak Reply at 5. He kept "his only office at the hospital," worked there "generally" every business day, and "visited nearly all parts of the hospital regularly." *Id.* at 5–6. (Novak does not identify the parts he did not visit regularly.) Novak notes in his declaration that in his "initial years of ownership," he was "actively involved in all aspects of management" of Sacred Heart. Novak Mem., Ex. PP ¶ 5. "Over time," he continues, "I added other administrators and delegated responsibility to them to conduct various aspects of the business of the hospital"; these "subordinates were responsible for managing most of the business of the hospital," although Novak retained "final authority." *Id.*

By Novak's own declaration, then, he did not actually direct each and every business decision of the hospital, considering that his subordinates managed "most of the business" of Sacred Heart. That aside, Novak has offered few specifics about his "control over its day-to-day operations" and how that control related to individual places

searched or items seized. He does not describe, for example, his role in directly managing various parts of the hospital that might correspond with areas searched, such as the information technology office or billing offices within Sacred Heart. His inventory of the rooms of the hospital outside his own office suite, including the private offices of other individuals, does not assist in this regard; the inventory largely states that for each area he expected security measures or policies to be adhered to. It does not describe what, if anything, Novak himself had to do with supervising the people or contents in each area. Further, Novak's argument that his position as CEO gave him an expectation of privacy over the physical premises of an entire business is problematic. Permitting the president, CEO, or overall manager of any enterprise to assert Fourth Amendment standing in the entire premises of the business likely would expand the reach of the exclusionary rule far past the point any court has been willing to take it. The Court does not find this argument persuasive.

This conclusion applies equally to Novak's contention that his authority to exclude people from Sacred Heart along with its security measures also contribute to Fourth Amendment standing. The statements in his declaration about his duties and role at Sacred Heart do not include specifics on actions he personally took to secure specific areas or items at the hospital. In any event, were a sole or controlling shareholder's ability to exclude the uninvited a significant factor in the Fourth Amendment standing analysis, it would verge on a rule that ownership without more confers standing, which is not the law.

In sum, Novak has not shown that he exhibited a personal connection to much of the area searched and the items seized, such as through descriptions of specific

measures he personally took to secure them or the frequency and detail of his interactions with them.

The Court does not conclude, however, that Novak is entirely without Fourth Amendment standing to challenge the search of Sacred Heart. As discussed earlier, there is little question that an individual is entitled to a reasonable expectation of privacy in his own office within a business, regardless of whether the person owned or managed the business. *See Mancusi*, 392 U.S. at 369. Novak therefore has standing to challenge the search of his own office, and the Court is persuaded that this standing extends to the entirety of his office suite, including his secretary's office and the storage closet in the suite. These rooms were located, as Novak argues, within "a private suite with Novak's own office" and "were the only offices in the suite." Novak Reply at 10. The government responds that Novak does not detail "how he used his secretary's office, what personal property he kept there, or any action he personally took to secure the location." Gov't Surreply at 17. The government does not argue, however, that Novak's office was separated from that of his secretary and the storage closet in any meaningful way, nor does it otherwise respond to Novak's argument that they were the only elements of one contiguous office suite separated from the rest of the business premises. Further, although Novak's secretary also worked for Puorro, her office was in the suite with Novak's, and the storage closet was accessible only through the suite they shared. The Court is persuaded that Novak had a legitimate expectation of privacy in the office suite and thus can challenge the search of items seized from there. The Court will therefore proceed to evaluate his arguments against the validity of the affidavit that supported the search warrant.

16

2.     **Kuchipudi, Moshiri, and Payawal**

Dr. Kuchipudi also contends he has standing to challenge the search of Sacred Heart, "including but not limited to files relating to his patients." Kuchipudi Mot. to Join Novak's Mot. at 2. He argues he had an expectation of privacy in the files and documents searched because of "custom and practice at Sacred Heart" as well as federal requirements for maintaining the privacy of patient files. *Id.* The government responds that Sacred Heart, not Dr. Kuchipudi, owned the items seized, and that his notes on patient charts did not create a privacy interest in the charts, considering the access other employees had to them. The government further contends that federal regulations do not create an expectation of privacy on Dr. Kuchipudi's part sufficient to confer Fourth Amendment standing.

The regulation Dr. Kuchipudi cites is part of the Health Insurance Portability and Accountability Act (HIPAA). *See* 45 C.F.R. § 164.530(c). It requires "covered entit[ies]" to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." *Id.* § 164.530(c)(1). Dr. Kuchipudi contends that in light of this regulation, he expected that "no one would access his patient files without his permission or the permission of another medical professional treating his patients on his behalf." Kuchipudi Reply at 4. One element missing from Dr. Kuchipudi's argument is what Sacred Heart did to comply with the regulation, let alone what Dr. Kuchipudi himself did. As noted earlier, a defendant has Fourth Amendment standing to challenge a search if he demonstrates a reasonable expectation of privacy in the area(s) searched or the items seized, an inquiry that encompasses "whether the individual, *by his conduct*, has exhibited an actual

17

(subjective) expectation of privacy." *Carlisle*, 614 F.3d at 756–57 (emphasis added). The Court doubts the HIPAA regulation can do that job for Dr. Kuchipudi.

To that end, aside from his HIPAA argument, Dr. Kuchipudi states he "kept his patient files private and other medical personnel would not access his files without his permission." Kuchipudi Mot. to Join Novak's Mot. at 3. This statement is vague and does not specify what Dr. Kuchipudi did to keep the files private. It likewise does not indicate where he (or someone else) kept these files. Dr. Kuchipudi also states that he "expected his electronic files to be private in part because he needed to enter a password to access them." *Id.* Here, at least, Dr. Kuchipudi has provided a basic example of conduct he undertook to keep his files private, at least the electronic ones. He does not, however, state where these files were kept—for example, on a personal hard drive or on a shared network drive to which others had access, with a password or otherwise. His standing to challenge a search of these files is thus uncertain at best. On a broader note, the Court doubts that Dr. Kuchipudi has a legitimate expectation of privacy in his patients' files at the hospital, given that—as computerized records—they likely were not kept in his own office and that others likely had access to them too.

Like Novak, Dr. Kuchipudi likely has a reasonable expectation of privacy in his own office. *See Mancusi*, 392 U.S. at 369. But he has not demonstrated that he exhibited or enjoyed an expectation of privacy in the rest of the hospital. Indeed, he has not provided any information on the locations from which his particular files were searched and seized, including his computer files. In addition, there is no indication that the government intends to use in evidence any materials that were seized from Dr. Kuchipudi's own office. Assuming those materials were seized from other areas of the

18

hospital, Dr. Kuchipudi has not persuasively argued that he had a legitimate expectation of privacy in them sufficient to confer Fourth Amendment standing. The Court therefore concludes that Dr. Kuchipudi has standing to challenge the government's search of his office and its physical contents, but not anything beyond that area.

The same is true of Dr. Shanin Moshiri, who has also joined in Novak's motion to suppress. He has standing to challenge a search of his own office. But as with Dr. Kuchipudi, there is no indication that the government intends to use in evidence anything seized from that location.

Finally, Roy Payawal, like the other defendants, has standing to challenge the search of his office. Because there is some indication that the government may use items seized from that location, Payawal, unlike Drs. Kuchipudi and Moshiri, participated in the *Franks* hearing held by the Court.

### 3. Court action absent standing

Novak (joined by other defendants) also contends that even if the Court finds he does not have standing to challenge the search, the Court should still suppress the fruits of the search via its "supervisory power." Novak Mem. at 16. Novak points to the Seventh Circuit's decision in *Cortina* to argue that the Court does "not need to require that the individual defendants each demonstrate standing as to each item searched." *Id.* at 17. The government briefly responds that Novak's argument is "overwrought" and lacks merit considering the government's argument that the agent's affidavit supporting the warrant did not contain material misrepresentations or omissions. Gov't Surreply at 18. Given the Court's conclusion above that the defendants have standing to challenge the searches of their offices, the Court need not consider at this juncture the application

of *Cortina* to this case. Rather, the Court would need to address *Cortina* only if, based

on his established standing to challenge at least some aspects of the search, Novak

can meet the *Franks v. Delaware* threshold for success in that challenge.

**B.    The affidavit**

As indicated, Novak contends that the warrant was issued based on material

false representations and omissions by the government and has moved for a hearing on

his motion to suppress the fruits of the government's search. The Court's decision

whether to hold such a hearing is governed by *Franks v. Delaware*, 438 U.S. 154

(1978). Under that decision, a defendant is entitled to a hearing if he "makes a

substantial preliminary showing that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit,

and if the allegedly false statement is necessary to the finding of probable cause." *Id.* at

155–56. Courts must accord "a presumption of validity" to the affidavit supporting the

warrant, and a defendant must "point out specifically the portion of the warrant affidavit

that is claimed to be false; and they should be accompanied by a statement of

supporting reasons." *Id.* at 171. The requisite deliberate or reckless disregard for the

truth requires "more than a showing of negligence," but it "may be proved from

circumstances showing obvious reasons for the affiant to doubt the truth of the

allegations." *United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013).

If the Court finds that there is information that is false or that was reported with

reckless disregard for the truth, it must "set to one side" such material and determine if

"there remains sufficient content in the warrant affidavit to support a finding of probable

cause." *Franks*, 438 U.S. at 171–72. If so, "no hearing is required," but if not, the Court

must hold a hearing.  *Id.* at 172; *see also United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003).

As indicated earlier, the Court made an oral ruling in which it found that Novak had made the necessary substantial preliminary showing entitling him (and Payawal) to a hearing under *Franks* with respect to several of the alleged false statements and omissions in Barbour's affidavit.  These included the following:

- the sufficiency and accuracy of the disclosure regarding credibility issues concerning Anthony Puorro, who was a government informant during a significant portion of the investigation and who was the primary source for information contained in the affidavit;

- paragraphs 27, 38, 39, and 43 of the affidavit, concerning rent payments by Sacred Heart Hospital for office space, including office space rented from defendant Dr. Percy May;

- paragraph 32 of the affidavit, concerning a purported statement by Payawal about Novak withholding payments to doctors;

- paragraph 81, concerning statements by Dr. Kuchipudi regarding admission of patients he referred to the hospital;

- paragraph 84 footnote 18, concerning the purported absence of Medicaid claims by a particular employee;

- paragraph 86, concerning Sacred Heart Hospital's arrangement regarding the same employee; and

- paragraph 113, concerning purported statements by Novak about sending patients to the hospital's emergency room.

The Court concluded preliminarily that it could not say that the warrant application would be sufficient if the offending material were set aside. Though this was a close question, the Court premised its determination primarily on the fact that the affidavit arguably relied to a significant extent on Puorro's credibility. Because of the allegations by Novak regarding non-disclosure and insufficient disclosure of matters bearing on Puorro's credibility, the Court concluded that a hearing was necessary to resolve the motion to suppress.

The Court begins by discussing the evidence adduced at the hearing regarding the process by which Barbour's affidavit was drafted and finalized. The remaining points addressed at the hearing will be addressed in the appropriate sections of the discussion of Novak's allegations regarding material misstatements and omissions in Barbour's affidavit. The Court will refer to exhibits introduced at the hearing as "GX" and "DX," to distinguish them from exhibits that accompanied the parties' pre-hearing memoranda.

### 1. Preparation of Barbour's affidavit

The government's investigation of Sacred Heart Hospital appears to have begun sometime in 2011. *See* Affidavit ¶ 10 (stating that "Physician A" – Dr. Mohammed Asgar – agreed to cooperate with the investigation). The warrant application was submitted to Magistrate Judge Martin on April 15, 2013.

The government's investigation of the hospital was both wide-ranging and intensive. It involved at least three informants—Dr. Asgar, Noemi Velgara, and Puorro—who wore or carried devices that allowed them to record conversations and meetings with other subjects and potential subjects of the investigation, *see id.* ¶¶ 10,

13, 15.  The investigation also involved court-approved monitoring of telephone calls, *see id.* ¶¶ 13 n.6, 15 n.8, and review of voluminous records regarding Medicare and Medicaid claims and reimbursements involving the hospital and medical practitioners whose conduct the government was investigating.  The informants were also debriefed extensively and on numerous occasions regarding their prior and current dealings involving the hospital and others whose conduct the government was investigating.

Based on Barbour's affidavit, it appears that Dr. Asgar agreed to cooperate with the government's investigation in October 2011, after he was recorded accepting a kickback for referring Medicare-insured patients to a home health care company not affiliated with Sacred Heart.  *Id.* ¶ 10 & n.4.  At the time, Dr. Asgar was the chair of Sacred Heart's emergency room operations.  He was terminated from Sacred Heart in March 2012 for reasons that are not disclosed in the affidavit but that were discussed at the *Franks* hearing.

Velgara, a member of the executive staff at Sacred Heart, agreed to cooperate in February 2012.  She was approached by investigators about allegations that she was soliciting kickbacks for referral of prescription medications and medical equipment for Medicare patients.  *Id.* ¶ 12.  Before she agreed to cooperate, Velgara was recorded offering to pay kickbacks for referral of Medicare patients to Sacred Heart.  *Id.* ¶ 12 n.5.

Puorro was the last of the informants to agree to cooperate.  He agreed to cooperate in January 2013 after he was recorded offering to pay and paying kickbacks in return for referrals of patients to Sacred Heart.  *Id.* ¶ 14 & n.7.  After he was approached by investigators, Puorro retained counsel and sat for multiple interviews with investigators and prosecutors.  Hearing Tr. at 60.  Puorro began recording

conversations in February 2013. *Id.* at 63.

As indicated earlier, the majority of the information in the application came from Puorro, via conversations he recorded and information he provided regarding his dealings with hospital personnel and physicians, some of which predated his cooperation. Agent Barbour testified at the hearing that the approximate two-month interval between the onset of Puorro's active cooperation (i.e. recording conversations) and the April 15, 2013 submission of the warrant application was, under the circumstances, a "very quick" time frame. *Id.* at 64. It appears that under normal circumstances, the investigation would have continued for a significant period before seeking a warrant to search and seize records from Sacred Heart. The "time line was expedited," Barbour testified, when the government "received what we believed were credible allegations of patient harm at the hospital." *Id.* As best as the Court can determine, these allegations came to the government's attention in early March 2013 but became more pointed in late March-early April 2013. *See* Affidavit ¶¶ 121-42 (concerning allegedly unnecessary intubations and tracheotomies, as well as a cholecystectomy). (The Court notes that although these allegations were described in Barbour's affidavit, which was also submitted in support of the initial criminal complaint against several of the defendants, they have not resulted in any criminal charges against any of the defendants or others.)

Barbour's affidavit—which, as indicated earlier, was ninety pages long—was drafted entirely by prosecutors. Hearing Tr. at 74, 181. "At the very end of the process," Barbour reviewed drafts of the affidavit, *id.* at 74, and she made a small number of comments regarding those drafts, but she was not involved in the drafting

process in any meaningful way.[2]

The first draft of the affidavit that was provided to Barbour, identified as "VER X" (version 10), was sent to her by e-mail in the early morning hours of Thursday, April 11, 2013.  This was just four days before the warrant application was to be presented to the magistrate judge on Monday, April 15, and five days before the hoped-for warrant's anticipated execution on Tuesday, April 16.  *See* DX 37 at DRAFT_001-000001.  The prosecutors' e-mail accompanying the draft said that "[a]lthough the affidavit remains in draft form, we are providing it to you now to aid you in the preparation of the various tasks that need to be accomplished on Tuesday and to assist us in correcting and finalizing what is currently written."  *Id.*

The draft affidavit was also sent to agent Theiler, the lead HHS agent on the investigation.  On Saturday morning, April 13, Theiler sent two brief e-mails to prosecutors (with copies to Barbour) in which he pointed out a typographical error and a minor error regarding whether a particular conversation was in person or via telephone. *Id.* at DRAFT_001-000020 – 001-000022.

Barbour's first comments regarding the draft affidavit—evidently a later version that was "emailed out on Friday" (that is, Friday, April 12)—were provided to prosecutors by e-mail on the evening of Saturday, April 13.  *See id.* at DRAFT_001-000023.  Barbour listed twenty corrections or changes.  Most were typographical, grammatical, or scrivener's errors, but two involved matters of substance.  One of these suggested addition of a point that evidently had not been included in that draft.  Barbour

---

[2] This, at least, was the essence of the evidence presented at the hearing, at which the government offered only the agents' testimony and not the testimony of any of the prosecutors involved in drafting the affidavit or other evidence regarding the drafting and review process.

testified that when she reviewed the draft, she "was looking at it for anything that jumped out." She was not in her office and did not have the supporting documentation, so she "was looking for information that didn't jibe with [her] independent recollection." Hearing Tr. at 77. "Along the way, I found, you know, typos and some grammatical errors, so I noted those." *Id.* Even though the submission of the affidavit was nearly imminent, Barbour testified that she did not intend to provide any substantive comment. She did not consider her review to be an affirmation of the information in the affidavit, because "[i]t was still very much a work in progress at this point." *Id.* at 78.

Barbour stated that she subsequently went back and looked at interview reports and draft transcripts of recordings and in some instances reviewed recordings. This was done partly at her office and partly at the prosecutors' office. *Id.* at 78-80. The government offered no evidence, however, that Barbour's further review resulted in any additional changes to the draft affidavit, with one minor exception. On the evening of Sunday, April 13, the day before the warrant application was to be presented to the magistrate judge—in response to an e-mail from a prosecutor asking for "[a]ny add'l edits thus far to the affidavit," Barbour replied, "I read through it but I read for content, not edits." She made no suggestions or comments about the affidavit in that e-mail. *Id.* at DRAFT_001-000024. A few minutes later, Barbour sent another e-mail in which she pointed out a typographical error. *Id.* at DRAFT_001-000025. There is no evidence of any other change initiated by Barbour.

At 3:10 a.m. on Monday, April 15, one of the prosecutors sent Barbour and Theiler "VER XII" (version 12) of the Barbour affidavit. The prosecutor's accompanying e-mail stated,

> Enclosed please find the latest draft of the complaint affidavit. Cathy, give
> me a shout in the a.m. so we can schedule when you should come here to
> review this one last time and swear it out. Pete, can you please review
> the forfeiture section and make sure the numbers are correct. Talk to you
> all tomorrow.

*Id.* at DRAFT_001-000026. A little before 8:00 a.m. that same morning, Theiler sent

back an e-mail stating, "Yea looks good." *Id.* at DRAFT_001-000039. There is no

responsive e-mail from Barbour. She appeared before Magistrate Judge Martin later

that day to swear out the affidavit; the precise time was not recorded. There is no

evidence that Barbour offered any additional corrections prior to her appearance before

the magistrate judge. Indeed, Barbour testified that when she met with the lead

prosecutors before swearing out the affidavit, the prosecutor simply explained the

changes he had made. Barbour had no recollection of any of them and no notes

regarding what changes had been made. Hearing Tr. at 186.

In sum, the affidavit, though nominally Barbour's statement, was the work of the

prosecutors on the case. That was the gist of Barbour's testimony, and the government

offered no evidence suggesting otherwise (such evidence, if it existed, was entirely

within the government's possession). The prosecutors effectively had complete editorial

control over what was and was not included and on how the affidavit was worded.

Barbour's corrections and proposed changes were quite minimal. It is apparent that she

trusted the prosecutors to determine what should be included and how the relevant

facts and allegations should be described. The Court does not say this to criticize agent

Barbour; it is simply a matter of fact. In addition, given the compressed time frame for

Barbour's "review" of the affidavit as well as the affidavit's length, there is zero chance

that she cite-checked everything in the affidavit, or even any significant part of it. And

Barbour testified that she did not participate in any meeting at which she and prosecutors (or any of them) vetted the affidavit paragraph by paragraph. Hearing Tr. at 181. In short, Barbour essentially placed near-complete trust in the prosecutors to prepare an appropriate affidavit.

There is nothing wrong, of course, with the involvement of a prosecutor in drafting an affidavit for an agent to submit to a judge in support of an application for a search warrant or any other investigative tool. Significant involvement by an attorney, including editorial control over the contents of the submission to the court, is to be expected, and it is an appropriate and necessary component of the process. This is particularly so in a matter like the present one, in which the investigation summarized in the affidavit was highly complex both factually and legally. There is a difference, however, between drafting and ghost-writing. As some courts have suggested in the roughly analogous area of preparation of expert reports in civil cases pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) (which requires a report "prepared and signed by the witness"), a court reviewing an agent's affidavit ought to be able to assume that the agent had "involvement other than perusing a report drafted by someone else and signing [her] name at the bottom to signify agreement." *Hoskins v. Gunn Trucking*, No. 4:07-CV-72, 2009 WL 2970399, at *3 (N.D. Ind. Sept. 14, 2009).

The Court has concerns regarding the relative non-involvement by the affiant, agent Barbour, in the preparation and editing of her affidavit. The drafting of the affidavit bordered on ghost-writing. The government seems to attribute the process it followed to perceived urgency resulting from the information it received regarding harm or potential harm to patients at Sacred Heart. Whether or not the perceived degree of

urgency warranted the amount by which the affidavit preparation process was truncated, *see* Hearing Tr. at 463 (argument by defense counsel), however, it is difficult to understand why Barbour's involvement in her own affidavit was enlisted only at or near the eleventh hour. That said, the question under *Franks* is whether the affidavit contained material misstatements or omissions, and if so whether they were deliberate or knowing. The process by which the affidavit was prepared certainly informs the Court's analysis of these questions, but it is not determinative. The Court therefore turns to Novak's challenges to the contents of the affidavit.

### 2. Disclosures concerning Puorro's credibility

Novak challenges the accuracy and sufficiency of the disclosure in Barbour's affidavit relating to the credibility of Anthony Puorro. Novak contends that nearly the entire affidavit "is inextricably intertwined with what Puorro told the Government" and that Puorro was the government's "single most important source." Novak Mem. at 7–8. *See also* Hearing Tr. at 196 (testimony by agent Barbour; agreeing that Puorro's reliability was "particularly important" and that she relied on him "quite a bit" in her affidavit). Novak argues that the affidavit made misleading assertions about Puorro's own admissions of culpability as well as statements about his past and about his participation in the investigation.

### a. Evidence adduced at the hearing

The process that led to Puorro becoming an informant began with the targeting of Velgara, Sacred Heart's director of marketing. A physician working as a government informant recorded a conversation in which Velgara indicated that Sacred Heart could make a disguised payment to the physician in return for patient referrals, by hiring and

paying an employee of the physician. In January 2012, a second physician acting as an informant set up a meeting with Velgara to discuss affiliation with Sacred Heart. Puorro, Sacred Heart's chief operating officer, also attended the meeting, which the physician-informant recorded. The physician told Velgara and Puorro that he could bring the hospital at least fifteen patient admissions per month and asked what incentives he could get in return. Puorro "suggested that there were several ways that the hospital to make payment to [the physician]. For instance, Barbour testified, Puorro suggested that the hospital could make payments that were masked as either educational payments or as a medical directorship." Hearing Tr. at 19. In the same recorded conversation, Puorro said that if the physician was able to refer a certain number of payments, he would take the proposal to Novak, the hospital's owner. As a result of this conversation, Puorro became a subject of the government's investigation.

After Puorro became a subject, Barbour directed an FBI support staffer to conduct a background check on him. This included checking various law enforcement databases. From these databases, there was no indication that Puorro had any prior criminal convictions. Queries in an internal FBI database that allows a search for the names of persons identified in FBI reports (but not text-searching of the reports themselves) resulted in two "hits" for Puorro, both of which involved a health care fraud investigation and prosecution in the Pittsburgh area concerning Dr. Joseph Rudolph. The case involved a charge that Rudolph had sold prescription drugs without a license; it concerned the alleged diversion of pharmaceutical medications that Aliquippa Community Hospital had obtained on a discounted basis, via a government-sponsored program, to be used for low-income patients. Puorro, then the president and chief

executive officer of the hospital, where Dr. Rudolph worked, was identified as having been interviewed or referenced in a report. Barbour obtained and searched the underlying FBI documents and found no indication that Puorro had been a subject of the investigation or had been suspected of wrongdoing. She also contacted the FBI case agent for the Rudolph case.

Barbour also found several newspaper articles about Puorro and Aliquippa Community Hospital. One concerned the hospital's prior financial problems; it indicated that Puorro had led a financial turnaround. Another involved criminal charges against hospital employees for distributing OxyContin; it did not indicate Puorro was involved. A third article reported the hospital's firing of Puorro; it indicated there was a "gag order" regarding the lawsuit but made reference to the hospital's financial problems and the investigations involving OxyContin and Dr. Rudolph. Another, later article referenced that the hospital was in dire financial straits. This article indicated that Puorro had sued the hospital after his termination to recover unpaid salary. The article further indicated that the hospital had countersued Puorro for doctoring the hospital's books.

Barbour sent the articles to one of the prosecutors on the Sacred Heart investigation, with a cover e-mail referencing Puorro's troubled history with Aliquippa Community Hospital. Barbour asked the prosecutor to try to obtain documents from the referenced lawsuit. The prosecutor obtained Puorro's complaint against the hospital but evidently did not obtain or review the countersuit referenced in the newspaper article, in which the hospital had accused Puorro of doctoring the hospital's books. Barbour did not follow up to try to obtain the countersuit. The government (which was completely in control of the evidence on this point) offered no explanation for why this follow-up was

31

not done.

Barbour also obtained a copy of a memorandum of an interview of Puorro by an HHS agent conducted in connection with the Rudolph investigation. During the interview, Puorro told investigators that he had approved the program Rudolph had set up. He told the investigators that he had acted on the advice of counsel for the hospital and had no reason to believe the program was illegal.

Barbour then contacted the FBI case agent on the Rudolph investigation. Barbour told the agent that Puorro was chief operating officer of a hospital she was investigating and asked for information about Puorro's role in the Rudolph investigation. The other agent outlined the history of the Rudolph case consistently with the articles Barbour had read. He did not have much of a memory about Puorro but said he was not a subject of the investigation and had not been charged. Barbour also learned that the case against Dr. Rudolph had resulted in a hung jury, followed by a civil settlement and a decision not to retry the criminal case. Barbour did not conduct further follow-up investigation regarding Puorro and Aliquippa Community Hospital before submitting the search warrant affidavit. She did, however, run a criminal background check on Puorro in February 2013 through the National Crime Information Center (NCIC) database— which contains, among other things, criminal history information—with negative results.

In the meantime, Velgara and Dr. Asgar continued to record conversations at and concerning Sacred Heart Hospital, including some involving Puorro. In January 2013, Barbour and Theiler agents approached Puorro in the lobby of the building where he lived and told him that he was a target of a criminal investigation. They provided him a "target letter" and played clips of recorded conversations for him. Puorro agreed to

cooperate with the government's investigation.  After obtaining counsel, he was interviewed by law enforcement and prosecutors on multiple occasions, pursuant to a "proffer agreement."  Hearing Tr. at 60.[3]  As indicated earlier, Puorro also began recording conversations and meetings with Novak and others at Sacred Heart Hospital, starting in February 2013.

On April 9, 2013, a little less than a week before the submission of the warrant application, agent Theiler spoke with Puorro by telephone after meeting with him earlier in the day.  Theiler testified that the first questions he asked Puorro over the telephone involved an incident in November 2012 when, as Puorro had previously described, Novak had him hand-deliver checks to Drs. Shanin Moshiri and Subir Maitra.  In the April 9 conversation, Puorro told Theiler that he was unaware at the time that the checks were in return for referring patients.  Theiler realized that this was inconsistent with what Puorro had previously told agents and prosecutors about this incident, and he did not believe that Puorro was telling the truth.

The Court notes that the background and context for the discussion of this point on April 9 was a bit murky and was not cleared up meaningfully by Theiler at the *Franks* hearing.  When asked on direct examination why he brought up this topic with Puorro, Theiler initially testified that one of prosecutor Terra Reynolds "provided me with some questions to ask in order to tie up some loose ends with our case" for purposes of the search warrant, Hearing Tr. at 376, but then stated, somewhat inconsistently, that he

---

[3] Though the proffer agreement was not introduced in evidence, the Court assumes that it followed the more-or-less standard format in this district and consisted of an agreement by Puorro to provide information relevant to the government's investigation and an undertaking by the government not to use his statements against him, unless he later testified contrary to or took a position inconsistent with the proffer.  *See, e.g., United States v. Araujo*, 622 F.3d 854, at 860-61 (7th Cir. 2010).

"was just basically verifying information that we . . . learned before in proffers," *id.* at 377. Yet from the government's standpoint, this was *not* a "loose end." Puorro had supposedly stated definitively in his fifth proffer session that Novak had specifically told him during the meeting in question that "We are not paying Maitra for nothing" and had told Puorro to hand-deliver checks to Maitra and Moshiri and that he (Novak) "wants to see more volume" from them. DX 6 (2/13/13 interview mem.) at 7.

Whatever the reason for re-interviewing Puorro about this incident, Theiler did not pursue the inconsistency when speaking with him on April 9. Theiler explained at the hearing that Puorro "had an attorney, and I felt this issue should be discussed in front of his attorney. The other issue is if he did change his answer and I was the only one on the phone, I felt that I wanted somebody else to verify that he did change his answer." *Id.* at 379. Theiler wrote a report regarding the conversation and contacted prosecutor Reynolds, telling her that they needed to discuss this issue with Puorro further. *Id.* at 383-84, 442. Barbour was also made aware of Puorro's statement to Theiler; she testified at the hearing that she likewise did not believe that Puorro had told Theiler the truth. *Id.* at 66.

A meeting was quickly arranged (exactly how it was arranged and what was said in order to arrange it was not introduced in evidence, presumably because it was a prosecutor who arranged the meeting). The meeting, held at the U.S. Attorney's Office on April 11, 2013, was conducted in a way that emphasized its significance: it included Puorro and his attorney, Theiler and two other law enforcement agents, and three prosecutors, with Barbour participating by telephone. Barbour said the reason why so many people were present was that "there was a level of import to this meeting because

we at that point were getting very close to the execution date of the [not-yet-issued] search warrant and arrests." *Id.* at 70. After some preliminaries, a prosecutor confronted Puorro with the differences between his April 9 statement to Theiler and his earlier interview and accused Puorro of lying (Theiler confirmed the use of that word). *Id.* at 385-86, 444. Puorro agreed that when he delivered the checks in November 2012, he understood at the time that they were payments for patient referrals. *Id.* at 71-72, 446. According to Barbour, Puorro explained his inconsistent statement to Theiler by saying that "he felt like things were coming to an end, and he was getting very scared about what was going to happen to him." *Id.* at 72. Theiler testified that Puorro said "that he was overwhelmed and wanted to protect himself." *Id.* at 386.

Barbour testified that she was not concerned that Puorro's statement to Theiler on April 9 had undermined his previous assertions regarding his role in paying for patient referrals or regarding Novak's culpability. *Id.* at 73.

### b.    Disclosure of Puorro's misrepresentations

Novak's arguments regarding the affidavit's disclosures about Puorro's credibility concerns a footnote in agent Barbour's affidavit. The footnote was single-spaced and in smaller typeface than the body of the affidavit, so the Court reproduces it in similar fashion here. Though the Court is using a different typeface from the affidavit, the size and spacing of the footnote are approximately the same as in the original. In the footnote, Puorro is identified as "Administrator A":

Prior to agreeing to cooperate in the investigation, Administrator A was consensually recorded offering to pay, and in at least one instance, paying kickbacks, to physicians in return for their referral of patients to Sacred Heart. Administrator A was also consensually recorded directing that Sacred Heart physicians not interfere with the admission of other physicians' patient referrals to Sacred Heart, irrespective of the perceived lack of medical necessity for those admissions. Administrator A was further recorded directing physicians and others to use the hospital's emergency room unnecessarily to observe and admit patients to Sacred

Heart. Administrator A's interviews with law enforcement agents were subject to the terms of a proffer agreement. In those interviews, Administrator A has made certain statements which he has subsequently acknowledged were not accurate. Other than the proffer agreement, the government has not made any other promises or assurances to Administrator A in connection with his assistance in this investigation. Administrator A is cooperating with the hope that his cooperation will be considered in any charging decisions made in connection with this investigation and, if Administrator A is charged and convicted, by a court at the time of sentencing. Administrator A has never been arrested or convicted of a crime.

Affidavit ¶ 14 n.7.

Novak contends that this footnote is a "perfunctory summary" about what the government knew about Puorro's credibility that is "both false and misleadingly incomplete." Novak Mem. at 8. He focuses first on this sentence: "Administrator A has made certain statements which he has subsequently acknowledged were not accurate." Affidavit ¶ 14 n.7. He argues that this is a "false characterization," Novak Mem. at 10, that minimizes the import of the April 9—April 11 statements discussed above. Novak contends that Puorro recanted a significant statement in which he had directly implicated Novak in a pay-for-patients scheme and then "recanted his recantation," *id.* at 9, and he points out that this occurred just a matter of days before the warrant application was submitted to the magistrate judge. This is a fair description of what occurred. On April 9, Puorro disavowed a significant accusation against Novak; on April 11, he disavowed the disavowal.[4] Novak contends this episode reflects that Puorro "lied intentionally," and he argues the affidavit misleadingly omitted that Puorro's statements that he recanted "concerned a critical allegation related to one of the three theories of criminal liability" in this case. *Id.* at 10. Novak continues: "Nor did [the

---

[4] As Novak points out, Puorro's April 11 recantation of the April 9 recantation did not include the same accusation that Novak had directed him to confront Moshiri and Maitra about the level of their referrals. That omission, though arguably significant in its own right, is not terribly important in the Court's consideration of the present dispute.

affidavit] tell the Magistrate Judge that Puorro recanted his exculpatory statements only after being called to the prosecutors' office to face a no doubt intimidating panel of prosecutors and agents, or that he admitted his willingness to lie to the Government in order to mask his own culpability." *Id.*

Barbour testified that she believed the footnote's statement that "i[n] those interviews, [Puorro] has made certain statements which he has subsequently acknowledged were not accurate" was sufficient to cover the April 9 statement to Theiler, because Puorro "had made certain statements. Subsequently he came in and acknowledged that was not accurate." Hearing Tr. at 86-87. Barbour testified, however, that this statement in the footnote did not cover simply Puorro's April 9 statement to Theiler, but also a series of earlier statements in which Puorro had attempted to minimize his own culpability but then admitted the inaccuracy of the minimization. *Id.* at 87. Barbour was unable, however, to identify any of these earlier "minimizations," aside from a claim by Puorro when first confronted by the agents that he had "run everything through" the hospital's attorneys. *Id.* at 200-01.[5]

The content of what became footnote 7 in Barbour's affidavit as provided to the magistrate judge—quoted earlier—changed from the earlier draft that Barbour reviewed. In that draft, which as previously noted was sent to Barbour a little after 1:00 a.m. on April 11—in other words, *before* Puorro and his attorney came in for the recant-the-recantation meeting that day—the footnote was considerably shorter, and it included no references to Puorro having made inaccurate statements during his interviews with law

---

[5] When disclosing impeachment material regarding its witnesses, the government likely will have to do a bar better job than this of identifying Puorro's other statements to law enforcement that he later admitted were "not accurate."

enforcement.  Nor did it include any reference to the proffer letter; indeed it said that no promises had been made to Puorro.  It also made no reference to Puorro having been recorded directing unnecessary admissions to the hospital via its emergency room.  The earlier draft read as follows:

> Prior to agreeing to cooperate in the investigation, Administrator A was consensually recorded offering to pay, and in at least one instance, paying kickbacks, to physicians in return for their referral of patients to Sacred Heart.  Administrator A was also consensually recorded directing that Sacred Heart physicians not interfere with the admission of other physicians' patient referrals to Sacred Heart, irrespective of the perceived lack of medical necessity for those admissions.  The government has not made any promises or assurances to Administrator A in connection with his assistance in this investigation.  Administrator A is cooperating with the hope that his cooperation will be considered in any charging decisions made in connection with this investigation and,  if  Administrator A is charged  and  convicted, by a court at the time of sentencing.   Administrator A has never been arrested or convicted  of a crime.

DX 37 at DRAFT_001-000004.

If this version of the Puorro footnote had been in the final version of Barbour's affidavit that was submitted to the magistrate judge, the disclosure would have been false (due to the claim of no promises or assurances) and would have contained significant omissions (due to the absence of any reference to earlier false statements by Puorro).  And in that event, the non-disclosures might well have been material, given the degree to which other portions of the affidavit significant to the probable cause determination relied on the veracity of Puorro's accounts.

Despite the incompleteness and inaccuracy of the draft of the Puorro footnote, Barbour made no suggestions for changing it and did not suggest its inaccuracy or completeness.  *See* Hearing Tr. at 358.  Rather, the changes were all initiated by the prosecutors.  Their additions to footnote 7 that preceded its submission to the magistrate judge improved it.  In its final form, the footnote made it clear that Puorro had engaged in significant criminal misconduct before his cooperation; that he had

38

cooperated with the government in the hope of currying favor and obtaining leniency; that he had been interviewed pursuant to an agreement that gave him assurances that his statements would not be used against him; and that even then, he had made false statements that he later acknowledged.

Novak argues that even with these improvements over the earlier draft, the final version of the footnote was insufficient to disclose Puorro's significant credibility issues to the magistrate judge.  This is anything but an "unfair" characterization, contrary to the government's repeated protestations during argument at the conclusion of the *Franks* hearing.  Indeed, the Court is constrained to say that form and manner of the footnote reflects that it was designed to soft-pedal Puorro's credibility issues.  First of all, the disclosures were not made in the double-spaced text of the affidavit.  Rather, they were made in a smaller-type, single-spaced footnote in a section of the affidavit that was chock-full of lengthy footnotes—seven in the first seven pages, and five of them, all but one lengthy, in the three pages ending with the page on which the Puorro footnote appeared.  The Court acknowledges the government's claim that lawyers and judges read footnotes, but it is equally true that lawyers and judges who draft documents place points in footnotes that they consider less important than the text of the document, and lawyers and judges who read those documents understand this.  The fact that disclosures regarding the credibility of all three of the government's informants were made in footnotes is reflective of an effort to deemphasize them and minimize their significance.  Indeed, when asked why the disclosure regarding Puorro was in a footnote, Barbour testified that her "understanding all along was that this was information that, while it was information that should be included, it also kind of

interrupted the telling of the story. So that's why it was put into a footnote." Hearing Tr. at 356-57. This amounts to a virtual admission that the use of footnotes was meant to deemphasize their contents.

Second, the disclosure about Puorro's "inaccurate" statements, as Novak contends, at least arguably could be read to suggest mistakes as opposed to lies. But more importantly, the disclosure, read in context, was made in a form that effectively reduced it to near-boilerplate. Similar statements, in virtually identical language, were made in the footnotes concerning Asgar and Velgara. *See* Affidavit ¶¶ 10 n.4 ("In his initial interviews, Physician A [Asgar] made certain statements which he has subsequently acknowledged were not accurate), 12 n.5 ("In her interviews, Administrator B [Velgara] has made certain statements which she has subsequently acknowledged were not accurate."). None of the footnotes describe the contents of any statements that were "not accurate" or even the nature of the inaccuracy—e.g., a false accusation? an attempt to minimize the informant's own culpability? The use of this near-boilerplate, again, represented an effort to deemphasize the significance of the credibility disclosures.

That does not necessarily mean, however, that the disclosures were *misleadingly* inaccurate or incomplete. The ultimate question is whether they had the relevant information necessary to evaluate Puorro's reliability in considering the portions of the affidavit that relied on what he had told investigators. In arguing the insufficiency of the disclosures, Novak cites *United States v. Glover*, 755 F.3d 811 (7th Cir. 2014), in which the court concluded that information about an informant omitted from a warrant application was material. *See id.* at 820. The court in *Glover* catalogued several cases

where an affidavit's presentation of an informant's credibility was at issue. In one, the affidavit "described the confidential informant as 'reliable' without offering any explanation for that assertion," though the court noted that lack of information about an informant's reliability "is not necessarily fatal." *United States v. Dismuke*, 593 F.3d 582, 587 (7th Cir. 2010), *abrogated on other grounds as recognized in United States v. Miller*, 721 F.3d 435, 438 (7th Cir. 2013). The court went on to review the affidavit's corroboration of the informant's information and, stating it was "a close case," found police had presented "basic details" that conferred "at least *some* indicia of reliability," although "the level of detail and corroboration" were "not well-developed." *Id.* at 587–88. Considering those facts, as well as the "great deference" due the authority issuing the warrant, the court declined to find that the affidavit supporting the warrant was insufficient. *Id.* at 588. In *Glover*, on the other hand, the affidavit featured "the complete omission of known, highly relevant, and damaging information" about the informant's credibility, including his criminal record, gang activity, aliases, and expectation of payment. *Glover*, 755 F.3d at 817. This is the type of information, the court said, that would have to be disclosed by the prosecution under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); the lack of it "impaired the neutral role of the magistrate deciding whether to issue the warrant." *Id.* In another recent case, although the affidavit "was lacking in specificity" about the informant's report to police, "this shortcoming, on balance, [was] not sufficient to overturn a finding of probable cause." *United States v. Searcy*, 664 F.3d 1119, 1123 (7th Cir. 2011). The Seventh Circuit noted that the informant's reports had previously led to three other arrests, and "because the informant faced criminal prosecution for furnishing false

information to police, the informant's information was sufficiently reliable to compensate for its lack of detail."  *Id.*  On balance, the informant in *Searcy* "provided fresh information that he observed firsthand and which law enforcement adequately corroborated," which combined with his history of accurate reports to police "compensates for any absence of detail in the affidavit."  *Id.* at 1124.

Novak cannot argue that, as in *Glover*, the affidavit "omitted all credibility information" regarding Puorro.  *Glover*, 757 F.3d at 818.  The affidavit states that he "subsequently acknowledged" that "certain statements" he made to authorities "were not accurate."  Affidavit ¶ 14 n.7.  This sentence does not contain the words "Puorro admitted he lied," but that implication is more or less clear.  And although the footnote in question does not specify which statements "were not accurate," the magistrate judge was thus free to infer that it could apply to any (or many) of Puorro's statements to law enforcement.  Novak contends that the affidavit should have also reported "the circumstances . . . under which [Puorro] changed his story."  Novak Reply at 20.  Yet he cites no controlling authority for the proposition that this level of detail was required.

In addition, the footnote disclosed that Puorro had engaged in criminal conduct before cooperating; that he had the benefit of a proffer agreement; and that he was hoping that this cooperation would result in favorable treatment.  Further, as the government contends, the affidavit contained corroborating information from "the government's other cooperating witnesses, Puorro's own pre-cooperation recorded statements to third-parties, and the numerous recordings Puorro made at the government's direction,"

Thus, though Novak contends that "the affidavit rests" on Puorro's word, Novak

Reply at 22, it includes a substantial amount of information from recordings Puorro made, as well as two other cooperating witnesses, who like Puorro made recordings of Sacred Heart employees and gave statements to law enforcement. *See* Affidavit ¶¶ 10 & 11 & nn.4–5. It is true that the affidavit also reports that both of these informants, like Puorro, made statements later reported to be inaccurate. But Novak does not specifically attack either informant on this measure. And although Novak attacks the affidavit's characterization of certain recorded conversations, the affidavit contains a large number of direct quotations from those recordings, many of which corroborate Puorro's claims.

The Court finds, as described earlier, that the government deliberately soft-pedaled and minimized the factors that warranted skepticism about Puorro's believability. But it did not hide them from the magistrate judge. Given Judge Martin's significant pre-judicial experience in negotiating and litigating criminal cases in this district as well as his experience as a magistrate judge, the footnote disclosure would have clued him in to the fact that the government had sought to cultivate Puorro as a source and an informant—thus the proffer agreement; that even then, Puorro had made false statements, the falsity of which he had later acknowledged; and that he was attempting to curry favor with the government. Though there is good reason to be critical of the form and content of the government's disclosure, it was not so bland or that its implications would have gotten past the magistrate judge. The footnote sufficiently disclosed the bases for skepticism regarding Puorro's allegations, enabling the magistrate judge to evaluate them fairly. The Court concludes that neither the omissions from the footnote nor its minimization were material.

### b.     Puorro's criminal history

Novak next contends that the affidavit falsely reported that Puorro had never been arrested or convicted of a crime.   *See id.* ¶ 14 n.7 ("Administrator A has never been arrested or convicted of a crime.").   In fact, Novak says, Puorro was arrested in 2003 on a domestic violence charge in Ohio, which is information he says his counsel "were easily able to obtain."[6]   Novak Mem. at 10 (citing Novak Mem., Ex D - 6/14/03 Jefferson Cnty. Sheriff's Office Arrest Report).   The government concedes the affidavit was wrong about this fact but states that its failure to obtain this information "was inadvertent" because the NCIC criminal history report on Puorro that Barbour obtained reported he had no criminal history.   Gov't Resp. at 17–18 (citing Gov't Mem., Ex. 21). The government further argues that this failure was not material, because Puorro pleaded no contest to the disorderly conduct charge resulting from the arrest and that the crime itself "has no bearing on veracity," and cannot result in jail time.   *Id.* at 18. The omission thus "would have had little or no impact" on the magistrate judge's evaluation of Puorro's credibility.   *Id.*

In his reply, Novak does not respond to the government's contention that the omission of Puorro's Ohio arrest and charge was not material to the magistrate judge's evaluation of the affidavit or that an initial criminal history report failed to note his Ohio arrest and charge.   He states that government agents should have "asked Puorro himself" about his criminal history but does not explain why it was not reasonable for the

---

[6] Novak states in his initial memorandum that the arrest occurred in Pennsylvania, but the arrest report he submitted in evidence indicates it occurred in Bloomingdale, Ohio. *See* Novak Mem., Ex. D at 2 (noting that the arresting officer was "dispatched to the above arrest" where he eventually arrested Puorro, listing the address in Bloomingdale); *see also id.* at 5 (complaint against Puorro indicating from Jefferson County Court in Ohio).

agent to rely upon the erroneous criminal history report. Novak Reply at 22. The Court concludes that the error on the government's part was neither mistaken nor reckless.

### c. Other prior misconduct by Puorro

Novak argues that the affidavit recklessly failed to disclose criminal and other misconduct by Puorro during his tenure as president and chief executive officer of Aliquippa Community Hospital in Pennsylvania during the 2003-2007 time frame. The Court begins by summarizing what the evidence shows, including the evidence adduced at the *Franks* hearing.

After Puorro became a subject of the Sacred Heart investigation, Barbour ran a background check on him and, among other things, accessed internal FBI databases. She learned that Puorro had been interviewed or referenced in connection with a federal health care fraud investigation and prosecution in the Pittsburgh area involving Aliquippa Hospital. The investigation involved allegations of diverting pharmaceutical medications acquired at low cost via a government program aimed at benefitting low-income patients. *See* Hearing Tr. at 240-41. The defendant charged in the case was Dr. Joseph Rudolph, a physician affiliated with the hospital who had set up cancer treatment clinics outside of the hospital's geographic area and diverted the medications to those clinics. Rudolph was charged with distribution of prescription drugs without a license. *See* GX 12. Barbour obtained a memorandum of an interview of Puorro conducted during the investigation. The memorandum reported that Puorro told investigators that he had approved the program and that the hospital had profited significantly from it. *See id.* at 246-49; DX 12. Puorro stated, however, that he had relied on advice of corporate counsel in approving the program, that he would not have

45

approved it if he thought it was illegal, and that neither he nor anyone at the hospital had benefitted personally. Based on Barbour's review of FBI reports, she found no indication that Puorro had been a subject of the investigation or suspected of wrongdoing. She also spoke to the FBI case agent, who had little memory of Puorro but confirmed he had not been charged and had not been a subject of the investigation. Barbour also learned that Dr. Rudolph had not been convicted in the criminal case and that the case had been resolved via a civil settlement after the jury in the criminal trial deadlocked. *See* DX 12.

In addition to the Rudolph matter, Barbour also obtained various news articles that mentioned Puorro. One of these articles indicated that Puorro had been fired from his position as president and chief executive officer of Aliquippa Community Hospital and had sued to recover lost pay. The article reported that the hospital had countersued, accusing Puorro of doctoring the hospital's books. Puorro forwarded the articles to the prosecutors in the Sacred Heart case, referencing the counterclaim and asking if they could get access to the lawsuit. *See* DX 13.

As of the date of the warrant application, however, Barbour's and the government's inquiry into these matter had essentially stopped there. Neither Barbour nor anyone connected with the investigation did any further follow-up regarding the Rudolph/Aliquippa matter prior to submission of the warrant application. If Barbour had done so, she would have obtained, with relative ease, an FBI report regarding a preindictment meeting with the prosecutor in the Rudolph matter. During this meeting, the prosecutor told the FBI case agent that "consideration should be given to prosecuting Anthony J. Puorro, President and Chief Executive Officer, Aliquippa

46

Community Hospital, and the physicians Dr. Rudolph is selling to should evidence of a kickback scheme be identified." GX 2 at 2-3. In addition, if Barbour or another investigator had reviewed court filings in the Rudolph criminal case, they would have found a submission by the government in which it stated that "[t]he government's position at trial . . . will be that Mr. Puorro is equally culpable with the defendant." GX 3 at 2. More specifically, the government said that

> the evidence will demonstrate that Mr. Puorro and the defendant were primarily responsible for the implementation of the prescription drug sales program which is the basis of the charge in this case. . . . [T]he nature of the evidence will inevitably suggest to the jury that Mr. Puorro and the defendant acted in concert as to the relevant conduct in this case.

*Id.* at 2-3. As of the time of the warrant application, however, the government had done no further follow-up and thus remained blissfully unaware of this.

With regard to the Puorro-Aliquippa civil case, even though Barbour's request to the prosecutors to obtain records specifically referred to the hospital's counterclaim accusing Puorro of doctoring the hospital's books, they obtained only a copy of Puorro's complaint against the hospital, not the counterclaim accusing him of misconduct—and Barbour evidently did not follow up. The counterclaim, which the government could have obtained easily, accused Puorro of backdating a board-approved increase in his salary and providing the hospital's board with misleading financial statements that overstated its assets and understated its liabilities, allegedly to conceal the hospital's true financial condition and thus perpetuate his own employment. *See* DX 9.

In addition, despite numerous interviews with Puorro prior to the submission of the warrant application, the government appears never to have asked him a single question about the Rudolph matter or, for that matter, anything about Aliquippa

Community Hospital or his employment there.  Hearing Tr. at 259-61.  Indeed, Puorro

was not asked anything about any of these matters until October 2013, after (and

because) Novak's attorneys raised these points with prosecutors.  *Id.* at 265-66.

The evidence shows that the government was rather curiously uncurious about

Puorro's history prior to his work for Sacred Heart.  There was a bread crumb trail that, if

followed, might have led to evidence of fraud or other misconduct on his part.  But the

government did not follow it.  Agent Barbour acknowledged interest in these matters but

said that further follow-up "got pushed to the back" when the government's timeline for

filing charges became expedited, as discussed previously.  Hearing Tr. at 85.  Barbour

said that at the time, it appeared, based on the information she had obtained, that

Puorro had answered the relevant questions in connection with the Rudolph matter and

that there were no credible allegations of misconduct on his part.  *Id.*

But despite the government's rather feeble efforts to inquire into its key

cooperating witness's background, the Court cannot say, based on the current record,

that further investigation would have led to evidence of prior misconduct by Puorro that

would have been material in connection with the warrant application.  First, with regard

to the Rudolph/Aliquippa prosecutor's indication that charges against Puorro should be

considered, his recommendation was that Puorro might be subject to criminal charges *if*

evidence of kickbacks was uncovered.  Novak has offered nothing to suggest that any

such evidence ever surfaced.  Second, though Puorro admitted he had approved the

program that led to Rudolph's indictment, he said that he did so on advice by the

hospital's counsel.  Novak has offered no evidence indicating this was untrue.  And the

prosecutors in the Rudolph case, who had knowledge of Puorro's approval of the

program, chose not to charge him. Although they later made a filing prior to Rudolph's trial in which they said Puorro was equally culpable, Barbour was not aware of that filing, and the Court cannot say that in failing to follow up, she *knowingly* turned a blind eye to pertinent information. The government's failure to discover these matters arguably was careless, but it was not reckless. Perhaps just as importantly, the Court cannot say on the present record that further follow-up would have turned up anything of significance. In this regard, it is worth noting that Barbour's affidavit disclosed with particularity criminal misconduct that Puorro had engaged in at Sacred Heart before he agreed to cooperate with law enforcement. The Court cannot say that disclosure of his possible involvement in misconduct in the Rudolph matter would have added anything of significance to the mix of information the magistrate judge was given.

As for the Aliquippa counterclaim against Puorro, even if the government had found it, it amounts to a mere allegation. Novak has offered no evidence indicating the allegation was true. Thus there is no basis for a finding that by failing to disclose the counterclaim, the government withheld anything material regarding Puorro's credibility.

### d. Second cellular phone

Finally, Novak argues that the affidavit makes a "suggestion . . . that is at best misleading and at worse false": that the FBI was monitoring all of Puorro's phone calls when it was not actually doing so. Novak Mem. at 12. He points to this passage from the affidavit: "With [Puorro]'s consent, on or about February 21, 2013, and March 21, 2013, the government obtained judicial authorization pursuant to 18 U.S.C. § 2511(2)(a)(ii)(A) to record the communications to and from a cellular telephone used by [Puorro]." Affidavit ¶ 15 n.8. Novak contends that "[t]he plain implication" of this

49

passage "is that during the weeks leading up to the searches the Government was monitoring all of Puorro's cell phone calls."  Novak Mem. at 12.  The reason this is false, Novak argues, is that other evidence shows Novak had second cellular phone, and "[d]isclosure of that fact would have dispelled the notion the Government tried to float in footnote 8 that it was comprehensively monitoring Puorro's cell phone traffic."  *Id.* at 13.

Novak does not provide a good explanation for why this was or could have been material.  He does not suggest, for example, that Puorro was engaged in activity via his other cell phone that would have further undermined his credibility or contradicted other statements in the affidavit.  That aside, the Court disagrees with the basic premise of Novak's argument.  The passage in the affidavit about the cellular phone does not, as Novak contends, imply that the government was monitoring "all of Puorro's cell phone calls."  The passage states only that the government was monitoring "a cellular telephone."  Affidavit ¶ 15 n.8.  In his reply brief, Novak argues that the only reason the affidavit would have included this statement was "to suggest to the Magistrate Judge that it was monitoring all of" Puorro's cellular communications.  Novak Reply at 28. Without anything to support this contention but conjecture, Novak has not shown that this passage of the affidavit contained a deliberate or reckless falsehood the inclusion of which was "necessary to the finding of probable cause."  *Franks*, 438 U.S. at 156.

### 2.     Failure to discuss statutory provisions

Novak next contends that Barbour's affidavit should have described to the magistrate judge the "safe harbor" provisions of 42 U.S.C. § 1320a-7b, which the parties refer to as the anti-kickback statute.  The anti-kickback statute says that its prohibition does not apply to, among other things, "any amount paid by an employer to

an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). Novak contends that the affidavit's failure to refer to this provision was a "remarkable and misleading omission." Novak Mem. at 31. Because certain arrangements described in the affidavit may qualify for the safe harbor, Novak argues, its absence from the affidavit was "a misleading and material omission" or at least the "failure to provide plainly material context." *Id.* at 31–32.

The government responds that Barbour did not have to "instruct" the magistrate judge on the law because one should "presume[ ] that a magistrate judge—the party responsible for assessing legal sufficiency—knows or has the tools to determine, if necessary, the legal prerequisites of the crimes alleged." Gov't Resp. at 11. The affidavit, the government says, "was not a legal treatise." *Id.* at 12. In addition, the government argues that the affidavit's citations to the general citation of the anti-kickback statute was sufficient and belies the argument that Barbour sought to deceive the magistrate judge by omitting a reference to the safe harbor.

Barbour's affidavit contains several references to the federal anti-kickback statute. The first is a statement that defendants' actions violated 42 U.S.C. § 1320a-7b(b). *See* Affidavit ¶¶ 3–5. The next reference indicates that "Medicare and Medicaid constitute . . . federal health care programs as defined by Title 42, United States Code, Section 1320a-7b(f)(1)." *Id.* ¶ 20. In the next paragraph, the affidavit says that 42 U.S.C. § 1320a-7b(b)

> prohibits the solicitation and receipt as well as the offer and payment of "remunerations (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of

> any item or service for which payment may be made in whole or in part under a Federal health care program."

*Id.* ¶ 21. The affidavit repeats its assertion that defendants' activity violated 42 U.S.C. § 1320a-7b(b) in its conclusion section. *Id.* ¶¶ 190–92. As Novak argues, there is no reference to the statute's safe harbor provision.

As the government observes, however, Novak has not cited any authority, controlling or otherwise, to support the argument that a law enforcement agent's affidavit in support of a warrant application must include citations to or quotations from all relevant statutory provisions. The government contends that the affidavit need only lay out "sufficient *facts and circumstances*" to establish probable cause, citing *Nathanson v. United States*, 290 U.S. 41, 47 (1933) ("[A]n officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation."). Gov't Resp. at 11. Novak nonetheless argues that the affidavit's reference to part of the anti-kickback statute without inclusion of the safe harbor provision amounted to "selective quoting" that suggested "that there were no other portions [of the statute], much less any that were relevant, and thus that there was no need to look up the statute itself to see what else might be in it." Novak Reply at 18. Dr. Kuchipudi similarly argues that "[w]ithout some direction from the agent, Judge Martin would have had no reason to research or consider every potential safe harbor provision." Kuchipudi Reply at 13.

This argument is unpersuasive. Magistrate judges are aware of the complexity of federal laws. It is unrealistic to suggest that the government's citation to one portion of the anti-kickback statute caused the magistrate judge to believe the statute started and ended with the government's citations. It also presumes that the magistrate had no

prior awareness of the statute in question. Moreover, the nature of the citations indicated that the statute contains more provisions than just those cited. The references to sections 1320a-7b(b) and 1320a-7b(f)(1) make it obvious that the statute possesses content other than what the government presented, contradicting Novak's argument that the affidavit caused the magistrate judge to believe that the statute had "no other portions." The Court concludes that Barbour's failure to cite to the safe harbor provision that Novak argues exempts him and other defendants from liability did not constitute a material omission that was reckless and material.[7]

Dr. Kuchipudi likewise argues in his reply that Barbour "needed to inform Judge Martin of the *potential* applicability of the employee safe harbor" because "the facts she knew at the time she executed the affidavit sufficiently indicated" that the provision applied. Kuchipudi Reply at 8; *see also id.* at 11 (Barbour "omitt[ed] in her affidavit exculpatory evidence and information in her possession which demonstrated that the employee safe harbor was implicated"). When it comes to describing what this exculpatory evidence was, Dr. Kuchipudi says the following:

> [A]t the time the agent signed the affidavit, she had within her possession numerous recordings as well as other evidence demonstrating that that Employees A and B and Physician B were bona fide employees of Sacred Heart, and that the only remuneration Dr. Kuchipudi received was in the form of money "paid by [Sacred Heart] to [Sacred Heart Employees] (who had a bona fide employment relationship with Sacred Heart)."

*Id.* at 11 (quoting 42 U.S.C. § 1320a-7b(b)(3)(B)); *see also id.* at 12 ("[T]he agent failed

---

[7] Novak, Dr. Kuchipudi, and the government also dedicate significant space to arguing whether the safe harbor provision applies to defendants' conduct in this case. In applying for the warrant, the government was required to establish probable cause, not prove guilt beyond a reasonable doubt. The Court need not discuss this point in detail. It will suffice to say that the application of the safe harbor to the conduct alleged is not so obvious as to have undercut the finding of probable cause.

to inform Judge Martin of evidence *she knew* that demonstrated that Dr. Kuchipudi's conduct does not constitute a crime.").  This argument is more relevant to the *Franks* inquiry than the contention that the agent's affidavit failed to cite relevant statutory provisions.  Dr. Kuchipudi does not, however, provide any citations that would help identify what specific recordings and other evidence he is referring to.  It may be that Dr. Kuchipudi is referring to evidence that Novak presented in his own briefing on this motion.  Assuming that is the case, because Dr. Kuchipudi's brief contains no citations to any specific evidence, the Court refers to its analysis of Novak's arguments on individual allegations within the affidavit.[8]

Novak also contends that the affidavit did not state the required *mens rea* for culpability under the anti-kickback statute.  He argues that "the affidavit failed to mention" that "the underlying offense requires proof that a culpable individual acted 'knowingly and willfully.'"  Novak Mem. at 32; *see also id.* at 14 (stating that these elements were "not, of course, pointed out in the affidavit itself").  Novak is correct that the statute includes this language.  *See* 42 U.S.C. § 1320a-7b(b).  Contrary to Novak's argument, however, the affidavit also included this language.  *See* Affidavit ¶ 3 (stating that defendants "have conspired to knowingly and willfully offer and pay, and solicit and receive, remunerations directly and indirectly, overtly and covertly, in return for the referral of patients for the furnishing and arranging for the furnishing of any item and

---

[8] If Dr. Kuchipudi is instead referring to arguments he made in his motion to dismiss the superseding indictment, which largely concerned application of the safe harbor to this case, he argued in that motion that his conduct "**as alleged in the indictment**" qualified for the safe harbor exception.  Kuchipudi Mot. to Dismiss Superseding Indictment Mem. at 2; *see id.* at 15 ("[T]he Government's own allegations establish all of the elements of the Employment Safe Harbor.").  That motion thus did not concern additional evidence the government had in its possession but did not disclose at the time it filed the search warrant application.

service for which payment may be made in whole or in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b), all in violation of Title 18, United States Code, Section 371"); *see also id.* ¶ 190.

Considering these arguments, the Court concludes that the affidavit's failure to reference the safe harbor provisions of the federal anti-kickback statute was not material.

### 3.  Specific provisions

In addition to arguments regarding the credibility of Puorro and the lack of discussion of a safe harbor provision of the anti-kickback statute, the defendants make a wide range of arguments about individual sections and paragraphs of the affidavit. The affidavit sorts its paragraphs of allegations into sections by subject matter, and the Court will follow suit as it discusses the parties' arguments, concluding with a discussion of whether the affidavit still provides sufficient probable cause for the search absent any false and material provisions.  In discussing the defendants' arguments, the will use the shorthand "Novak" because virtually all of the arguments are contained in his submissions.

### a.  Physician A

Novak first contends that the affidavit omitted information about another informant, "Physician A" (Dr. Asgar).  The affidavit says Dr. Asgar "was terminated from Sacred Heart in or about March 2012."  Affidavit ¶ 10 n.3.  Novak argues that Dr. Asgar was fired because "*he* improperly failed to provide a legally required medical screening" for a patient brought to Sacred Heart, after which he told paramedics to take the patient to another hospital, where the patient died.  Novak Mem. at 14.  Novak says the affidavit

55

should have noted this incident because Dr. Asgar "was fired based on his own improper (and possibly fatal) understanding of when emergency care is 'medically necessary.'" *Id.* This is relevant, Novak says, because Dr. Asgar provided information for the affidavit's later allegations about unnecessary emergency services at Sacred Heart. Novak does not explain, however, how Dr. Asgar's understanding of what constitutes necessary emergency services specifically supported any other significant statement in the affidavit. Novak has not persuasively argued that any omission from the affidavit of discussion about the reason for Dr. Asgar's termination was material to the showing of probable cause.

### b. Velgara

#### i. Paragraph 25

Novak contends that paragraph 25 of the affidavit contained a misstatement about the knowledge that defendant Velgara, who as indicated earlier was also an informant, had of the alleged kickbacks-for-referrals scheme at Sacred Heart. He argues that although paragraph 25 of the affidavit suggests Velgara had direct knowledge of the alleged kickback scheme as it was ongoing, she told agents in September 2012 that she did not know of the scheme until after her cooperation with the government began. Yet as the government notes, other evidence indicates Velgara's knowledge of the alleged scheme before that time, such as recordings of her own activity in offering alleged kickbacks. *See* Affidavit ¶ 12 n.5 (Velgara "was consensually recorded offering to pay kickbacks for the referral of Medicare patients to Sacred Heart."). Given this evidence, paragraph 25 was not materially misleading. The government argues that, particularly considering the other evidence it had of Velgara's

involvement, her September 2012 statement to agents that she was unaware of the scheme was false. The proposition that Velgara had made false statements was sufficiently disclosed in the affidavit when it said that Velgara "has made certain statements which she has subsequently acknowledged were not accurate." *Id.* There was no material misstatement or omission.

### ii. Paragraph 27

Novak also argues that paragraph 27 of the affidavit inaccurately described Velgara's statement "that the hospital's executive committee discussed [kickbacks for referrals] as regular topics in its weekly meetings." Affidavit ¶ 27. As evidence of falsity, Novak points to an exhibit containing notes from two government interviews with Velgara in which she described these meetings without mentioning discussions of kickbacks. *See* Novak Mem., Ex. M. However, this does not make the affidavit's description of Velgara's statement deliberately or recklessly false; Novak does not argue, for example, that the meetings Velgara described in the interviews were the only meetings she ever discussed. As the government points out, "Velgara had generally advised" agents about the contents of the meetings; the government further points to Velgara's accounts of three other meetings at which referrals were discussed. Gov't Resp. at 31–32. Given these facts, the statement in the affidavit that Velgara told agents the meetings regularly contained information about kickbacks was not a deliberate or recklessly false statement.

### c. Payawal

### i. Paragraph 27

Novak contends that paragraph 27, discussed immediately above, contains a

false description of a conversation between defendants Payawal, Velgara, and Puorro on April 10, 2012. The affidavit states that on that date, Velgara recorded a conversation where she "inquired about the types of 'incentives' Sacred Heart could offer prospective referring physicians. Payawal and [Puorro] identified fictitious rental agreements as one such method." Affidavit ¶ 27. Novak says this description was false because there was no discussion of "fictitious" rental payments during the conversation.

This was one of the topics of the *Franks* hearing. The April 10, 2012 conversation involved Velgara, Puorro, and Payawal. *See* GX FTR 24 (transcript). It began with a discussion about the number of admissions the previous day and the doctors responsible for them. *See id.* at 2-3. The discussion then turned to a physician who, apparently, the hospital was considering recruiting. Puorro asked Velgara what needed to be done to expand the patient population. Velgara, who as a cooperating witness was recording the conversation, asked for permission to offer incentives. *Id.* at 4. Puorro said: "You say would be ah, send us admissions and in exchange for that, we would be providing some type of payment but it would be masked as an educational payment, or if they own property we could actually rent some space from them." *Id.* After Velgara replied, "Oh that's a good idea," Puorro said, "Right. If they've got their own property, we can rent an office. . . . An outpost." *Id.* at 4-5.

The government contends that the affidavit's description was accurate, because another part of the conversation "make[s] clear Velgara, Puorro and Payawal were discussing Sacred Heart's payment of purported rent to Defendant Percy Conrad May, Jr. as a means of disguising a kickback payment." Gov't Resp. at 32 (citing Gov't Mem., Ex. 12). The government's justification for this paragraph of the affidavit is

58

unconvincing. In the part of the conversation referenced in the affidavit, Puorro refers to an educational payment as a "masked" payment, but when discussing rental of space, he does not refer to a fictitious rental but rather "*actually* rent[ing] some space from them." And later in the conversation—as the Court will discuss in greater detail below—there is a discussion, including Payawal, in which the hospital's rental of office space from Dr. May is discussed. During that discussion, Payawal states that the hospital had a "podiatry doctor who make[s] a round in there. . . . They occupy a space." *Id.* at 13. This appears to reflect not that the arrangement as fictitious, but that Sacred Heart was actually using the space rented from May for medical purposes. Although other parts of the conversation indicate the hospital was paying May, and also trying to get him to direct admissions there, none of them say the hospital was paying his rent solely in exchange for referrals.

At the hearing, the government sought to justify agent Barbour's interpretation in part by offering another recorded conversation that occurred nearly five months later, in September 2012, as well as statements by Velgara and Puorro in interviews with the investigating agents. Paragraph 27, however, is not presented as a summary of a series of conversations; it attributes a discussion of "fictitious rental agreements" to a particular conversation occurring on April 10, 2012. Although it is no doubt true that, based on the entirety of her investigation, agent Barbour believed and understood the rental agreements to be fictitious, that does not justify presenting *this particular conversation* as including an offer of "fictitious rental agreements" to "prospective referring physicians." Perhaps the elision of these two points is a product of the manner in which the affidavit was prepared, but one way or another, the statement in paragraph

59

27 was untrue. And because the agent had access to the conversation that she purported to summarize, the mischaracterization was at least reckless. The Court will therefore leave this statement and others flowing from its description of this conversation "to one side" in evaluating the affidavit. *See Franks*, 438 U.S. at 172.

### ii. Paragraph 29

Novak criticizes this line from the paragraph 29 of affidavit: "employees who report to Payawal tabulate daily patient referral logs into weekly computer generated reports that identify Sacred Heart's patient sources." Affidavit ¶ 29. Novak says that Velgara said Puorro actually asked for these reports to be produced. This does not, however, make the affidavit's statement a material omission; the affidavit does not say, for example, that Payawal directed production of the reports.

Novak also contends there is no support for this line in paragraph 29: "According to [Puorro and Velgara], Novak uses these reports to monitor the number of referrals from doctors receiving payments and to ensure those doctors are meeting their paid-for referral obligations." *Id.* Novak argues that neither Puorro or Velgara ever said this, and he specifies in his reply that neither said Novak reviewed reports of "paid-for" referrals. The government cites an FBI report of an interview with Puorro in which he discussed a recording he made during which he and Novak go "through the report reviewing the top admitting physicians at the hospital." Gov't Mem., Ex. 38 at 2. Given this evidence, although it is apparent that the affidavit was drawing an inference, Novak has not shown that the statement about how he used the report was deliberately or recklessly false. There is evidence that Novak looked at a referral report, and the affidavit identifies a good deal of evidence supporting the contention that the hospital

paid for referrals.

### iii.     Paragraph 30

Paragraph 30 of the affidavit includes the following statement:

[I]n a February 14, 2013 telephone conversation consensually recorded by Administrator A, Administrator A told Novak that he had recently withheld a kickback payment from a referring physician because that physician had failed to attend certain committee meetings and failed to provide purported reports that were to conceal the true reason for the payments provided to him.

Affidavit ¶ 30.  The paragraph goes on to quote in some detail from the February 14,

2013 conversation.  The transcript of the conversation reflects the following discussion

between Puorro and Novak:

> PUORRO:     The other thing I wanted to let you – the other thing I had had on my list to talk to you about is Kandala.  I had a conversation with him.  Do you remember a couple of months ago when he sent us those invoices, and he had all those medical committee dates that were incorrect, and I said – we talked about it.
>
> NOVAK:       Yeah.
>
> PUORRO:     I stopped – I stopped his payment on that.  So, I think he's – he's upset that he hasn't been paid in, you know, a couple of months.  Umm, what do you want me to do?  Do you want me to just release the check and – and talk to him?
>
> NOVAK:       Yeah.  Give – give him his checks and – yeah.  That's – Tony, you cannot stop a guy's check without talking to the guy.

Novak Mem., Ex. O at 2.  Novak continues by suggesting that Puorro have Dr. Kandala

come to the hospital to pick up his check so that Puorro can talk to him or, as Novak

puts it, engage in "bonding."  *Id.* at 2-3.  The following exchange ensues:

> PUORRO:     Okay.  I – I mean – I – We gave him, you know, the dates of the committee meetings on a go-forward basis.  So this way, when he submits the bill in the future, at least, if he can list

>           the right date down – because he's not coming to any of the
>           meetings.
>
> NOVAK:    Well, he's got to come to the meetings once in awhile.  Don't
>           have to come to every one, but he's got to come once in
>           awhile.  People got to know who he is.

*Id.* at 3.  The conversation concludes with Novak repeating his direction or suggestion to

Puorro to have Dr. Kandala come to the hospital to pick up his checks.  *Id.* at 3-5.  A

good deal of this discussion is quoted or summarized in paragraph 30 of the affidavit.

Novak argues that contrary to paragraph 30's description of what Puorro told

Novak, neither Puorro nor Novak used the word "kickbacks" or discussed the purpose

of the check, nor did either of them make any references to concealment.  Novak is right

about this.  The government argues that the affidavit's interpretation of this conversation

was based on the recording as well as Puorro's reports to agents and other recordings

between Puorro, Kandala, Novak, and Payawal.

The Court confesses that it overlooked this paragraph when it set the scope of

the *Franks* hearing; it should have been included.  But the parties' positions on this point

are the same as their positions on other similar issues that were addressed at the

hearing, so the Court is comfortable addressing the merits regarding paragraph 30.

First of all, the use of the term "kickback" does not constitute a material misstatement,

even though that term was not used in the conversation.  A reasonable judicial officer

reviewing the affidavit would not have understood the affidavit's reference to a

discussion about kickbacks to mean that term was actually spoken.  In other words, it

would have been apparent to the magistrate judge that this was an interpretation, not a

quote.  And the government has provided enough evidence of a *quid pro quo*

arrangement for the Court to conclude that this was a fair interpretation of the

conversation, even if other interpretations are possible.

The Court has a different view regarding paragraph 30's statement that Puorro told Novak that Dr. Kandala had "failed to provide purported reports that were to conceal the true reason for the payments provided to him." Affidavit ¶ 30. Puorro does in fact discuss invoices that Dr. Kandala had provided—one would assume these are the "reports" the affidavit references—and he describes that the invoices had incorrect dates for medical committee meetings. Puorro goes on to say that Dr. Kandala evidently had not been attending the meetings; Novak replies that Kandala would need to attend at least some of them.

The Court assumes from this that the government's theory is that there was some sort of arrangement between the hospital and Dr. Kandala by which he would be a nominal member of a hospital committee whose meetings he would not have to attend but for which he would nonetheless be paid, in return for referring patients. It may be that the government has evidence that supports this theory. But as with paragraph 27, this paragraph of the affidavit is not presented as a summary of evidence from a variety of sources and conversations; it is presented as a summary of a *particular conversation*. Presented as such, the reference to "purported reports that were to conceal the true reason for the payments provided to him" was a misstatement of what occurred during the cited conversation. The Court therefore sets aside that portion of paragraph 30 in assessing the question of probable cause.

Novak also argues that footnote ten to paragraph 30 misstates the contents of a conversation. The footnote says that

> Novak amended this instruction (about how to pay Dr. Kandala) following
> an unannounced early March 2013 investigation by CMS and State of

> Illinois surveyors at Sacred Heart. In particular, following that inquiry, Novak instructed Administrator A that he should withhold future payments from [Dr. Kandala] if he did not produce reports to evidence his alleged service, thereby justifying his compensation.

Affidavit ¶ 30 n.10. Though the affidavit does not provide the specific date of the conversation, Novak assumes it refers to a March 20, 2013 recorded conversation and contends the affidavit "violently misrepresents what was actually said." Novak Mem. at 19.

The Court disagrees. In the conversation, a transcript of which Novak has provided, Novak asks, "What's going on with Kandala?" Puorro replies that he gave Dr. Kandala his December check and that they had a discussion in which Dr. Kandala proposed a different arrangement with the hospital that would provide him with more compensable time (the details are not significant for present purposes). Novak replies that Dr. Kandala has "got to do something for those hours. He's got to come in here." Novak Mem., Ex. Q at 2. Puorro makes a suggestion on how to structure the arrangement, and Novak says, "it's all got to go through, legal, you know, to make sure it's a legal thing," and he repeats that "he's got to actually do the stuff and come in the hospital and all that other stuff." *Id.* at 3. Puorro then says that he had withheld Dr. Kandala's check because he wasn't providing a report regarding "palliative care." The following exchange ensues:

NOVAK:      Well, he's got to give us reports.

PUORRO:     So I'm just going to hold his check until he gets it.

NOVAK:      You got to get the reports, you got to – that's why I told you to go through all of our contracts –

PUORRO:     Um-hum.

NOVAK:        -- and make sure that we're – we're up to date with everything.

*Id.* at 3-4.

Contrary to footnote 10, it appears from this exchange that the impetus for withholding Dr. Kandala's checks if he did not provide reports came initially from Puorro, not Novak. But Novak's response may be read fairly as approving this proposal. The Court cannot say this was a deliberate or reckless misrepresentation of the conversation.

### iv.        Paragraph 32

Paragraph 32 states that Novak, Payawal, and Puorro had a discussion on February 28, 2013 about which physicians should receive kickback payments. Novak says the passage refers only to delivering checks, not kickback payments. Again, the term "kickback" is not presented as a quote from the conversation, and a reasonable magistrate judge would not have understood there to have been an express reference to kickbacks. The characterization was reasonably based on Puorro's understanding of the conversation. This reliance does not turn the affiant's summary into a deliberate or reckless material falsehood.

This paragraph also states that Payawal told Puorro on February 28, 2013 (mistakenly identified in the affidavit as March 1, 2013) that Novak wanted him to temporarily withhold certain checks to doctors "[t]o get more business." Affidavit ¶ 32. Novak argues the conversation does not include the words "to get more business" or discuss withholding checks. Rather, the discussion concerns a direction that Novak had given Puorro "to hand deliver the checks to the doctors that have all these agreements in place" by having the doctors come to his office to pick them up. GX FTR 14

(transcript) at 8.  Payawal says that Novak had called him the previous week to ask about the $2,000 being paid to Chicago Foot and Ankle."  *Id.* at 9.  The following exchange ensues:

> PAYAWAL:  Yeah I told him that's Dr. Moshiri.  He said oh, make sure the check, you give it to ah Tony [Puorro], to have Tony give it to him.
>
> PUORRO:  Yeah.
>
> PAYAWAL:  You know if, if you look at it, it should be like that.  But whenever, us, when it comes to . . . Noemi [Velgara] to hand deliver the check to the, to the Golden Light doctor . . .
>
> PUORRO:  Uh-huh.
>
> PAYAWAL:  . . . so she can uh, tell uh, tell uh, them, you have to admit more patients or what or send more patients.
>
> PUORRO:  I see.
>
> . . .
>
> PAYAWAL:  Maybe that's Ed's [Novak's] intention.
>
> PUORRO:  That's, that's probably what he wants, what do you think?
>
> PAYAWAL:  Yeah yeah.  But as I said uh, you have to learn how to work around him.  (laughs)

*Id.* at 9.

In her testimony at the hearing, agent Barbour stated that she got the phrase "to get more business" from a report by agent Theiler regarding his debriefing of Puorro after he recorded this conversation.  Hearing Tr. at 118-20; *see* GX 32-001.  Theiler testified that this is the language Puorro used during the debriefing and that he (Theiler) had not listened to the recorded conversation at the time.  Hearing Tr. at 409.  Barbour testified that she did not listen to the recording in preparing the affidavit but rather relied

on Theiler's report.  *Id.* at 278.  For that reason, Barbour's use of quotes was reckless, but the difference between her words ("to get more business") and the actual statement ("admit more patients"/"sent more patients") is immaterial, as the patients *were* the business.

More problematic, however, is this paragraph's attribution to the February 28 recorded conversation of a discussion about "temporarily . . . withhold[ing]" payments to the doctors.  The transcript offered by the government at the hearing references nothing of the kind; it discusses hand-delivering the checks, not withholding them.  The reference to withholding checks for the express purpose (attributed to Novak in the affidavit) of extracting more "business" from the doctors would have been understood by any reasonable reader as a relatively ham-handed attempt to enforce a *quid pro quo* arrangement.  Yet what is described in the actual conversation is not withholding checks, but the means of delivery, and the reference to "sen[ding] more patients" does not come from Novak but rather is Payawal's surmise or speculation about Novak's motive.  This reference in paragraph 32 was misleading.   The agent's reliance on Theiler's memorandum of interview for this was reckless.  The Court will set aside this portion of paragraph 32 in assessing the issue of probable cause.

### v.      Paragraphs 34–35

In addressing paragraphs 34 and 35, Novak argues that the conversations they reference are not supported by what was said on recordings.  Both include quotations of Novak telling Puorro he wanted hospital contracts to be "fine," with "a paper trail" and "kosher," "all just to cover our asses."  Affidavit ¶¶ 34–35.  Paragraph 34 then states that Puorro understood that Novak was actually telling Puorro "to ensure that there was

sufficient paperwork to conceal the true nature of the kickback payments Sacred Heart paid to physicians." *Id.* ¶ 34. The other says Puorro believed Novak was telling him "that the hospital needed to ensure that the physicians took sufficient steps to make the contracts appear legitimate, even though they were not." *Id.* ¶ 35. The phrases Novak criticizes do not appear in quotes; they are clearly marked as based on Puorro's understanding of the recorded statements of Novak. Barbour's reliance on this understanding, which was made clear by the affidavit, did not make these statements in the affidavit false.

### d.    May

#### i.    Paragraphs 38–39

This paragraph states that "[t]o [Puorro]'s knowledge, Sacred Heart never used any of May's office space for which Sacred Heart paid the purported 'rent.'" Affidavit ¶ 38. As discussed under the heading for paragraph 27, Novak has established that Puorro and the government were aware of evidence to the contrary: Payawal's statement during the recorded April 10, 2012 conversation that the hospital had a podiatrist who did work at May's office space and "that's the reason we're paying rent." GX FTR 24 at 9. As the transcript indicates, Puorro was present for this conversation, which renders untrue the affidavit's statement that to Puorro's "knowledge" the hospital never used the space.

At the hearing, the government acknowledged Payawal's statements about the podiatrist but attempted to justify the affidavit's discussion of this point by reference to other conversations, including one that took place on March 13, 2013. In that conversation, Novak asked Puorro whether the hospital had someone going to May's

clinic and also asked what the contract with May was for; Puorro replied, "I have no idea."  Hearing Tr. at 102-03; GX FTR 20 at 29.  Based on this and Puorro's purported statement to Barbour on an unidentified date prior to the warrant application that he had no knowledge that the hospital was using the May space, *see* Hearing Tr. at 101, the government argues that paragraph 38's statement that "To [Puorro's] knowledge, Sacred Heart never used any of May's office space for which Sacred Heart paid the purported 'rent'" was accurate.  The Court disagrees.  Even though this statement in the affidavit was premised on Puorro's knowledge, the government could not turn a blind eye to discussions of which it was aware that Puorro participated in that gave him contrary "knowledge."  The Court will therefore not consider this part of the paragraph when evaluating the affidavit.  This conclusion extends to paragraph 39, which repeats the allegation regarding the April 10 conversation.

Though not pointed out by the government in its brief or at the hearing, footnote 11 to paragraph 39 said that at an earlier time, Sacred Heart "had a podiatrist stationed at May's clinic" but that when the hospital reduced the rent payment, May reduced his admissions to the hospital, and the podiatrist left the clinic.  Affidavit ¶ 39 n.11.  This footnoted reference to the podiatrist was insufficient to cure the misstatement in the text of the affidavit.

Novak also contends that the rest of paragraph 38 relies on unrecorded conversations that Puorro told agents about.  As discussed elsewhere, reliance on Puorro's recollection for such statements does not render them deliberate or reckless falsehoods.

69

### ii.    Paragraph 43

Like paragraphs 27 and 38, paragraph 43 references Puorro's contention that the money Sacred Heart was paying May constituted "fictitious lease payments."  *Id.* ¶ 43. discussed earlier, there is at least some evidence that Puorro and, by extension, Agent Barbour were aware of contrary evidence—Payawal's statement that the hospital was actually using the space for which Sacred Heart paid rent to May.  The Court thus will not consider this portion of paragraph 43.

Novak also says that paragraph 43's description of Puorro's fall 2012 pressuring of May "at Novak's direction to provide Sacred Heart additional patient referrals" was false.  *Id.*  Novak points to a March 2013 recording where Novak appeared not to know why the hospital had a contract with May.  This, however, does not establish that the affidavit's statement about what Novak did six or more months earlier is false.  Novak also points to his recorded urgings of Puorro to "keep us kosher" regarding May's contract.  As with paragraphs 34 and 35, the affiant's reliance on Puorro's understanding of these statements—reliance that is made clear from the wording of paragraph 43—did not amount to a deliberate or reckless falsehood or omission.

### iii.    Paragraphs 44–45

Paragraph 44 says that in a February 2013 conversation "concerning the delivery of those kickback payments" Puorro asked Payawal "to confirm those doctors to whom Sacred Heart made payments 'for rent.'"  *Id.* ¶ 44.  Novak contends there was no indication in the conversation that the "payments might not be legitimate" and thus that the affidavit "misstates what was actually said."  Novak Mem. at 24–25 (discussing

Affidavit ¶¶ 44–45).[9]  As discussed earlier, the Court does not believe that an ordinary person reading this paragraph would understand the references to kickbacks in the first two sentences to indicate that this term or its equivalent was used in a conversation. Rather, it is clear from context—among other things, the preceding paragraph—that the reference is a characterization based on information from Puorro.  *See* Affidavit ¶ 43. Paragraph 44 therefore cannot appropriately be considered to be false.  The Court also notes that the referenced conversation (on February 28, 2013) does include the quoted words "for rent."  *See* Novak Mem, Ex. P at 2:3–4 ("[W]hich doctors get a monthly check for teaching or for rent?").

Novak also contends that paragraphs 44 and 45 constitute a false characterization because in the conversation "Payawal listed a number of doctors, several of whom have never been identified as being involved in any kickbacks."  Novak Mem. at 24.  He does not explain why this statement makes the paragraph false, and the fact that the government has not specifically accused certain doctors of receiving kickbacks does not render this portion of the affidavit false or as containing a material omission.[10]

e.    **Moshiri**

i.    **Paragraphs 49–51**

Novak contends that the content of paragraphs 49, 50, and 51 is "subject to Puorro's undisclosed credibility problems" because the paragraphs relate Puorro's understanding about Sacred Heart's relationship with Moshiri.  Novak Mem. at 25. Reliance on Puorro's understanding—which is made clear from the text of the affidavit—

_____

[9] Novak repeats these arguments with respect to paragraphs 57, 58, and 68.
[10] Novak repeats this argument with reference to paragraph 74.

did not render these passages deliberately or recklessly false. As discussed earlier, the affidavit sufficiently discussed matters that might adversely impact Puorro's credibility.

### ii.      Paragraph 52

Paragraph 52 states that Novak "directed [Puorro] to deliver Moshiri's kickback payments in person" on February 17, 2013, which Puorro did in a recorded phone call with Moshiri. Affidavit ¶ 52. It further states that "Moshiri told [Puorro] that he had already received a call from Novak's assistant instructing him to pick up his check." *Id.* Novak contends the reference to "Novak's assistant" was misleading because the assistant worked for both Novak and Puorro. Yet Novak does not describe why the secretary's dual role was material with reference to retrieval of a check. The Court finds that any error was insignificant.

Paragraph 52 also states that during the phone call, Puorro "confirmed that Novak wanted Moshiri to come to Sacred Heart to retrieve the check." *Id.* Novak says Puorro did not use the word "confirm" in the conversation, but said instead that Novak was "insistent that I hand you the check." Novak Mem. at 25 (quoting Novak Mem., Ex. T). But as the government observes, Puorro's full quote from the transcript says, "Mr. Novak—as we talked about, I had a recent conversation with him. He's insistent that I hand you the check." Novak Mem., Ex. T at 2:17–19. The phrase "as we talked about" supports the affidavit's reference to Puorro "confirm[ing]" the arrangement. The paragraph also says Moshiri offered to "get a list for Novak" of cases he had worked on at Sacred Heart. Affidavit ¶ 52. Novak says this reference is false because it is an "attempt to suggest that Moshiri knew Novak would want such a list." Novak Mem. at 26. That may be Novak's interpretation of what the affidavit was attempting to suggest,

72

but it does not render the statement false.

### iii.     Paragraph 53

Paragraph 53 describes a recorded conversation between Puorro and Payawal on February 20, 2013.  It states that Puorro asked Payawal why Novak wanted Puorro to hand-deliver checks to doctors; it then reports that "Payawal said that Novak wanted [Puorro] to ask Moshiri something to the effect: 'How come you haven't got referrals?' or 'how come you haven't been to surgery and so forth?'"  Affidavit ¶ 53.  Novak argues this description is misleading because it left out the fact that "Payawal was explicitly speculating" as to Novak's intentions, omitting, for example, the word "maybe" in Payawal's response.  Novak Mem. at 27.  The government concedes the word "maybe" should have been included in this description but says the overall presentation of the conversation was based on the rest of the conversation as well as Puorro's understanding.  As support, the government cites a conversation eight days later in which Payawal described Velgara hand delivering checks "so she can tell them you have to get more patients or what or send more patients."  Gov't Mem., Ex. 28 at 5.

As with paragraph 30, the Court overlooked this paragraph in setting the scope of the *Franks* hearing, but again, the parties' positions on this paragraph are set forth clearly and are parallel to those addressed at the hearing.  The Court concludes that the omission of the word "maybe" renders misleading the discussion of the Payawal's statements about Novak during this conversation.  The way the paragraph reads, Payawal is represented as reporting something Novak actually said, rather than Payawal's speculation or educated guess about what Novak intended.  The government's reference to a separate conversation that essentially allows one to

connect the dots does not make the reference in paragraph 53 any less misleading; that conversation is not referenced in paragraph 53, which on its face purported to describe the February 20, 2013 conversation, and only that conversation. The Court will therefore disregard this contention in the affidavit in reevaluating probable cause.

### iv.    Paragraph 56

In paragraph 56, the affidavit describes a recorded exchange between Puorro and Novak about Moshiri, during which Puorro showed Novak a list of Moshiri's surgeries at Sacred Heart. "Reviewing the list," the affidavit says, "Novak responded: 'So what . . . five cases in a month?" Affidavit ¶ 56. This description, Novak argues, "leaves so much out as to materially misrepresent the conversation," because Novak also said, "What's that got to do with me?" and "Means nothing to me" regarding Moshiri's surgeries. Novak Mem. at 28 (quoting Novak Mem., Ex. V at 3). These statements show Novak's "disinterest in the issue," he contends, so the paragraph's suggestion otherwise is a misrepresentation. *Id.* Barbour perhaps should have included a question mark after the phrase "So what" in the affidavit, but the lack of one does not rise to the level of a deliberate or reckless material omission. "So what" can be read either the way Novak argues or the way the government urges—either an expression of disinterest, or as a prelude to another statement. The Court also notes that the final sentence of paragraph 56 reports that when Puorro asked Novak whether he should ask Moshiri to bring in more cases, Novak replied, "No, just let it be." Affidavit ¶ 56. This was sufficient to get across Novak's expression of indifference. For these reason, Novak has not shown that the missing question mark amounted to a material omission.

### v. Paragraph 59

Paragraph 59 states that a check made out to Moshiri "bears the signatures of Novak and Payawal." Affidavit ¶ 59. Novak contends this is "a small falsehood" because it is "a rather hamhanded attempt to suggest that Novak and Payawal had personal knowledge of" the check despite the fact that it appears that the check's signatures "were computer-generated." Novak Mem. at 29 (citing Novak Mem., Ex. W). Whether Novak is correct that the signatures were computer generated, the affidavit does not state that they were handwritten. It is undisputed that Novak's and Payawal's signatures are on the checks. Novak's reading of the implication of this statement does not make it false.[11]

### f. Maitra

#### i. Paragraphs 66–67

Novak's argument about paragraphs 66 and 77 and other paragraphs in the section of the affidavit regarding Maitra concerns the fact that they represent conversations that were not recorded and rely on Puorro's recollections. As discussed earlier, Barbour's reliance on Puorro's understanding—which is made clear to the reader by the lead-in language, "[a]ccording to Administrator A"—did not render these passages to be deliberately or recklessly false.

#### ii. Paragraph 71

Paragraph 71 states that Puorro asked Maitra whether the check he received from Sacred Heart was "based on the number of cases," to which Maitra responded, "I don't know. [Novak] just did it." Affidavit ¶ 71. Novak contends that Maitra's full

---

[11] Novak repeats this argument with reference to paragraph 73.

response was, "No.  I don't know.  He just did it."  Novak Mem. at 30 (quoting Novak

Mem., Ex. X at 3).  The government argues the omission of "No" from this account was

immaterial, because Maitra "immediately corrected himself" by then saying, "I don't

know.  [Novak] just did it."  Gov't Resp. at 51.  The government says this shows that

Maitra initially "did not know on what basis Novak issued checks to him."  *Id.*  The Court

notes that Novak does not correctly quote his own transcript of this recording.  It shows

that Maitra's actual response was, "No.  I don't know.  He did the details."  Novak Mem.,

Ex. X at 3:6–7.  Puorro then confirmed that Maitra was referring to Novak.

The omission of the word "No" did not render the discussion of the conversation

misleading, because it is clear from what was quoted that Maitra did not know the basis

for Novak's calculation of the amount of the check.  Novak argues this paragraph was

intended "to establish what Maitra knew about why he was paid by the hospital," Novak

Mem. at 30, but the quote shows the opposite.  It does not constitute a deliberate or

reckless material falsehood or omission.

### iii.    Paragraph 74

Paragraph 74 describes a recorded conversation in which Puorro told Maitra he

was going to hand deliver Maitra's check, and Maitra said he would come to Sacred

Heart to pick it up in fifteen minutes.  Novak contends this paragraph "fails to point out"

that six days later, Novak said, "We got a contract with Maitra.  He's supposed to be

seeing students, well, he better be seeing students."  Novak Mem., Ex. BB at 33:7–9.

Yet the later conversation Novak points to does not negate anything in paragraph 74,

which describes a particular and fairly straightforward conversation in which Puorro told

Maitra he had a check for him, and Maitra said he would come get it.  The Court does

not agree that the affidavit's failure to mention some other conversation in this paragraph constituted a deliberate or reckless omission.

### g.    Kuchipudi

#### i.    Paragraphs 80, 84–91

In paragraphs 80 and 84 through 91, Novak contends that the affidavit mischaracterized the work and compensation of Employee A (Johanna Szwajnos),[12] a physician assistant, with regard to Dr. Kuchipudi.  The affidavit states that Szwajnos was "assigned to work almost exclusively for Kuchipudi," yet "the hospital pays the majority of" her salary.  Affidavit ¶ 80.  Novak argues this arrangement is "unremarkable" under the safe harbor provision of the anti-kickback statute, given the fact that Szwajnos "was an employee of the hospital."  Novak Mem. at 32–33.  "Under that provision," Novak continues, "it was entirely proper for the hospital to pay part or even all of [Szwajnos's] salary."  *Id.* at 33.  The affidavit, however, more or less disclosed that Szwajnos worked for Sacred Heart.  It stated that Dr. Kuchipudi told Puorro "that [Szwajnos] also worked for the hospital," quoting Dr. Kuchipudi as saying, "If other doctors are asking for help, she can help them."  Affidavit ¶ 91.  The affidavit also portrayed a recorded conversation between Szwajnos and Puorro, in which Szwajnos stated "that she performs the majority of her work for Kuchipudi" but also stated "that if there are times at which Kuchipudi does not need her assistance, she is then available to assist other Sacred Heart physicians."  *Id.* ¶ 88.  Novak himself quotes these passages, arguing that they contradict the affidavit's statement elsewhere that Szwajnos worked "full time" for Dr. Kuchipudi.  *Id.* ¶ 84.  Yet they also indicate that

---

[12] The Court is using Employee A's real name because it became part of the public record at the *Franks* hearing.

Szwajnos worked for Sacred Heart, not just for Dr. Kuchipudi.

Novak also contends that the affidavit mischaracterizes the conversation between Novak and Puorro regarding Szwajnos's work for Dr. Kuchipudi.  Paragraph 86 states:

> [Puorro] explained that when he first learned that Sacred Heart paid [Szwajnos] to work for Kuchipudi as a concealed payment for patient referrals, he questioned Novak about the relationship.  According to [Puorro], Novak acknowledged that Sacred Heart could not assign a physician assistant to assist only one doctor because the benefit to the doctor would not be sufficiently concealed.  Novak, however, indicated that he wanted to continue to pay Kuchipudi.  According to [Puorro], Novak initially suggested finding other ways in which Sacred Heart could compensate Kuchipudi for his patient referrals, including appointing Kuchipudi to a paid directorship or committee chair.  Despite this suggestion, according to [Puorro], Sacred Heart has not amended the Kuchipudi—[Szwajnos] relationship, and Sacred Heart has continued to pay the majority of [Szwajnos's] salary.

Affidavit ¶ 86 (footnote omitted).

Novak argues that agent Theiler's report of the interview with Puorro during which he discussed this conversation (which was not recorded because it took place before Puorro began working as an informant) does not indicate the men were discussing concealment and that it actually portrayed Novak as objecting to the propriety of such an arrangement.  The government does not answer this specific argument in its brief, and Novak is correct.  The relevant passage of the report states that Puorro "learned about this arrangement"—the fact that Szwajnos "was exclusively seeing Kuchipudi's patients"—and then "approached Novak" and told him about it.  Novak Mem., Ex. H-2 at 8; *see also* GX 86-02 (the same report).  The report then says that according to Puorro, "Novak yelled at Puorro and told Puorro that Johanna has to see other doctors' patients because it is illegal for [Employee A] just to see Kuchipudi's

78

patients." *Id.* The report concludes by describing Novak's discussion of other ways to compensate Dr. Kuchipudi, such as with a directorship or chairmanship of a committee. *Id.* From this paragraph, it appears that Puorro brought the arrangement to Novak's attention, and Novak rejected it as illegal. Nowhere does it state that Novak disagreed with the arrangement because it "would not be sufficiently concealed."

The government's explanation for this paragraph at the hearing was unpersuasive. The government sought to rely on a series of statements by Puorro and other evidence that collectively, agent Barbour testified, led her to conclude that in referring to the need for Szwajnos to see other patients, Novak was communicating that the arrangement need to be concealed better. *See, e.g.*, Hearing Tr. 144-45, 148, 311. But as Novak's counsel correctly pointed out in argument following the *Franks* hearing, agent Barbour's submission was an affidavit, not a brief. Had the affidavit explained that the statement in question represented the affiant's conclusion based on her consideration of various items of evidence, then it might have been accurate. But that is not what the affidavit said; it represented this as *Puorro's* rendition of a particular unrecorded conversation. Put that way, the statement attributed to Novak as having "acknowledged that Sacred Heart could not assign a physician assistant to assist only one doctor *because the benefit to the doctor would not be sufficiently concealed*" was false, and at least recklessly so. The Court thus will not consider this statement in evaluating the showing of probable cause.

The same is true of footnote 20 to paragraph 86, which says that in two recorded conversations with Puorro in March 2013, Novak "reiterated the need to make sure that payments made to physicians for patient referrals were sufficiently concealed." Affidavit

¶ 86 n.20.  This, again, may be a fair conclusion that one could draw from the totality of the evidence, but that is not the way it was represented in the affidavit.  The affidavit said that this was something Novak said in two particular conversations, and that was

Finally, footnote 18 to paragraph 84 of the affidavit is concededly incorrect.  It says:  "A review of Medicare claims data shows that although she is assigned a Medicare provider number, no claims have been submitted to Medicare for [Szwajnos's] services over the last year. Nevertheless, according to [Puorro] and others, [Szwajnos] is treating Medicare-insured patients."  Affidavit ¶ 84 n.18.  The government concedes that this is incorrect; in fact, there were 137 claims submitted to Medicare under Szwajnos's provider number during the year preceding the warrant application.  Hearing Tr. at 123-24.  Based on testimony at the hearing, the information in the footnote was communicated to agent Barbour from Joel Hammerman, one of the prosecutors, who directed her to confirm it with Theiler, under whose direction the analysis of claims had been performed.  Barbour called Theiler, who verified the "no claims" assertion.  *Id.* at 129-30.  Theiler testified that he interpreted Barbour's question as involving claims for work done at Sacred Heart Hospital and replied accordingly.  Hearing Tr. at 424-26.

In the footnote, Barbour inferred from the purported absence of Medicare claims under Szwajnos's provider number that her services were being billed under another provider's number.  She also points out that the Medicare reimbursement rate for the services of a physician's assistant is lower than the rate for the same services by a physician.  Affidavit ¶ 84 n.18.  The inference suggested is that Dr. Kuchipudi was billing under his number for Szwajnos's work and was reaping unwarranted revenues as a result.  In fact, as Theiler agreed at the hearing, there is no data that shows that Dr.

Kuchipudi billed under his provider number for Szwajnos's work; rather, there is an absence of data that shows that he didn't do so.  Hearing Tr. at 455.  That is a rather significant difference.

Under the circumstances, the misstatement was reckless:  one agent communicated misinformation to another, who despite providing a statement under oath did not independently verify it but instead imprudently relied on the misstatement.  The Court will not consider this point in evaluating probable cause.

### ii.      Paragraph 81

Paragraph 81 states that in a February 28, 2012 conversation, Dr. Kuchipudi "explained that he wanted Sacred Heart's staff to admit all of his patient referrals, irrespective of the patients' apparent need."  Affidavit ¶ 81.  Dr. Kuchipudi argues that he actually explained the opposite:  that he said "he would **_not admit_** patients unless they medically required admission."  Kuchipudi Mot. to Join Novak's Mot. at 4.  The government responds that the transcript of the recording shows that Dr. Kuchipudi "explained that when he referred patients to the hospital, he wanted them seen," pointing to Dr. Kuchipudi's reference to several tests that could be performed on patients and how much they cost.  Gov't Resp. at 72.  As the transcript of the conversation reflects, however, there is a difference between wanting patients "seen" or evaluated and the affidavit's allegation that Dr. Kuchipudi wanted the patients *admitted*. The transcript quotes Dr. Kuchipudi as saying that when patients arrived at Sacred Heart, the hospital could evaluate them for as many as twenty-three hours, during which time "we're gonna evaluate[;] if they don't belong here we'll lose money."  GX FTR 1 at 49.  He continued:  "Hospital lose money, I don't get paid.  You know insurance not

gonna approve, I'm not gonna take the chance.  Next day they'll be out if they don't belong."  *Id.*  Dr. Kuchipudi goes on to say:  "They'll evaluate.  If not sure, not going to keep them.  . . .  I'm not gonna get in trouble from anybody.  No way.  After all the years in practice I'm not, ah, here to get in trouble now."  *Id.* at 49.  And further:  "Any patient they can do 23 hours. . . .  [P]ut them in 23 hours.  You can't say admit.  Place in 23 hours . . .  Either way, go home or . . . continue, depending on the [unintelligible]."  *Id.*

This material, which was exculpatory, was omitted from the affidavit even though it was in the same recorded conversation referenced in paragraph 81.  It therefore appears that the affidavit's description—that Dr. Kuchipudi wanted Sacred Heart to "admit all of his patient referrals, irrespective of the patients' apparent need"—was false, and either recklessly or deliberately so in light of this transcript.  The Court therefore will not consider paragraph 81 in evaluating the showing of probable cause.

### iii.    Paragraph 95

The next section of the affidavit concerns Dr. Kuchipudi's dealings with Physician B, another Sacred Heart doctor.  It states that during two conversations Puorro recorded on February 14 and 22, 2013, "both Kuchipudi and Physician B told [Puorro] that Novak and [Puorro's] predecessor had agreed to compensate Physician B for treating Kuchipudi's patients in the hospital when Kuchipudi was unavailable."  Affidavit ¶ 95. Novak argues that in these conversations, "neither Kuchipudi nor Physician B said anything about an agreement to compensate Physician B on either recording."  Novak Mem. at 36.  Of the February 14 conversation, Novak contends that the participants "said nothing about compensation having been part of the arrangement" in which Physician B saw Dr. Kuchipudi's patients.  *Id.*  In response, the government argues that

Physician B and Dr. Kuchipudi believed the hospital would pay Physician B for seeing Dr. Kuchipudi's patients.

Turning to the February 14 transcript,[13] the affidavit's reading of the conversation is fair. Puorro brought up "that Dr. [Redacted] thing," which the parties appear to agree is a reference to Physician B. Novak Mem., Ex. CC at 5:15–16. Dr. Kuchipudi said that he had called Puorro before talking to Physician B, and Puorro asked, "So what is he saying? How much do we owe him?" *Id.* at 5:20–21. Dr. Kuchipudi responded, "No. You have everything in there. You told me one time. 16,000 or something." *Id.* at 5:22–23. Dr. Kuchipudi then told Puorro that Physician B had received $1600 to that point but wanted more, and Puorro then asked, "So he's seeing your patients?" *Id.* at 6:19. Dr. Kuchipudi said yes. After some other talk, Puorro asked, "So how long's he been doing this, like going back when—" and "So Clarence [Nagelvoort] put this whole thing together?" *Id.* at 7:10–11, 18–19. Dr. Kuchipudi confirmed that Nagelvoort had.

These statements—regarding payment owed to Physician B and Nagelvoort's role in "put[ting] this whole thing together"—support the affidavit's depiction of the conversation. The transcript of the February 22 conversation likewise supports this depiction. There, Physician B spoke with Puorro: "The reason why I came is at the urge of Dr. Kuchipudi, but otherwise I would not come, you know. I'm just too proud to come, keep on asking for—for the money *which I thought that you agreed.*" Novak Mem., Ex. DD at 2:3–7 (emphasis added). Puorro later asked if the money "specifically is for you seeing Kuchipudi's patients?" *Id.* at 3:21–22. Physician B confirmed that it

---

[13] Novak repeatedly cites this conversation as located at Novak Ex. II, which is a transcript of a discussion between Novak and an unnamed doctor on February 18, 2013. It appears that Novak intended to cite Novak Ex. CC, which is a transcript of a February 14, 2013 conversation including the quotations Novak attributes to Exhibit II.

was. And later: "I was just supposed to cover for him and every time he's—he's not here or take vacation or has holidays or whatever, who knows." *Id.* at 4:13–16. When Puorro asked, "Who told you? That was Clarence?" Physician B confirmed that it was. *Id.* at 4:20–22. Considering this evidence, the Court finds that the affidavit's description of these conversations was not deliberately or recklessly false.

### iv.     Paragraph 97

In paragraph 97, the affidavit describes a February 28, 2013 conversation between Novak and Puorro about payment to Physician B. It says Puorro told Novak Physician B wanted payment because he was seeing Dr. Kuchipudi's patients on weekends, and Novak told Puorro to pay Physician B and "make sure it is legal. You can't pay him for doing nothing." Affidavit ¶ 97. The affidavit says Puorro asked how to do so, and "Novak, in turn, responded: 'I don't know . . . . What are you paying him for?" *Id.* Novak argues that omissions from this description make it misleading. He says the whole conversation shows Novak did not have knowledge of the arrangement to pay Physician B and omits that he rejected the idea to pay Physician B based on a calculation of Dr. Kuchipudi's referrals. Yet the affidavit's description does not portray Novak as having prior knowledge of the arrangement. It directly quotes Novak asking Puorro, "What are you paying [Physician B] for?" *Id.* And this paragraph of the affidavit does not mention any "calculation" of Physician B's payment based on Dr. Kuchipudi's referrals. Novak has not shown that this paragraph contains any false statements or material omissions.

### v.     Paragraph 98

Paragraph 98 states that Dr. Kuchipudi spoke to Novak on March 1, 2013 and

"reiterated once again" that he sought payment for Physician B for seeing Dr. Kuchipudi's patients. Affidavit ¶ 98. Novak argues this paragraph leaves out evidence that "plainly contradict its suggestion that there had been *any* agreement to pay Physician B before" this March 1 conversation. Novak Mem. at 38. In its response, the government does not answer this argument. But as the Court has discussed in reference to paragraph 95, conversations from February 2013 can plausibly be read to describe an agreement to pay Physician B.

Novak also says this paragraph omits a description of Dr. Kuchipudi's efforts to get Novak to pay Physician B because he was "a nice guy." Novak Mem. at 38. Yet Novak has not explained why such an omission is material, and the Court has hard-pressed to see how it possibly could be so.

### vi. Paragraph 99

Novak argues that paragraph 99 "omits critical parts of another recording" that it does not describe. Novak Mem. at 38. The paragraph notes that Illinois and the Centers for Medicare & Medicaid Services began surveying Sacred Heart on March 4, 2013. It continues that on March 11, 2013, Novak asked Puorro about Physician B's contract. Novak told Puorro that the contract could not say only that Physician B was seeing Dr. Kuchipudi's patients, and he further stated that "You can't just pay a doctor for seeing someone else's patients." Affidavit ¶ 99 (alterations omitted). Novak contends now that the paragraph should have referenced other conversations where "Novak told Puorro on tape that, if Physician B was to be paid by the hospital, he had to see other doctor's [sic] patients as well." Novak Mem. at 38. Yet this is nearly exactly what the paragraph states—that Novak told Puorro, "You can't just pay a doctor for

seeing someone else's patients." Affidavit ¶ 99. Another conversation, Novak says, showed that Novak "did not know how Physician B came to be seeing Kuchipudi's patients, or even that he had been doing so." *Id.* Yet paragraph 99 does not state or rely on the fact that Novak earlier knew that Physician B was seeing Dr. Kuchipudi's patients or the reason he did so. As the direct quotations in the paragraph make clear, regardless of the motivation for paying Physician B, Novak came to be aware of the need to pay Physician B. The subtext Novak reads into the paragraph does not make it a material falsehood or the omission of the other conversation a material omission.

### vii.    Paragraph 100

This paragraph describes a recorded phone call between Puorro and Payawal on March 21, 2013. It states that Payawal "confirmed that Kuchipudi, and not Sacred Heart, billed for the physician services provided by Physician B for Kuchipudi's patients," and thus that Dr. Kuchipudi benefited from this arrangement, not the hospital. Affidavit ¶ 100. Novak argues that this paragraph should have referenced the "safe harbor" provision of the anti-kickback statute. For reasons previously described, the failure to mention the safe harbor provision did not constitute a material omission.

### h.    Emergency admissions

### i.    Observation services versus admissions

Paragraphs 104 through 120 of the affidavit allege "a scheme to defraud Medicare and Medicaid" among Sacred Heart employees "by submitting and/or causing the submission of claims and/or the presentment of hospital cost reimbursement reports seeking payment for emergency care evaluation, testing and observation services that are not medically necessary." Affidavit ¶ 104. The services rendered were not

medically necessary, according to the affidavit, because "the patients receiving those services are not suffering from any symptoms or conditions that justify provision of emergent care services." *Id.* The affidavit continues by citing Puorro's description of "the pressure to obtain and retain patients," resulting in "unnecessary medical testing and procedures in an attempt to justify the patients' admissions and to increase billing." *Id.* ¶ 105.

The affidavit further alleges that the hospital had established a system "to admit nursing home patients to the hospital, irrespective of any medical necessity of those admissions." *Id.* ¶ 106. According to the affidavit, Puorro and Dr. Asgar ("Physician A") reported that the hospital told its referring physicians to transfer patients to Sacred Heart by ambulance and to characterize them "as requiring 'direct admission,'" which means ambulance drivers would bring the patient to Sacred Heart rather than to a hospital emergency room nearer to the patient's residence. *Id.* ¶ 106. These patients were "direct admits 'on paper only,'" according to Puorro and Asgar, because they were observed and evaluated in the emergency room "prior to admission." *Id.* ¶ 107.

Novak argues that the section of the affidavit describing this scheme "is so lacking in necessary context, legal and otherwise, as to be materially misleading in virtually all respects." Novak Mem. at 40. He contends the section fails to mention that "admissions" are distinct from "observation services"; "if a patient is admitted to the hospital as an inpatient after receiving observation services in the" emergency room, Novak argues, "the hospital will receive *no* additional money for what was done in the ER." *Id.* at 41. Novak says this is because reimbursement for observation services is "bundled into the claim for the subsequent inpatient stay, the cost of which is

predetermined under Medicare's DRG prospective payment system." *Id.* Thus Novak argues that Sacred Heart would not receive "additional hospital reimbursement" if it admitted a patient to the hospital after giving them emergency room observation services. *Id.*

Novak's argument, in the Court's view, essentially misses the point. The thrust of this section of the affidavit is that Sacred Heart had established a system to provide unnecessary testing, treatment, and care to patients who did not need it, in order to increase the hospital's billings. In other words, the point appears to be that the patients did not need to be at the hospital *at all*, not simply that they did not need to be in the emergency room. It may be the case that the hospital would not make more money on an ultimately-admitted patient by initially treating the patient or providing "observation services" in the emergency room, but the essence of the scheme, as described in this section of the affidavit, was to bring the patients to the emergency room even if they did not need hospitalization and then concoct reasons to admit the patients to the hospital. As indicated, the affidavit describes a scheme "to obtain and retain patients at Sacred Heart" and "admit nursing home patients to the hospital, irrespective of any medical necessity of those admissions." Affidavit ¶¶ 105–06. Later, the affidavit says that the process allowed the hospital "to screen paid-for patient referrals for conditions that could be used to justify the patients' admission," but that it also "*further benefitted Sacred Heart because it allowed the hospital to bill for the patients' emergency room evaluation.*" *Id.* ¶ 112 (emphasis added). In other words, the focus of the scheme was to get patients admitted to the hospital, not reimbursement for the services provided in the ER as Novak suggests. Novak Mem. at 41.

Moreover, this section of the affidavit concludes by stating that Medicare paid Sacred Heart $18,503,578 for 1,864 Medicare Part A claims "for patients who received emergency room and observation services, and then were admitted for in-patient services at the hospital." *Id.* ¶ 120. Novak does not contest these figures. Assuming Novak is correct that the hospital could not receive extra reimbursement for ER services provided to patients who were subsequently admitted, the affidavit still alleges that Sacred Heart received a substantial amount from Medicare for both ER services and "in-patient services at the hospital" for those patients. *Id.* Considering these facts, the affidavit's failure to describe the differences between admissions and ER observation services did not constitute a material omission.

## ii.    Failure to mention EMTALA statute

Novak also argues that the affidavit should have mentioned the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. That statute requires hospitals to "provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department" to patients entering the ER "to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). Novak contends that the affidavit's failure to mention EMTALA was material because it shows that provision of ER services depends "on what the hospital's [ER] doctors—and not the doctor who might have sent the patient to the [ER]—decide when they perform the required medical screening." Novak Mem. at 43. This is the extent of Novak's argument; he fails to explain why this omission was material. Further, as discussed earlier, this section of the affidavit is not premised solely, and perhaps not

even primarily, on the hospital's alleged fraudulent billing for ER services. Rather, it is largely concerned with the Medicare reimbursement Sacred Heart received from services provided to ER-admitted patients after admission.

Novak also contends the affidavit should have mentioned EMTALA to "put in context the affidavit's reliance on Physician A . . . as someone knowledgeable about whether a patient required emergency services." *Id.* This is a reference to his earlier argument that the affidavit made a material omission in not disclosing an incident in which Physician A, one of the government's informants, "turned away a patient who subsequently died at another hospital." *Id.* The Court has already concluded that failure to mention this incident was not material, and Novak does not describe how a description of this section of EMTALA would have "put in context" Physician A's conduct.

### iii. Room 200A direct admissions

Novak also takes issue with the affidavit's description of a code the hospital allegedly provided to ambulance drivers in telling them to admit patients directly to "Room 200A" at Sacred Heart. *See, e.g.*, Affidavit ¶ 108. Novak argues there is no regulation prohibiting such a practice, which results in a patient going to a hospital where she can see her own doctor. In Novak's view, the affidavit thus makes a "false assertion" that the "direct admit" procedure contributed to fraudulent billing at Sacred Heart. Novak Mem. at 43–44. Novak has not made the necessary showing that this assertion was false, let alone deliberately or recklessly so. The affidavit describes the "Room 200A" / direct admit procedure as a way to get patients into Sacred Heart who otherwise "would be re-routed to different hospitals on their way to the [sic] Sacred

Heart." Affidavit ¶ 110. An order for direct admission to Room 200A, according to the affidavit, was of "processing patients through the hospital's ER," and a way to get patients into the hospital who did not actually require hospital treatment—the primary subject of this section of the affidavit. *Id.* ¶ 109. The affidavit's failure to mention that the hospital's alleged practice of encouraging direct admissions to its Room 200A itself was not itself prohibited by law was thus not a material omission.[14]

### iv.    Paragraph 113

Novak contends that paragraph 113 mischaracterized a recorded conversation that it described, which took place on February 18, 2013. The affidavit says that in this conversation, Novak encouraged a physician he was recruiting "to show his ability to refer patients to the hospital by sending them to the hospital's ER." Affidavit ¶ 113. Novak says this description is false, because he was simply telling the doctor what would happen if a patient entered the hospital through the ER at nighttime (i.e. when the doctor was unavailable), not encouraging admissions through the ER. Novak Mem. at 44 (citing Novak Mem., Ex. II at 2–3). The government did not answer this argument in its response to Novak's motion, and Novak's reading of the transcript of the conversation appears to be correct.

At the hearing, the government attempted to justify this paragraph's characterization of the conversation by relying on other evidence, namely a different recorded conversation and statements by Puorro and Velgara to investigating agents. But the section of paragraph 113 in question characterizes a particular conversation—

---

[14] The parties also debate whether a Medicare regulation requires ambulance patients to be brought to the nearest hospital and whether that regulation applied to Sacred Heart. Because the affidavit's references to the hospital's direct admissions to Room 200A did not contain material omissions, the Court does not address this argument.

the February 18, 2013 recorded conversation—not a general practice.  And it is presented not as an interpretation drawn from a series of events or statements by others, but rather as a particular statement made by Novak.  This was misleading. The Court will therefore not consider paragraph 113 in evaluating the affidavit's showing of probable cause.

### j.     Intubations and tracheotomies

Paragraphs 121 through 142 of the affidavit, the last section Novak challenges, allege a scheme at Sacred Heart to encourage medically unnecessary intubation and tracheotomy procedures on patients.  The Court will address each of Novak's arguments in turn.

### i.     Lack of fraud evidence

Novak argues first that this section of the affidavit "does not really address fraud" but instead addresses only "malpractice or potential regulatory violations."  *Id.* at 45.  To begin with, the first paragraph of the section asserts that the intubation / tracheotomy scheme violated 18 U.S.C. § 1347.  That statute makes it a crime "to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services."  *Id.* § 1347(a)(2).

This section of the affidavit contains several allegations that meet this description, such as a reference to a recorded conversation in which an "ICU case manager" stated "that she often must 'stretch' the length of hospital stay for a tracheotomy patient to 28 days to maximize Medicare reimbursements 'to make Novak

happy.'" Affidavit ¶ 124. Further, the section states that a doctor called Physician D, who bills Medicare and Medicaid for his services, "performs a high number of unnecessary intubations, and purposefully and unnecessarily prolongs them by directing the heavy sedation of his patients." *Id.* ¶ 123. The section also states that Physician D "intentionally extends tracheotomy patients' stay in the hospital, thereby earning more money in insurance reimbursements for the hospital." *Id.* ¶ 128. Novak does not specifically address these passages. Nor does he indicate how the section's general purported failure to address fraud constitutes a deliberate or reckless material falsehood. His argument lacks merit.

### ii.     Omission of account of March 8, 2013 meeting

Novak next argues that the section on intubations and tracheotomies should have mentioned a meeting he attended at Sacred Heart on March 8, 2013. During the meeting, Novak contends, he asked whether unnecessary tracheotomies were being performed, which "made it clear he was not aware of any issues related to tracheotomies other than those related to documentation." Novak Mem. at 45. He also points to his comments from the meeting in which he sought to encourage hospital staff to document their procedures and performing them correctly. This omission was material, Novak says, because "the affidavit sought to portray Novak as pushing tracheotomies for profit." *Id.* at 46.

The Court acknowledges that portions of this section of the affidavit could be read that way, and that a fair reading of his comments from the March 8 meeting suggests that he did not, prior to that date, learn about unnecessary intubations and tracheotomies at Sacred Heart. However, it is clear from the section that the focus of

the affidavit is the allegedly unnecessary tracheotomies and intubations themselves, not Novak's involvement.  To this end, the affidavit gives more extensive treatment to the actual performance of the intubations and tracheotomies by Physician D.  *See* Affidavit ¶¶ 122–23, 127–30, 132–34, 139–40.

Even if the March 8 comments by Novak had been included, this would not have undercut the affidavit's claims regarding a pattern of unnecessary procedures, largely performed by Physician D.  In his brief, Novak quotes his question to staff at the March 8 meeting:  "[D]id we have any problems up there with . . . [u]njustified surgeries, unjustified . . . intubation?"  Novak Mem., Ex. JJ at 26:13–20.  The response from an unidentified doctor, which Novak does not include in his brief, was:  "You have some unjustified surgeries."  *Id.* at 26:21–22.  Although other doctors at the meeting deny that such procedures occurred, one stated that "there was [an] anonymous complaint that Sacred Heart [was] keeping the tubes too long and we are doing unnecessary intubation and trach."  *Id.* at 27:11–13 (adding that "there's no such thing like that").  In short, the meeting Novak now says should have been described in the affidavit does not present a one-sided portrayal of the question of whether such unnecessary procedures had been performed at Sacred Heart.  The unnecessary, fraudulent performance of these procedures—and not Novak's knowledge of them—constituted the primary allegation of this section of the affidavit.  The inclusion of a description of this meeting therefore would not have altered this section of the affidavit such that it would not have contributed to a finding of probable cause to search the hospital for evidence of this alleged wrongdoing.

### iii.    Paragraphs 130–31

Paragraphs 130 and 131 describe two telephone calls in which Puorro was involved, both on February 28, 2013.  In the first, the affidavit says Sacred Heart's director of nursing told Puorro that Physician D had performed an intubation on a patient of Dr. Kuchipudi's and kept the patient "under heavy sedation" since the intubation eight days prior, and had scheduled a tracheotomy on the patient for the next day.  Affidavit ¶ 130.  The second paragraph says that Puorro placed a phone call that same day "[a]t the direction of law enforcement" telling the hospital's chairperson of Performance Improvement and Utilization Review "to scrutinize" the patient's case "and determine whether the scheduled tracheotomy was medically necessary."  *Id.* ¶ 131.  Novak contends the affidavit's description of this second paragraph is false, because the chairperson Puorro called told him she was already aware of and working on the situation.  She also told Puorro, Novak argues, that the problem was not one of medical necessity for the tracheotomy but rather "why [the patient] had been scheduled for one despite the fact that neither of his doctors wanted it."  Novak Mem. at 48.

The Court notes that the distinction Novak presents between the affidavit's version of the conversation and his own is a narrow one, and perhaps not a distinction at all.  Medical necessity and a doctor not wanting a patient to receive a certain procedure are not mutually exclusive concepts.  At no point do any of the participants in the conversation state that the issue over the scheduled tracheotomy was *not* one of medical necessity.  In fact, the reference in the conversation to an unnamed doctor who "apparently doesn't want the tracheostomy [sic]" could be read as evidence that doctor did not think it was medically necessary.  Novak Mem., Ex. LL at 9:12–13.  Furthermore,

the redacted portion of the transcript of the conversation that Novak has submitted does not contain the entire conversation; there are five blank pages before any content is reflected, and the content that is included appears to begin in the middle of the conversation. *See id.* at 7:6. It is therefore hard to agree with Novak that the affidavit falsely stated that Puorro asked Physician F at some point during the call to review the patient's case.

### iv. Paragraph 142

Novak also takes issue with a specific paragraph in the tracheotomy section of the affidavit describing a recorded conversation Puorro had with Physician D. The paragraph says Physician D told Puorro that Novak asked Physician D "to provide two more tracheotomy cases for the hospital soon, before the CMS surveyors might return to the hospital." Affidavit ¶ 142. Novak argues that the affidavit should have included Physician D's statement from the conversation that Novak wanted the tracheotomy to demonstrate "how we're doing" to auditors. Novak Mem. at 47 (quoting Novak Mem., Ex. MM at 3:3–5). Novak contends that this statement showed his "motive" was to show "that the hospital would be able to perform other tracheotomy procedures successfully and in accordance with medical guidelines before auditors returned." Novak Reply at 59–60 n.20. But even if true, this does not mean the procedures he requested were medically necessary, which is reinforced by the rest of the conversation. As the government argues, Physician D proceeded to state that Novak had asked for one tracheotomy previously, and "[n]ow he increase[d] the number to two," a request that made the physician "very uncomfortable." Novak Mem., Ex. MM at 3:3–10, 13–15. Physician D continued, "That tells you [about] the leadership of the institution, himself—

96

shouldn't be directing us [to] do procedures like that," adding that it would get the hospital into trouble and "I couldn't—couldn't believe my ears." *Id.* at 3:24–4:3, 4:8–9, 4:12–13. Considering these statements, the Court agrees with the government that omission of Physician D's statement about Novak's intentions in asking for the surgeries was not material.[15]

### v.    Omissions regarding Dr. Kuchipudi

Dr. Kuchipudi contends that the affidavit should have mentioned that he "*himself* stopped what he believed to be an unnecessary tracheotomy." Kuchipudi Mot. to Join Novak's Mot. at 6. He says this fact "directly undercut[s] the Government's allegations." *Id.* The affidavit, however, already states that Physician D and Dr. Kuchipudi had "decided to postpone" a certain tracheotomy. Affidavit ¶ 132. It also alleges that Physician D had intubated and kept under heavy sedation one of Dr. Kuchipudi's patients, and that an unnamed Sacred Heart employee "works with Kuchipudi and the nursing homes to facilitate the admission of respiratory patients to Sacred Heart." *Id.* ¶¶ 130, 125. It does not, however, state that Dr. Kuchipudi had any role in scheduling or performing unnecessary tracheotomies. It was therefore not a material omission for the affidavit not to mention his efforts to stop an unnecessary tracheotomy.

### 4.    Reevaluation of probable cause

The affidavit submitted in support of the search warrant application in this case

---

[15] Novak further argues that the affidavit should have disclosed that Puorro told the government that he had not spoken to Novak about tracheotomies, and that neither Puorro nor Payawal mentioned "manipulating the medical process in order to have a tracheotomy performed" at Sacred Heart. Novak Mem. at 47 (quoting Novak Ex. KK at 2). He does not state, however, which parts of the affidavit these additions would contradict. Paragraph 142 concerns Physician D's interactions with Novak over tracheotomies, not Puorro's or Payawal's.

was quite voluminous. It contained numerous allegations about the actions of multiple individuals involved in multiple schemes, all within the same hospital. Novak has shown that some of these allegations contained false statements that were either made deliberately or with reckless disregard for the truth or material omissions that were either deliberate or recklessly made. These allegations were contained within all or parts of paragraphs 27, 30, 32, 38, 39, 43, 53, 81, 84 footnote 18, 86 and footnote 10, and 113 of the affidavit. The Court has proceeded to review the affidavit anew, absent the portions the Court has determined to set aside.

Even without the omitted material, the affidavit contains detailed factual allegations tending to show the existence of a scheme to pay kickbacks to physicians in return for referring patients to the hospital. *See* Affidavit ¶¶ 24-35. These general allegations are corroborated by detailed factual submissions, including recorded conversations, regarding repeated kickback payments to two physicians, Drs. Moshiri and Maitra. *See id.* ¶¶ 47-61 (Moshiri), 62-76 (Maitra). Specifically, the affidavit contains support for allegations that these physicians had contracts with the hospital purportedly to teach but in fact did no teaching; that there were directions from Novak to make their files appear that they had actually done teaching; and that the purpose of the purported teaching stipends was to pay the physicians for referring patients to the hospital. These contentions are corroborated by contemporaneously recorded conversations.

With regard to Dr. Kuchipudi, the allegations regarding the Johanna Szwajnos ("Employee A") arrangement are more equivocal absent the material the Court has determined to set aside, but they are still sufficient to lend support to a finding of

probable cause. The portions of the affidavit that remain tend to show that a hospital employee ("Employee C") reported that Puorro's predecessor and Dr. Kuchipudi agreed to assign Szwajnos to Dr. Kuchipudi and that the purpose and effect of this arrangement was to enable Dr. Kuchipudi to bill for Szwajnos's services and make referrals to the hospital in return. *See id.* ¶¶ 77-91. In addition, the portions of the affidavit that remain standing include material supporting the proposition that Dr. Kuchipudi asked the hospital to pay another physician ("Physician B") in return for referrals and that Novak okayed this while directing Puorro to make sure the arrangement *appeared* legal (the conversation can be interpreted more than one way, but this interpretation was reasonable and supported). *See id.* ¶¶ 92-103.

In addition, the portions of the affidavit that remain include the previously-described scheme to cause inappropriate admissions via the emergency room and thereby bill for services that were not medically necessary. *Id.* ¶¶ 104-20. Finally, the affidavit included detailed allegations regarding a scheme to conduct medically unnecessary procedures (including tracheotomies and intubations) as a way of generating revenue for the hospital. *Id.* ¶¶ 121-142.

It is fair to say that without the omitted provisions, the showing of probable cause is more dependent on the veracity of Puorro than with those provisions included. But it is not *entirely* dependent on Puorro's veracity. And as discussed above, Puorro's account of what was going on at the hospital is corroborated by significant independent evidence discussed in the affidavit. The Seventh Circuit recently reiterated that courts must take a "highly fact-specific," "totality-of-the-circumstances" approach in evaluating "cases where the affidavit is based on an informant's report." *Glover*, 755 F.3d at 816

(citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  In undertaking this analysis, a court should consider "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Id.*  The Seventh Circuit has also stated in this context that "no one factor necessarily dooms a search warrant."  *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011).  This is because "a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability."  *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003) (internal quotation marks omitted).

These factors support upholding the warrant even though the application is premised relies more significantly on Puorro's veracity than it would be if it included the material the Court has excised.  The events were relatively contemporaneous; there was a significant amount of firsthand observation, and there was a good deal of corroboration, as the Court has discussed.  And although Puorro did not appear before the magistrate judge, Novak has not successfully shown that the affidavit failed to adequately disclose information to permit the magistrate judge to weigh his credibility as well as that of the other informants whose statements were reported in the affidavit.

Although Novak has shown that specific provisions of the affidavit contain material falsehoods or omissions, the remainder of the affidavit still puts forth enough information to support a finding of probable cause sufficient to support the issuance of the warrant to search the hospital and its records.  Put another way, Novak has not shown that any "false statement[s] knowingly and intentionally, or with reckless disregard for the truth" within the affidavit were "necessary to the finding of probable

cause." *Franks*, 438 U.S. at 155–56.

## Conclusion

For the reasons stated above, the Court therefore denies the motion to suppress [docket no. 223].[16]

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 6, 2015

_____

[16] Given this conclusion, the Court need not discuss the government's contention that it would have inevitably obtained all of the information seized in the search through independent lawful means.